Jon M. Sands
Federal Public Defender
District of Arizona
Cary Sandman (AZ No. 004779)
Mridula S. Raman (NY No. 5103528)
Assistant Federal Public Defenders
407 W. Congress St., Suite 501
Tucson, Arizona 85701-1310
cary_sandman@fd.org
mridula_raman@fd.org
Tel: 520.879.7622
Facsimile: 520.622.6844

Counsel for Petitioner Juan Raul Navarro Ramirez

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| Juan Raul Navarro Ramirez, | Misc. Action No. 7:15-MC-1759 |
| Petitioner, | |
| vs. | |
| William Stephens, et al., | Capital Case |
| Respondents. | |

PETITION FOR WRIT OF HABEAS CORPUS

28 U.S.C. § 2254

## TABLE OF CONTENTS

I.   Introduction ......................................................................................... 1

    Jurisdictional Statement ........................................................................1

    Preliminary Statement ...........................................................................1

    Presumption of Correctness...................................................................2

    Amendment ...........................................................................................3

II.  Exhaustion and Procedural Default........................................................ 4

    Discovery, Expansion of the Record, and Evidentiary Hearing ...........5

III. AEDPA is Unconstitutional ................................................................... 6

    The Anti-terrorism and Effective Death Penalty Act of 1996 does not restrict this
    Court's power to review the merits of Ramirez's claim de novo...........6

      A.  The AEDPA is unconstitutional...................................................6

      B.  The claims raised in Ramirez's state habeas proceedings were not
      adjudicated on the merits. .................................................................10

      C.  Alternatively, Ramirez can satisfy § 2254(d) for each of the claims that
      were adjudicated on the merits in state court....................................15

IV. Ground for Relief/Federal Constitutional Claims ................................ 16

    CLAIM ONE ........................................................................................17

i

Ramirez received ineffective assistance of counsel during his capital sentencing proceedings, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ................................................................. 17

   A.  Standards Governing Ineffective Assistance of Counsel Claims .............. 17

   B.  Trial counsel performed deficiently in numerous respects during Ramirez's capital sentencing proceedings. ......................................................................... 18

   C.  Ramirez was prejudiced by his counsel's failures, and the mitigation evidence that existed but was not presented is sufficiently substantial to undermine the reliability of the death sentence in this case. ............................ 36

CLAIM TWO ......................................................................................... 66

As he was 18 at the time of the crime, Ramirez's execution would violate the Eighth Amendment prohibition on cruel and unusual punishment. ..................... 66

   A.  Evolving standards of decency no longer allow for the imposition of death sentences on people 18 years of age. ............................................... 70

   B.  Because of his impairments, the concerns raised in *Roper* apply to Ramirez and executing him would constitute cruel and unusual punishment in violation of the Eighth Amendment. ............................................................... 82

CLAIM THREE .................................................................................. 88

Ramirez's Sixth Amendment right to counsel was violated because trial counsel rendered ineffective assistance at the guilt phase. ................................................ 88

   A.  Ramirez's counsel's ineffective assistance in jury selection deprived Ramirez of his rights to counsel, a fair trial, impartial jury, reliable sentencing proceedings, due process, and equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ....................... 91

B.  Ramirez was denied effective assistance of counsel at his guilt-phase proceedings because counsel failed to investigate, develop, and present critical evidence, among other significant errors. .........................................................99

C.  Ramirez was denied effective assistance of counsel due to his trial counsel's conflicts. ...........................................................................................134

D.    The cumulative effect of counsel's deficiencies prejudiced the defense at both the guilt-innocence and the penalty phases...........................................137

CLAIM FOUR...................................................................................................139

The trial court's numerous errors during the guilt phase of trial violated Ramirez's constitutional rights.........................................................................139

A.    The trial court erred by not appointing qualified, un-conflicted counsel, violating Ramirez's rights under the Sixth and Fourteenth Amendments......140

B.  The trial court's admission of excessively gruesome photographs during Ramirez's trial resulted in the denial of a fair trial and due process. .............142

C.    The trial court unconstitutionally required that Ramirez be physically restrained at the guilt and penalty phase violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments. ......................................................143

D.  The trial court's failures to ensure that all of Ramirez's trial proceedings were recorded violated his Sixth, Eighth, and Fourteenth Amendment rights to a public trial and meaningful appeal. ............................................................145

E.  The trial court erred by denying Ramirez's requests for new counsel, violating Ramirez's constitutional rights. ......................................................146

F.  The trial court erred by failing to continue the suppression hearing. .......146

G.  The trial court erred in admitting statements Ramirez made during police interrogation. .................................................................................................149

H.  The trial court erred in allowing Champion to testify about Ramirez's statement admitting that he had marijuana. ....................................................152

I.  The trial court erred when it overruled Ramirez's motion for a mistrial..153

J.  The trial court erred in allowing Alvarez to testify as a gang expert........154

K.  The trial court erred in ordering Ramirez to show the jury his arms for the State to obtain testimony about the content of Ramirez's tattoos in the guilt phase...............................................................................................................156

L.  Ramirez's Sixth, Eighth, and Fourteenth Amendment right to have all potentially mitigating evidence considered at trial was violated when the trial court prevented Ramirez from presenting relevant mitigating evidence........158

M.   The exclusion of venire members for cause violated Ramirez's right to an impartial jury and due process under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ...........................................................160

N  The trial court erred by giving an insufficient voluntariness instruction that was contrary to Texas law and in violation of Ramirez's Fourteenth Amendment due process rights. ....................................................................163

O.   Ramirez's constitutional rights were violated when the trial court failed to use special verdict forms............................................................................166

P.  The cumulative effect of these trial-court errors prejudiced Ramirez. .....169

CLAIM FIVE ....................................................................................170

Ramirez's convictions and sentence should be vacated because the trial judge was biased, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ....................................................................170

CLAIM SIX....................................................................................172

Ramirez was denied the right to confront a witness against him and therefore his convictions and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. .................................................................172

CLAIM SEVEN ...........................................................174

Ramirez's due process rights were denied, rendering his sentence unreliable, under the Eighth and Fourteenth Amendments to the U.S. Constitution. ..........174

CLAIM EIGHT ...........................................................176

Ramirez's execution would be unconstitutional because he is actually innocent. ...............................................................................................................176

   A.  Legal Standard. ......................................................177

   B.  Discussion. ...........................................................178

CLAIM NINE ..............................................................181

The State committed misconduct throughout Ramirez's proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ...............................................................................................................181

   A.  The State committed misconduct when it denied the existence of the arrest video until the start of trial. ..........................................................183

   B.  The State committed misconduct when it engaged in or allowed police to engage in spoliation of evidence. ................................................185

   C.  The State committed misconduct when it sponsored false testimony at the suppression hearing. ......................................................186

   D.  The State committed misconduct regarding Marcial Bocanegra. .............190

E.  The State committed misconduct when failed to disclose conditions in the TYC and made false arguments regarding those conditions. .........................197

F.  The State committed misconduct by urging an unconstitutional limitation on mitigating evidence. ...................................................................................201

G.    The State committed misconduct when the prosecutors made inflammatory and improper comments during arguments.............................203

H.  The State committed various other forms of misconduct. .......................205

I.  Cumulative prejudice. ...............................................................................207

CLAIM TEN...................................................................................................207

Juror misconduct at Ramirez's guilt- and sentencing-phase proceedings deprived Ramirez of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial..................................................207

CLAIM ELEVEN............................................................................................211

The jury instructions given during Ramirez's trial violated his rights to a reliable sentence and to due process as enshrined by the Eighth and Fourteenth Amendments to the U.S. Constitution..............................................................211

A.  The Texas mitigation special issue given in Ramirez's case failed to adequately define "mitigating evidence," and the instruction created a reasonable possibility that the jury would construe mitigating evidence narrowly, requiring a cause nexus to the crime. ...........................................211

B.  The mitigation special issue instruction given in Ramirez's case was unconstitutionally vague and a violation of Ramirez's Eighth and Fourteenth Amendment rights..........................................................................................214

CLAIM TWELVE............................................................................................217

Ramirez was sentenced based in part on an invalid murder conviction in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ........................................................................................217

CLAIM THIRTEEN..........................................................................................220

The evidence presented at trial was factually and legally insufficient to convict Ramirez and to sentence him to death, violating Ramirez's Eighth and Fourteenth Amendment rights. ...........................................................................220

CLAIM FOURTEEN .......................................................................................223

Ramirez was denied the effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution. .....................223

CLAIM FIFTEEN .............................................................................................228

The Court of Criminal Appeals of Texas prohibited Ramirez from raising sufficiency of the evidence claims on direct appeal regarding the mitigation special issue in violation of Ramirez's Eighth and Fourteenth Amendment rights. ........................................................................................................................228

CLAIM SIXTEEN.............................................................................................230

Ramirez's post-conviction counsel were ineffective and deprived Ramirez of his constitutional rights to due process and effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution. ..230

   A.  Post-conviction counsel failed to adequately raise claims........................232

   B.  Post-conviction counsel failed to adequately develop mitigation evidence with both lay and expert witnesses. ...............................................................232

   C.  Post-conviction counsel elicited false testimony from trial counsel.........233

CLAIM SEVENTEEN ......................................................................................236

The state court erred in denying Ramirez's motion to test DNA evidence, violating Ramirez's rights under the Fourteenth Amendment's Due Process clause. ....................................................................................236

CLAIM EIGHTEEN..........................................................................240

Ramirez's death sentence is unconstitutional....................................240

   A.  Ramirez's execution as someone with a serious mental illness would be unconstitutional. ...............................................................240

   B   Ramirez's death sentence is inconsistent with the evolving standards of decency that mark the progress of a maturing society. ...................246

   C.  The Texas death penalty scheme violates Ramirez's due process rights as it is unconstitutionally arbitrary. ........................................263

   D.  Ramirez's execution after fourteen years on death row violates his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution. ..........................267

   E.  Ramirez's mental impairments render him insufficiently culpable, and thus ineligible, for the death penalty.....................................274

   F.  The reliability of testimony regarding Ramirez's future dangerousness is so low as to violate due process.........................................277

   G.  Ramirez's constitutional rights were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence...................................................................278

   H.  Texas's capital sentencing scheme violated Ramirez's rights by failing to require the jury find each element necessary to impose the death penalty beyond a reasonable doubt..........................................283

I.   Texas's capital sentencing scheme unconstitutionally limits what constitutes mitigation in violation of Ramirez's Eighth and Fourteenth Amendment rights. ............................................................................287

J.   The capital-sentencing scheme under which Ramirez was sentenced fails to ensure a proportionality review in violation of the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution. .........................................290

K.  Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it does not sufficiently channel the sentencer's discretion or sufficiently narrow the class of death-eligible defendants. ....................................................................................................292

L.  Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it affords the prosecutor unbridled discretion to seek the death penalty. ...............................................295

M.   It is a violation of the Eighth Amendment to convict someone in Texas of capital murder under the State's law of parties. ...............................................296

CLAIM NINETEEN ...........................................................................................298

Ramirez will be denied a fair, transparent clemency process in violation the Eighth and Fourteenth Amendments to the U.S. Constitution. ..........................298

CLAIM TWENTY .............................................................................................300

Texas's lethal injection protocol is a violation of the Eighth Amendment's prohibition on cruel and unusual punishment. ...................................................300

CLAIM TWENTY-ONE ....................................................................................301

The cumulative prejudice of the constitutional errors in Ramirez's case demands his conviction and sentence be vacated under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ...........................................301

CONCLUSION AND PRAYER FOR RELIEF ........................................................... 303

## I.    Introduction

Pursuant to 28 U.S.C. § 2254, Petitioner Juan Raul Navarro Ramirez, through counsel, respectfully petitions this Court for a writ of habeas corpus freeing him from the custody of Respondents, pursuant to the judgments and sentences of an Texas state court, on the grounds that those judgments and sentences were obtained and affirmed in violation of his rights under the United States Constitution. Ramirez is in the custody of the Texas Department of Criminal Justice ("TDCJ") because he was sentenced to death following his 2004 conviction for first-degree murder.[1]

### Jurisdictional Statement

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 2241 and 2254.

### Preliminary Statement

Ramirez is filing this Petition under unusual circumstances. Due to the actions of a Texas state court, Ramirez is unsure at this time whether the 28 U.S.C. § 2244(d) statute of limitations is currently stayed due to ongoing state-court litigation, running at this time, or expired. *See Ex Parte Ramirez*, No. CR-0551-04-G, Superseding

---

[1] Ramirez was initially convicted and sentenced to death on two counts of first-degree murder, but the second conviction and sentence were vacated on Double Jeopardy grounds by the Texas Court of Criminal Appeals during Ramirez's appellate proceedings. *Ramirez v. State*, No. AP-75,167, 2007 WL 4375936 (Tex. Crim. App. Dec. 12, 2007).

Order Den. Pet'r's Mot. for Forensic DNA Testing Under Chapter 64 of the Code of Criminal Procedure (370th Jud. Dist. Ct. Oct. 31, 2018) (finding that Ramirez's state-court counsel had not been notified of a prior dispositive order and that the order had been filed under an incorrect case number). Due to this uncertainty, Ramirez's counsel is filing this petition as quickly as possible to demonstrate continued diligence. Accordingly, this initial Petition was prepared in good faith and in compliance with the relevant rules, using information that is true to the best of counsel's current knowledge and beliefs about the state court proceedings in this matter and the constitutional violations that occurred therein. *See* Rule 2, Rules Governing Section 2254 Cases in the United States District Court ("Habeas Rules") (outlining general requirements for a federal habeas petition's contents). Although this initial Petition is legally adequate, given the extremely limited time frame in which this Petition was compiled, counsel may seek leave to amend in accordance with the rules to provide further analysis of the procedural history, as well as the facts and law underlying each claim.

## Presumption of Correctness

Ramirez hereby provides notice of his intention to challenge the presumption of correctness of findings of fact made by the state court in his case. Certain findings of fact by the state court in this case, if any are found to exist, are not entitled to the

presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court in Ramirez's trial and sentencing and the decisions by the Texas Court of Criminal Appeals in his appellate proceedings. Pursuant to 28 U.S.C. § 2254(e)(1), Ramirez asserts that certain findings of fact by the state court at trial, sentencing, on direct appeal, or in his post-conviction proceedings, if any are found to exist, are not fairly supported by the record. Ramirez also asserts other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford him full and fair hearings; that material facts were not adequately developed at state-court hearings; that Ramirez did not receive full, fair and adequate hearings in the state court proceedings; and that Ramirez was otherwise denied due process of law in the state court proceedings.

## Amendment

Ramirez expressly reserves his right to amend this petition. In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a habeas

petitioner has to have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition. *Id.* at 497–98. Ramirez believes additional claims may be identified following a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these proceedings, Ramirez will present any additional claims, along with complete factual and procedural histories and more thorough briefing on his claims through amendment to the petition.

## II.     Exhaustion and Procedural Default

Due to the procedural history in this case, Respondents may raise issues of exhaustion and procedural default in their answer. Ramirez shall present facts and law addressing any such contentions in further briefing in this Court. As an initial matter, none of the facts and claims presented in this Petition are procedurally barred because (a) any state court procedural rulings in this case are not independent and adequate state grounds to bar federal review; (b) Ramirez can establish cause and prejudice to overcome any procedural bar; and/or (c) Ramirez can establish a fundamental miscarriage of justice to overcome any potential procedural bar. To the extent this Court believes that this Petition contains unexhausted claims, the Court

may stay and hold in abeyance the federal proceedings, and direct Ramirez to exhaust those claims in state court.

### Discovery, Expansion of the Record, and Evidentiary Hearing

At the appropriate time, Ramirez will file motions with the Court requesting the necessary evidentiary development of his claims pursuant to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing). To the extent this Court believes that any of Ramirez's claims may be procedurally defaulted, this Court should grant a hearing so that he can show cause and prejudice and/or a fundamental miscarriage of justice to overcome any default. *See, e.g.*, *Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980) (application of cause and prejudice may require district court fact finding); *Schlup v. Delo*, 513 U.S. 298 (1995) (remanding to district court to determine whether to hold hearing on fundamental miscarriage of justice); *Trevino v. Thaler*, 569 U.S. 413 (2013) (ineffective assistance of state post-conviction counsel can establish cause). Finally, in procedural circumstances where a "procedural morass" resulted in the absence of a record, a habeas petitioner may be entitled to discovery and an evidentiary hearing to reconstruct that record. *See, e.g.*, *Wellons v. Hall*, 558 U.S. 220, 221, 226 (2010) (per curiam).

## III.    AEDPA is Unconstitutional

**The Anti-terrorism and Effective Death Penalty Act of 1996 does not restrict this Court's power to review the merits of Ramirez's claim de novo.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") is unconstitutional. As a result, AEDPA cannot lawfully apply to restrict this Court's ability to review the merits of Ramirez's claims de novo. Moreover, even accepting AEDPA's constitutionality, it is no bar to de novo review in this case. Because the court that presided over Ramirez's state habeas petition adopted nearly verbatim the findings of fact and conclusions of law supplied by Respondents, there was no "adjudication on the merits" within the meaning of 28 U.S.C. § 2254(d). Consequently, Ramirez is entitled to de novo review of the claims fairly presented in his state habeas petition. In the alternative, for any claims which this Court deems adjudicated on the merits, Ramirez alleges that § 2254(d) is satisfied, also entitling him to de novo review.

### A.    The AEDPA is unconstitutional.

The principle that every prisoner must have all of his constitutional claims heard by a court is central to fundamental fairness and the integrity of the U.S. justice system. *See Bounds v. Smith*, 430 U.S. 817, 822–23 (1977). One method of ensuring

6

that a prisoner's constitutional claims are heard is through the writ of habeas corpus. However, the passage of AEDPA substantially changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the separation of powers, which results in prisoners remaining in prison without review of alleged constitutional defects of their convictions and sentences.

First, AEDPA suspends the writ of habeas corpus. Congress cannot define prisoners' rights so narrowly that it, in effect, suspends the writ of habeas corpus. The writ of habeas corpus is guaranteed by the U.S. Constitution in the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. The Suspension Clause is a structural limitation on the power of Congress. Like bills of attainder and ex post facto laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred[.]" *United States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest

tenor of the Constitution void." *Id*. at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

Under the tenets of AEDPA, the federal court must conclude that a constitutional violation is "unreasonable" before it may grant relief. 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011). The court cannot remedy a constitutional error unless it is one that no fairminded jurist could make. *Richter*, 562 U.S. at 101–02. Because AEDPA thereby prevents federal courts in certain circumstances from granting relief even when a conviction or sentence is unconstitutional, it suspends the writ of habeas corpus. *See* 28 U.S.C. § 2254(d).

Second, AEDPA violates the separation-of-powers doctrine. Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). Congress has the power to constrain courts' authority. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993). "The judicial Power of the United States, shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. However, Congress must not manipulate the "test for determining the scope of [habeas corpus]" because the writ "is designed to restrain" Congress, and because the writ is "an indispensable

mechanism for monitoring the separation of powers." *Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008).

The separation-of-powers doctrine found in Article III "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government . . . and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (internal quotation marks and citations omitted). When it was confronted with an unconstitutional provision, the Supreme Court in *Marbury* asked whether courts are bound by "an act of the legislature" that is "repugnant to the constitution"; the Court answered, "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177.

"[I]f Congress does provide for habeas in the federal courts, Congress cannot . . . instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain the law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc). Because AEDPA requires courts to ignore unlawful detentions if the prisoner does not meet certain provisions, it unconstitutionally suspends the writ of habeas corpus. The question

before the federal court should simply be whether Ramirez's constitutional rights were violated in such a way that he is entitled to habeas relief. Adding the gloss of "unreasonable" versus reasonable constitutional violations robs the writ of its power to remedy constitutional wrongs.

Thus, AEDPA suspends the writ of habeas corpus and violates the separation-of-powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also, AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action." *Id.* Therefore, AEDPA is unconstitutional, and this Courts should review Ramirez's claims de novo without the additional gloss, limitations, and deference that AEDPA imposes, including through § 2254(d).

**B.     The claims raised in Ramirez's state habeas proceedings were not adjudicated on the merits.**

Even if AEDPA is constitutional, § 2254(d) should not apply to claims Ramirez previously raised in state habeas proceedings. Section 2254(d)'s limits on the power of federal courts to grant habeas relief applies to claims that were

"adjudicated on the merits in State court proceedings," and precludes relief unless the petitioner satisfies the conditions listed in § 2254(d)(1) and (d)(2). The plain language of § 2254(d) therefore makes clear that it does not apply to claims not "adjudicated on the merits" in the state courts. Here, the state courts' treatment of Ramirez's state habeas claims cannot qualify as an adjudication on the merits within the meaning of § 2254(d), and therefore that section cannot apply to Ramirez's claims.

On January 5, 2015, Respondents filed a proposed order containing findings of fact, conclusions of law, and a recommendation with the 370th District Court. (Order Containing Findings of Fact, Conclusions of Law, and a Recommendation, Cause No. CR-0551-04-G (1), Jan. 5, 2015.) Respondents' proposed order just exceeded 400 pages and contained 181 pages of background material on Petitioner's case, 733 discrete findings of fact, and 58 discrete conclusions of law. (*See generally* Order Containing Findings of Fact, Conclusions of Law, and a Recommendation, Cause No. CR-0551-04-G (1), Jan. 5, 2015.)

Fifteen days later, 370th District Court Judge Noe Gonzalez issued an order adopting Respondents' proposed order nearly verbatim. Like Respondents' proposed order, the judge's signed order also just exceeded 400 pages and contained 181 pages of background material, 733 discrete findings of fact, and 58 discrete

conclusions of law. (*See generally* Order Containing Findings of Fact, Conclusions of Law, and a Recommendation, Cause No. CR-0551-04-G (1), Jan. 20, 2015.) The signed order even adopted errors in Respondents' proposed order. For one example, in both the proposed and signed orders Judge Gonzalez refers to himself numerous times as "Judge Ramirez." (*Compare* Order Containing Findings of Fact, Conclusions of Law, and a Recommendation at 178, 277, Cause No. CR-0551-04-G (1), Jan. 5, 2015, *with* Order Containing Findings of Fact, Conclusions of Law, and a Recommendation at 178, 279, Cause No. CR-0551-04-G (1), Jan. 20, 2015.) For another example, both the proposed and signed orders repeatedly refer to an expert witness retained during state habeas proceedings, Dr. Gilbert Martinez, as "Dr. Ramirez." (*Compare* Order Containing Findings of Fact, Conclusions of Law, and a Recommendation at 43, 56–57, Cause No. CR-0551-04-G (1), Jan. 5, 2015, *with* Order Containing Findings of Fact, Conclusions of Law, and a Recommendation at 43, 56–57, Cause No. CR-0551-04-G (1), Jan. 20, 2015.)

The Supreme Court has criticized the practice of uncritically adopting the prevailing parties proposed findings of fact and conclusions of law. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) (acknowledging that "[w]e, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties," but noting that the district court "in this case does not appear to

have uncritically accepted findings prepared without judicial guidance by the prevailing party"); *see also United States v. El Paso Nat. Gas Co.*, 376 U.S. 651, 656 n.4 (1964). This practice is particularly troubling in death penalty cases where life is at stake. *Cf. Jefferson v. Upton*, 560 U.S. 284, 292–94 (2010) (per curiam) (remanding question of whether presumption of correctness applied to state court's factual findings in capital habeas case where state court adopted findings "drafted exclusively by the attorneys for the State pursuant to *ex parte* request" and "adopted the State's proposed opinion verbatim even though it recounted evidence from a nonexistent witness."); *id.* at 294 (questioning the lawfulness of adopting proposed findings "that contain internal evidence suggesting that the judge may not have read them").

Judge Gonzalez may have simply adopted Respondents' proposed order in an effort to comply with the looming deadline set by the CCA "to resolve the claims presented and return the completed case" to the appellate court. (HA Order at 2, Nov. 19, 2014.) Indeed, the signed order was filed on the last day provided by the CCA. (*Compare* Order Containing Findings of Fact, Conclusions of Law, and a Recommendation at 403, Cause No. CR-0551-04-G (1), Jan. 5, 2015, *with* Order Containing Findings of Fact, Conclusions of Law, and a Recommendation at 403, Cause No. CR-0551-04-G (1), Jan. 20, 2015, *with* HA Order at 2, Nov. 19, 2014.)

Or, Judge Gonzalez may have simply adhered to a troubling practice among convicting courts in Texas of simply adopting the State's proposed findings of fact and conclusions of law. A 2002 study of Texas capital habeas cases found that in the "211 cases in which the prosecution's proposed findings of fact were available for review, the trial court entered findings of fact and conclusions of law which were identical or virtually identical to the prosecutor's in 189 (90%) of the cases." Tex. Defender Servs., *Lethal Indifference: The Fatal Combination of Incompetent Attorneys and Unaccountable Courts in Texas Death Penalty Appeals* 54 (2002), http://texasdefender.org/wp-content/uploads/Lethal-Indiff_web.pdf (last visited Nov. 27, 2018) (footnotes omitted).[2]

Either way, the effect is that Ramirez's adversary is responsible for the factual findings and legal conclusions on which Ramirez's death sentence rests. If the state courts' wholesale adoption of the prosecutors' findings and conclusions is treated as an adjudication on the merits, as a practical matter this Court would have to defer to

---

[2] The same Texas Defender Services study revealed that the CCA also almost never makes changes to the prosecutor's proposed findings of fact and conclusions of law. *See* Tex. Defender Servs., *Lethal Indifference: The Fatal Combination of Incompetent Attorneys and Unaccountable Courts in Texas Death Penalty Appeals* 54–55 (2002), http://texasdefender.org/wp-content/uploads/Lethal-Indiff_web.pdf (last visited Nov. 27, 2018) ("Of the cases in which CCA orders were available for review, changes were made to the trial court's findings of fact and conclusions of law in only nine (4%) of cases."). In Ramirez's case, the CCA likewise issued a two-page order "adopt[ing] the trial judge's findings and conclusions" and denying relief. (HA Order at 2, Oct. 14, 2015.)

the prosecutor in evaluating constitutional challenges to Ramirez's convictions and sentences. *See* 28 U.S.C. § 2254(d). Such a result is incompatible with due process and the heightened scrutiny required of capital cases, and indeed with AEDPA itself. *See, e.g.*, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (emphasizing the importance of federal habeas review after AEDPA and denouncing "abandonment or abdication of judicial review."). *But see Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012) (declining to accord the state court's decision "less deference" because it adopted a proposed order it requested ex parte from the state).

Because Judge Gonzalez's signed order adopted Respondents' proposed order uncritically and nearly verbatim, this Court should conclude that the claims fairly presented to Judge Gonzalez were not adjudicated on the merits within the meaning of § 2254(d) and should instead conduct de novo review.

## C. Alternatively, Ramirez can satisfy § 2254(d) for each of the claims that were adjudicated on the merits in state court.

In the alternative, if the Court concludes that AEDPA is constitutional and that the state courts' denial of Ramirez's state habeas petition constituted an adjudication on the merits of the claims presented therein, Ramirez alleges that he can nonetheless satisfy § 2254(d) because the state courts' adjudication was contrary to or involved an unreasonable application of clearly established law, or because it resulted in a decision that was based on unreasonable factual determinations in light

15

of the state-court record. *See* 28 U.S.C. § 2254(d). The state court decisions were based on unreasonable factual determinations in part because the fact-finding process was itself deficient: among other problems, the state courts adopted the State's proposed findings wholesale, as noted above, and the state courts relied on false testimony presented by trial counsel at the state habeas petition evidentiary hearing, as described in Claim One.

Ramirez can similarly satisfy § 2254(d) for all claims previously raised on direct appeal because the state courts' adjudication was contrary to or involved an unreasonable application of clearly established law, or because it resulted in a decision that was based on unreasonable factual determinations in light of the state-court record. *See* 28 U.S.C. § 2254(d). Thus, for any claim raised in state court which this Court concludes was adjudicated on the merits, Ramirez alleges that § 2254(d) is satisfied and he is entitled to de novo review.

## IV.     Ground for Relief/Federal Constitutional Claims

Ramirez petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus freeing him from the custody of Respondents pursuant to the judgment and sentence of the state courts of Texas, on the grounds that the judgment and sentence were obtained and affirmed in violation of his rights under the Constitution of the United States. In support of this request, Ramirez offers the following:

# CLAIM ONE

**Ramirez received ineffective assistance of counsel during his capital sentencing proceedings, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition, and all facts found in the exhibits attached to the Petition.

Ramirez's counsel failed to investigate and prepare adequately for the sentencing phase of trial and consequently neglected to investigate, develop, and present Ramirez's significant and compelling mitigation evidence to the jury. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Ramirez and thereby violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Ramirez presented this claim below. (Initial Writ Appl. at 83, July 2, 2009; Second Writ Appl. at 61, Nov. 6, 2013.)

## A.    Standards Governing Ineffective Assistance of Counsel Claims

Ramirez has a constitutional right to the effective assistance of counsel at sentencing. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 393 (2005); *Wiggins v. Smith*, 539 U.S. 510, 519–20 (2003); *Williams (Terry) v. Taylor*, 529 U.S. 362, 390 (2000). Accordingly, a capital sentencer must be afforded the opportunity to assess "the character and record of the individual offender[.]" *Eddings v. Oklahoma*, 455 U.S.

17

104, 112 (1982) (internal quotation marks and citation omitted). As the Supreme

Court has explained,

> If the sentencer is to make an individualized assessment of
> the appropriateness of the death penalty, evidence about
> the defendant's background and character is relevant
> because of the belief, long held by this society, that
> defendants who commit criminal acts that are attributable
> to a disadvantaged background, or to emotional and
> mental problems, may be less culpable than defendants
> who have no such excuse.

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation

omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002);

*Eddings*, 455 U.S. at 112 (explaining that consideration of an offender's life history

is a "constitutionally indispensable part of the process of inflicting the penalty of

death" (internal quotation marks and citation omitted)). Ramirez's counsel failed to

provide this representation, and he is entitled to relief.

### B. Trial counsel performed deficiently in numerous respects during Ramirez's capital sentencing proceedings.

When representing capital clients, "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations

unnecessary." *Strickland*, 466 U.S. at 691; *see also id.* ("In any ineffectiveness case,

a particular decision not to investigate must be directly assessed for reasonableness

in all the circumstances, applying a heavy measure of deference to counsel's

judgments."). The Supreme Court later reaffirmed this mandate, holding that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Williams (Terry)*, 529 U.S. at 396. Subsequent decisions of the Supreme Court and the United States Court of Appeals for the Fifth Circuit all affirm the previous holding that counsel is required to conduct a reasonable and adequate investigation of the defendant's history. *See, e.g.*, *Wiggins*, 539 U.S. at 521 (holding that the "deference owed such strategic judgments" of trial counsel is "defined . . . in terms of the adequacy of the investigations supporting those judgments"); *Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009) (citing case law "that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history"); *see also Adams v. Quarterman*, 324 F. App'x 340 (5th Cir. 2009); *Williams v. Allen*, 542 F.3d 1326, 1329–30 (11th Cir. 2008); *Gray v. Branker*, 529 F.3d 220, 225–26 (4th Cir. 2008).

Pursuant to *Strickland*, *Williams (Terry)*, and *Wiggins*, in addition to the prevailing professional norms in Texas at the time of Ramirez's trial, Ramirez's trial counsel had an obligation to conduct a thorough investigation of his background in preparation for sentencing. In fact, in *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam), the Supreme Court described this obligation as "unquestioned" as of the

time of Porter's 1988 sentencing. *Id.* at 38–39; *see also Wiggins*, 539 U.S. at 524 (finding deficient performance where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources."); *Lewis v. Dretke*, 355 F.3d 364, 367–68 (5th Cir. 2003) (per curiam) (accepting testimony of petitioner's sisters that trial counsel never interviewed them, and finding counsel ineffective in capital sentencing for failing to investigate and present evidence of petitioner's abusive childhood); *Moore v. Johnson*, 194 F.3d 586, 616–17 (5th Cir. 1999) (per curiam) (finding counsel deficient in penalty phase because, although counsel knew some of petitioner's background, he did not investigate or present mitigating evidence that would have shown abuse and abandonment by family). Ramirez's trial counsel did not comply with their obligation to conduct this investigation, and as a result, their performance in this case was deficient.

When she was appointed to represent Ramirez in January 2003 (1 CR at 2), Alma Garza was per se unqualified under then-existing Texas law, which required her to have "trial experience in . . . investigating and presenting mitigating evidence at the penalty phase of a death penalty trial," Tex. Code Crim. Proc. Ann. § 26.052 (d)(2)(F)(ii) (2003). Alma Garza did not have this experience. (Evid. Hr'g Tr. at 77–82, Nov. 3, 2014.) The statute also required she have trial experience in the "use of

20

and challenges to mental health or forensic expert witnesses[.]" Tex. Code Crim. Proc. Ann. § (d)(2)(F)(i). While the record is unclear as to Alma's experience on this front, her performance in this area evidenced a profound lack of competency. Seven months later, the court appointed Rolando Garza (no relation to Alma) as second chair counsel.[3] Rolando also had no prior capital case experience and in fact, very little trial experience. (Evid. Hr'g Tr. at 19–20, Nov. 3, 2014.) Rolando was mainly responsible for legal research. (Evid. Hr'g Tr. at 20, Nov. 3, 2014.)

On May 24, 2004, sixteen months after her appointment as counsel, Alma filed a motion for appointment of a mitigation specialist. (Ex. 1.) In the motion, Alma argued that an extensive background investigation and record collection is required in a capital case, including obtaining information relevant to mental and physical health, educational history, family and social history with verification through contact with collateral sources, and confidential records related to any of the relevant histories. Alma represented that she would be ineffective under *Williams (Terry)*, 529 U.S. 362, if she failed to adequately investigate and present mitigating evidence; she also cited 2003 ABA Guideline 11.4 as requiring an investigation comprising efforts to discover all reasonably available mitigating evidence and evidence to rebut

---

[3] Due to counsel's shared surname, first names will be used to refer to them throughout this claim.

any aggravating evidence introduced by the prosecutor. Finally, despite the 16-month delay in making application for a mitigation specialist, Alma cited 2003 ABA Guideline 11.4 for the proposition that investigation for the sentencing phase should begin "immediately upon counsel's entry into the case."

The motion also requested that Gilda Bowen be appointed as the mitigation specialist. The court appointed Bowen on June 1, 2004, just several months before commencement of the trial. (Evid. Hr'g Tr. at 90, Nov. 3, 2014.) This was Bowen's first death penalty case. According to Rolando's testimony during the state post-conviction relief ("PCR") evidentiary hearing in 2014, Bowen was recommended to Alma by John Niland, an attorney out of Austin who had experience with experts. (Evid. Hr'g Tr. at 24, Nov. 3, 2014.) According to Bowen's testimony at the same hearing, Alma did not speak to her prior to her appointment date to confirm that she had the time and resources necessary to conduct a thorough investigation. (Evid. Hr'g Tr. at 157, Nov. 3, 2014.)

The record has conflicting information on what, if any, mitigation work was done prior to Bowen's last-minute appointment. With one exception, Alma's billing records were not obtained by prior counsel, and are no longer available. (*See* Exs. 9, 10.) During the state PCR hearing, Rolando acknowledged that he had not conducted

any mitigation investigation (Evid. Hr'g Tr. at 27–32, Nov. 3, 2014), and no mitigation work is apparent from counsel's files.

After Ramirez's initial post-conviction application, Alma submitted a sworn written declaration responsive to certain questions posed by the court. (Aff. of Alma Garza, CR-0551-04-G(1), filed Oct. 26, 2012.) In response to a question as to what steps were taken by the attorneys to investigate Ramirez's background in order to obtain mitigation evidence she said that the investigation was done by the mitigation specialist—the inference being that it was not done by her. Nevertheless, when she testified in PCR hearings, she claimed to have done her own mitigation investigation by interviewing Ramirez and his mother and sisters. (Evid. Hr'g Tr. at 92–97, Nov. 3, 2014.) The inconsistency between the lack of mitigation related work-product in her file and her written pre-hearing declaration on the one hand, and her hearing testimony on the other hand, was never mentioned during the state PCR proceedings. Bowen's billing records show that she began work on July 5, 2004. (Second Writ Ex. 34 at 4.) She interviewed Ramirez on August 5, 2004, for three hours and again on August 26, 2004, for two hours. (Second Writ Ex. 34 at 4–5.) Her billing records also show that she conducted a grand total of three witness interviews; the first was with Ramirez's mother for two hours on October 21, 2004, just a week before voir dire; the second was with Ramirez's father for two hours on November 4, 2004; and

the last was a two-hour interview on November 17, 2004, with Ramirez's former girlfriend. (Second Writ Ex. 34 at 6, 8.) Bowen had a final meeting with Ramirez, together with the attorneys, on November 10, 2004, "re: individuals interviewed," which up to that point had been only Ramirez's mother and father. (Second Writ Ex. 34 at 8.) This amounted to 11 total hours of mitigation interviews with Ramirez and three witnesses during the investigation. The only records obtained by Bowen were Ramirez's school records, which she obtained on December 13, 2004, a few days before the punishment phase began. (Initial Writ Ex. O.) Bowen billed for 111 total hours of mitigation work. (Second Writ Ex. 34.)

Meanwhile, the record of proceedings before the trial court reveals that during a pretrial hearing on October 12, 2004, Alma reported that she had just received 832 pages of Ramirez's Texas Youth Commission ("TYC") records from the prosecutor.[4] (3 RR at 19–23.) Ramirez had been in TYC custody in juvenile correctional facilities for much of the time between June 2000 and November 2002; indeed the capital offense had occurred just six weeks after his release from TYC. During the hearing, Alma complained that it appeared that the prosecution was

---

[4] The state filed these same records with the court at this time, although the documents themselves were erroneously not included in the certified state-court record, despite being part of the record itself. (*See* 1 CR 265.) Ramirez received additional TYC documents during his state PCR proceedings (Initial Writ Exs. P, W, V; Second Writ Exs. 38, 41–42), and in federal habeas proceedings (Sealed Ex. S11).

contemplating admitting some or all of the TYC records at sentencing, it would take a considerable amount of time to review the records to determine if any were objectionable. (3 RR at 19.) She appeared to have no inkling that the records might also have relevance to mitigation, apart from any objections she might have, despite the court's note that the records would be relevant to "punishment." (3 RR at 19.) At the same hearing, Alma promised to disclose defense experts within a week. (3 RR at 32–34.) To this point, however, no experts for the sentencing phase had been retained. (*See, e.g*., Ex. 89 (Allen file discussing limited time on case); Sealed Ex. S5.)

At another pretrial hearing the following week, on October 18, 2004, Alma complained that the State had made it difficult to get records, specifically mentioning the TYC records. (4 RR at 10–14.) The court admonished Alma that she should not rely on the State for investigation; that she must have known about the TYC records for nearly two years and she could have subpoenaed them herself. At this same hearing, Alma indicated she would need a psychologist appointed to help her evaluate a report of a TYC psychologist, Dr. Kim Buck. Dr. Buck had evaluated Ramirez shortly after he was taken into TYC custody, as part of TYC's assessment/treatment planning process. The court was skeptical that Alma needed an expert for this reason.

On October 20, 2004, the court granted a request to appoint Dwight Stewart as a gang expert. On the same date, the court appointed Larry Fitzgerald as a prison classification expert. On October 29, 2004, after voir dire was underway, Alma filed an ex parte application for the appointment of Dr. Kate Allen (whom she mistakenly identified as "Kate Ellen"). (Sealed Ex. S4 at 3.) The trial judge appointed Dr. Allen on November 9. (Sealed Ex. S5.)

Bowen's billing records show that on October 6-7, 2004, she spent six hours reviewing the TYC records, which contain several key childhood mental-health evaluations, significant relevant social history and other relevant mitigation leads and evidence. (Second Writ Ex. 34 at 6.) These records contain significant indications of developmental and/or acquired brain injury, mental illness and childhood trauma, few of which were flagged or investigated.[5] The TYC records were redacted in accordance with the Code of Federal Regulations, however these records, along with the brief mitigation interviews, were the only information used to build the team's theory of mitigation. Bowen presented Alma with four documents: 1) a Bio-Psychosocial History (Tr. Def. Ex. 8), 2) a Life History Outline (Tr. Def. Ex. 9), 3) Developmental Stages - Erikson vs. Juan Raul Navarro (Tr. Def.

---

[5] In fact, even the defense mental-health expert, Kate Allen, noted that she did only a "cursory" review of these documents in the limited time she had to prepare for her testimony. (Ex. 89 at 21.)

Ex. 10), and 4) an Eco-Map: Individual Systems. Bowen completed these documents on December, 16, 2004—the day the punishment phase began—and turned them into the testifying mental health expert, Dr. Kate Allen, and Alma on December 17, 2004. (Second Writ Ex. 34 at 10.)

Bowen's billing records also show that she emailed some documents to Dr. Allen on November 26 and that on November 29, with the jury trial on the guilt phase underway, she assisted Alma's staff in preparing additional documents for Dr. Allen. Dr. Allen's own billing records show that she first began reviewing records on December 6. (Ex. 89 at 1.) Bowen's billing records show that she acquired Ramirez's school records on December 10 and forwarded them to Dr. Allen on December 13, just four days before Dr. Allen would testify. (Second Writ Ex. 34 at 10.) During PCR proceedings, Alma testified that she had sent Dr. Allen records several months in advance of the sentencing. (Evid. Hr'g Tr. at 11, Nov. 3, 2014.) This was untrue, as demonstrated by the documented record.

On November 29, 2004, at another hearing before the trial court, Alma represented that Dr. Allen would rely on an interview of Ramirez (which never took place) and records provided by the state. (27 RR at 2–5.) The trial judge assumed Dr. Allen had already interviewed Ramirez (27 RR at 4–5), and Alma did not correct the judge's misperception. At this late stage, with the sentencing proceedings

approaching, Dr. Allen had not yet received the bulk of the records, and according to Dr. Allen's invoice, she had reviewed none of them. (Ex. 89 at 1.)

The sentencing phase began on Thursday, December 16, 2004. (38 RR Vol. 38 at 1.) In Texas, the objective of the prosecution was simple: to prove beyond a reasonable doubt that there was a probability that Ramirez would commit future acts of violence and that he would be a continuing threat to society. Given the six dead bodies and Rosie's description of the killer of her son, who fit Ramirez's description, the jury would likely assume Ramirez was one of the shooters. The state was well on its way to proving future dangerousness just based on the crime.

However, the heart of the prosecution's future dangerousness strategy was to have Ramirez's juvenile probation and parole officers lay out Ramirez's juvenile record. (38 RR at 3–134.) Ramirez's offenses began in 1997-1998 when he was 13 or 14. He was adjudicated for relatively minor, non-violent criminal activity, including possession of marijuana, criminal trespass, and burglary of a vehicle. During the sentencing phase, the prosecution presented evidence to the jury that in the course of adjudicating Ramirez for these initial juvenile offenses, it was discovered Ramirez had a serious drug problem. The juvenile court and its probation officers responded by trying to help Ramirez by giving him an out-of-home placement where he could get treatment and rehabilitation. The prosecution

portrayed Ramirez as having failed to take advantage of these the rehabilitation services. Once the out-of-home services ended and Ramirez returned home, he became truant and was involved in a stabbing and two shooting incidents. Ramirez pled guilty to the charges associated with these incidents, which included a stabbing of one victim, the shooting of another, shooting at an occupied vehicle and shooting at a residential structure disregarding the risk that the structure might have been occupied.

The prosecution presented evidence that following these deadly assaults, in June 2000, Ramirez, then 16 years old, was again removed from the community. (38 RR at 3–134.) This time, he was placed in TYC juvenile correctional facilities, and later a halfway house, where he was provided with "education and treatment." Evidence was presented that shortly after his release back into the community, in December 2001, Ramirez was arrested in two separate incidents, once for possession of marijuana and another for resisting arrest and unlawful possession of a weapon. This led to Ramirez's incarceration and a return to TYC confinement until late November 2002. On December 31, Ramirez told his parole officer that he would no longer comply with his release conditions and a warrant (what is called a TYC directive) was issued for Ramirez's arrest. The subject multiple-murder offense took place on January 5, 2003, just a few weeks after Ramirez's release.

There were threads of mitigation evidence running through the prosecution's evidence at sentencing. Ramirez's parole officer, Ricardo Leal testified that he was opposed to Ramirez being returned home when Ramirez was released from TYC correctional custody in late 2001 and again in late 2002. (38 RR at 71–134.) He cited the gang activity in Ramirez's neighborhood and a fear that Ramirez might be subject to retaliation for the gang–related shooting incidents Ramirez had previously been involved in. Leal acknowledged the fact that Ramirez's problems at home and his community-based gang associations had contributed to his drug abuse and gang-related offending in the first place. Leal testified that there were alternatives to returning Ramirez home, but that there was no available space in an appropriate halfway house. There was also evidence that Ramirez did fairly well while in TYC custody and that he made legitimate efforts to rehabilitate. Ramirez met all the treatment and educational goals that were set for him by TYC and had no major incidents. Despite these indications, Ramirez's counsel did not stress the evidence of the abusive and ineffective conditions of Ramirez's TYC confinement, and the institutional failure to offer him meaningful rehabilitative services best suited for young, even violent, offenders, or attempt to develop and present this evidence to the jury themselves.

When the mitigation phase began, Alma made an opening statement, which in its entirety reads:

> Good morning, ladies and gentlemen. I know that this is a difficult job for you. I'm going to ask you to listen. I'm hoping to bring you a mitigating specialist that will tell you about his background, the way that he was raised, things that happened to him, and why he is where he is. We're going to ask you to answer the questions yes, yes, and yes, that there is mitigating evidence.

(38 RR at 2.) Alma called Larry Fitzgerald, a prisoner-classification expert, to testify, but he had nothing to say about Ramirez. (38 RR at 182–200.) He also was not really a classification expert. He had been a public information officer for the corrections department. Fitzgerald testified that a capital murderer may or may not go into general population, and that there is sometimes violence on death row. It appeared that the goal of his testimony was to show that, if sentenced to life, Ramirez would be placed in solitary confinement due to his gang affiliation and history of priors. Alma also called gang expert Dwight Stewart to testify about his work in gang prevention and why kids join gangs, including the need to belong, absentee parent(s), family tradition of membership, the need for protection, and the "money factor," but he too had nothing specific to say about Ramirez. (38 RR at 173.)

31

Dr. Allen was to be the final witness on December 17, 2004.[6] On December 16, 2004, Alma filed a motion to continue the sentencing proceedings to Monday December 20, because "Dr. Allen was ill and cannot attend court due to illness." (Mot. for Cont., No. CR-0551-04-G(1), filed Dec. 16, 2004; *see also* Ex. 89 at 20.) The Court denied the request to extend the proceedings to December 20, 2004. Instead, the Court ordered proceedings to resume on Saturday, December 18, 2004. (39 RR at 30–98.) As a result, Dr. Allen was quite ill when she testified on the 18th.[7] (Ex. 89 at 20.)

During her testimony, she opined that Ramirez had suffered from attachment disorder, chronic depression, Post-Traumatic Stress Disorder, and substance dependency. These were a result of maternal deprivation/abandonment, chronic domestic violence, and child abuse during his formative years; which were matched

---

[6] Prior to offering her testimony on December 18, Dr. Allen's invoice shows she performed the following work: she reviewed records during December 6-10 for a total of 8 hours, she met with Alma and Bowen on December 17 for 3 hours, and consulted again with Alma on the day of her testimony for an additional 1.5 hours. (Ex. 89 at 1.) She had not evaluated or examined Ramirez or spoken to other collateral sources.

[7] During the state PCR proceedings, Dr. Allen was highly critical of Alma. (Ex. 89 at 21.) Dr. Allen provided a declaration to the PCR Court where she explained that Alma had promised that there would be some weeks between Dr. Allen's completion of another death penalty case in mid-December and her testimony at Ramirez's sentencing. (Second Writ Ex. 1.) This turned out to be untrue. Alma summoned her to Texas immediately on the conclusion of the other case resulting in Dr. Allen's lack of preparation and inability to interview/evaluate Ramirez. (Second Writ Ex. 1.)

by gang dominance in the neighborhood, poverty, and limited societal interventions. She inferred that TYC did too little, too late. At one point Allen began to discuss the impact of these issues on the brain, and then was stopped when Judge Gonzalez ruled that there was no physical examination or MRI of Ramirez's brain, and that Dr. Allen was not qualified to speak to that as she was not an expert on brain development (39 RR at 54).

In preparing for her testimony, Dr. Allen reviewed Ramirez's school records, the Whitworth evaluations, TYC records, juvenile records, a summary of the crime, and mitigation documents prepared by Gilda Bowen. However; Dr. Allen was not allowed to testify about the records in which she reviewed because they were considered "hearsay" evidence according to Judge Gonzalez's ruling. In addition, the records were not entered as exhibits and counsel did not attempt to enter them in an acceptable form when the jury was hearing testimony. Judge Gonzales also criticized Alma for failing to present Ramirez's family members as witnesses in order to include the necessary evidence, stating "if she (Bowen) was able to interview those people (Ramirez's family), there is no reason why those people couldn't have been brought to testify." (39 RR at 156.)

The last witness was Solomon Avila, a pastor who ministered to Ramirez "once or twice a week when he was first detained"—nearly two years earlier. " (39

RR at 99–102). He testified he never felt threatened when visiting Ramirez in his jail cell. In closing argument, Alma summarized the evidence she had presented, and argued that in light of Ramirez's criminal record there was an inference to be drawn from Fitzgerald's testimony that if given a life sentence, Ramirez would be placed in administrative segregation, locked down 23 hours a day without television. (39 RR at 125–36.) The jury deliberated for less than three hours, sentencing Ramirez to death at 6:31 pm that same day. (39 RR at 145.)

As illustrated above, counsel's failure's throughout this phase of trial were startling. Counsel's failures began during the ridiculously brief opening statements and continued throughout their presentation. Counsel failed to even fulfill the brief promise to the jury of testimony explaining Ramirez's circumstances, misrepresented the circumstances of Ramirez's mother's absence from courtroom after counsel told Juana not to appear, failed to ensure a complete record, and failed to object to unnecessary courtroom security and/or shackling of Ramirez.

They failed to investigate, develop, and present readily available and compelling mitigation evidence that could have made a difference to at least one juror. These failures include misrepresentations to the court regarding the hiring of experts and the experts' trial preparation and work, the wholesale failure to investigate Ramirez's social history, organic brain damage/learning disability/

34

neuropsychological dysfunction, family dynamics, absence of parental figures, physical and psychological abuse, adolescent brain, poverty, neighborhood, difficulties in school, resultant turn to drugs and gang involvement/gang pressures, parole/probation conditions, and TYC conditions. They also failed to present evidence from expert and lay witnesses regarding Ramirez's brain damage, learning and emotional disabilities, substance abuse, and other issues, and did not understand basic legal concepts, such as the admission of evidence under Rule 705, resulting in the failure to have relevant and available records admitted and the prohibition of expert testimony regarding those records. They failed to even object to the exclusion of this evidence and testimony. They did not conduct a reasonable investigation, failed to investigate and present evidence they did have to the jury, and failed to adequately prepare the sole mental-health expert presented at trial. They failed to present available evidence regarding development of the adolescent brain, the effect of substance abuse on the brain, Ramirez's executive functioning difficulties, or evidence of Ramirez's brain damage (possibly from fetal alcohol spectrum disorder or other prenatal exposure). As a result of this investigative failure, they also failed to retain and prepare appropriate experts and thus failed to provide the jury with a reasonable, accurate mitigation picture.

In addition, trial counsel failed to object to evidence presented by the State, including a failure to challenge Leal's testimony on Confrontation Clause grounds and to object to Champion's statement regarding marijuana use. They failed to adequately challenge the State's evidence and argument regarding future dangerousness, or to raise due process concerns on this issue. As discussed *infra*, they failed to object to problems with the penalty phase jury instructions, including to vagueness of terms in future dangerousness special issue, to instructions on how future dangerousness is proven, to the anti-parties issue as insufficient to ensure individualized decision and insufficient under *Tison* to establish death eligibility, and they failed to request additional clarifying instructions. Regarding the mitigation instructions, counsel failed to object to the instructions on mitigation special issue as an insufficient vehicle for consideration of all circumstances, its failure to assign burden of proof, the lack of appellate review, the failure to instruct jury on what happens if one person does not vote for death, and the unanimity issue. Taken cumulatively, counsel's failures undermine confidence in the jury's verdict and Ramirez was prejudiced.

**C.    Ramirez was prejudiced by his counsel's failures, and the mitigation evidence that existed but was not presented is sufficiently substantial to undermine the reliability of the death sentence in this case.**

A reasonable probability of a different result is established where, but for counsel's errors, there would have existed a reasonable doubt about the appropriate punishment. The question is not whether the jury would have credited the evidence developed in the post-conviction proceedings, but whether the nature and quality of that evidence would have created a reasonable probability of a different result at the guilt-innocence or penalty phase. As the Fifth Circuit has explained:

> In conducting the *Strickland* prejudice analysis in this context, the Court has explained that we must consider both the "newly uncovered evidence" presented to the state habeas court, "along with mitigating evidence introduced during [the petitioner's] penalty phase trial, to assess whether there is a reasonable probability that [the petitioner] would have received a different sentence after a constitutionally sufficient mitigation investigation." *Sears v. Upton*, 561 U.S. 945, 956 (2010). After "compar[ing] the evidence actually presented at sentencing with any additional mitigating evidence presented in the habeas proceeding[,]" we inquire as to "whether under the applicable state capital sentencing statute, the additional mitigating evidence [is] so compelling that there [is] a reasonable probability that at least one juror could have determined that because of the defendant's reduced culpability, death [is] not an appropriate sentence." *Ruiz v. Stephens*, 728 F.3d 416, 424 (5th Cir. 2013) (internal quotation marks and footnote omitted). In so doing, we consider all evidence presented to the state habeas court, without limiting our analysis to evidence that would have been admitted under Texas evidentiary rules. *Id.* at 424–25.

*Escamilla v. Stephens*, 602 F. App'x 939, 941–42 (5th Cir. 2015) (per curiam).

And, in assessing prejudice, a reviewing court considers the effects of more than one deficiency cumulatively. In *Strickland*, the Supreme Court explained that a showing that counsel's deficient performance prejudiced the defendant requires that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687; *see also id.* at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

Like the Supreme Court, the Fifth Circuit has previously applied a cumulative *Strickland* prejudice analysis when confronted with a case in which there were multiple instances of deficient performance by counsel. *See, e.g.*, *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010) (holding, in the alternative, that "[t]he combined prejudicial effect of the post-arrest silence and the death of the unborn child inexorably leads us to conclude that White has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable."); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."); *Moore*, 194 F.3d at 619 (holding in a pre-AEDPA case that "we are unable to state that . . . the cumulative effect of all deficiencies at the guilt phase[] is

sufficient to render the guilty verdict . . . unreliable"); *Dodson v. Stephens*, 611 F. App'x 168, 178–79 (5th Cir. 2015) (unpublished) (assuming that cumulative prejudice analysis is required). Accordingly, this Court should consider the resulting prejudice from the numerous examples of trial counsel's deficient performance in a cumulative manner and grant Ramirez relief.

As explained above, the outline of a strong mitigation case can be gleaned from the extremely limited investigation conducted by Bowen and from the contents of the juvenile records in the TYC files. But little of what was available from Bowen and the TYC files was presented to the jury by Alma and Rolando. The jury heard little more than the general, largely unsubstantiated opinions of Dr. Allen, whose testimony was further limited by the trial court's limitations on her testimony and counsel's additional failure to understand the law regarding admission of exhibits or hearsay testimony. There were, however, abundant mitigation red flags that called out for a more thorough investigation. From the limited interviews conducted by Bowen in combination with the TYC/juvenile records, there was evidence of the following: poverty; domestic violence; physical abuse of Ramirez and his siblings by his father; a neglectful mother; the family's residence in a gang-infested neighborhood; Ramirez suffering prior head injuries with loss of consciousness; significant learning difficulties beginning in early primary grades signaling a

learning disability or neurodevelopmental disorder; a severe substance abuse disorder beginning at age 10 or 11, which included a variety of drugs as well as inhalants (spray-paint and glue being the most prominent); and evidence that Ramirez suffered from significant mental-health problems, including depression and Post-Traumatic Stress Disorder. Much of this information was contained in the TYC records and the records could have been offered in evidence, but Alma's misunderstanding of those rules prevented this admission.

The TYC records also contained several mental-health evaluations. The first evaluation was conducted by Dr. Gary Whitworth on March 25, 1998, just after Ramirez's 14th birthday. Dr. Whitworth diagnosed Ramirez with a major depressive episode and polysubstance dependence. Ramirez was identified as being at risk of suicide. The evaluator recommended residential treatment that could provide "psychological treatment, substance abuse treatment and a structured behavior management program." IQ testing on the WISC-R revealed a full scale IQ of 92, but Dr. Whitworth noted that Ramirez's level of academic achievement was significantly below his intellectual potential, and therefore, he concluded that Ramirez appeared to have a learning disability. He recommended an evaluation for special education and he diagnosed an Axis II Learning Disorder.

The TYC records show Ramirez was placed in Desert Hills of Texas in April 1998. He had to be discharged in August due to the facility's closure. The discharge report prepared by Dr. Michelle Woehr provides a clear picture into Ramirez's tortured 14-year-old soul. Dr. Woehr described a history of suicide attempts beginning at age 10 and that Ramirez came into the Desert Hills program with suicide ideation. Dr. Woehr recorded Ramirez's symptoms of hopelessness, feelings of abandonment, and PTSD, and she diagnosed him with a major depressive disorder. She also suspected that Ramirez suffered from a learning disability and diagnosed him with a learning disorder. Significantly, due to his gang affiliations, Ramirez expressed fear that his family—especially his younger brother—would face harm and retaliation from neighborhood gangs, and Ramirez told Dr. Woehr that he expected to be killed within two years of his return home. Ramirez showed major improvement in his behavior and emotional outlook during his brief stay at Desert Hills, and Dr. Woehr believed that Ramirez wanted to change and could change for the better if provided with appropriate emotional support and positive feedback.

The TYC records also show that Dr. Whitworth again evaluated Ramirez in 2000, when Ramirez was 16, just prior to his first placement in a TYC correctional facility. Ramirez reported feeling deeply estranged, abandoned, and rejected by both parents. He was again suffering from a significant substance abuse problem, with

frequent use of crack cocaine. He was also having problems associated with his affiliation with the Tri-City Bombers gang. Dr. Whitworth recorded that Ramirez had suffered exposures to extreme violence, including witnessing the deaths of some of his friends. The IQ testing, using the WAIS III, resulted in a full scale IQ of 90, but this time there was a wide differential between verbal and performance IQ of 17 points, and Ramirez's WRAT-3 scores showed grade equivalent scores of fifth, third, and sixth grade in, respectively, reading, spelling and arithmetic. Dr. Whitworth's diagnoses for Ramirez included Dysthymic Disorder (with a recommendation that he be evaluated for suicide potential) and a Learning Disorder NOS.

Finally, the TYC records showed that when Ramirez entered TYC, Dr. Kim Buck evaluated him "for diagnostic formulation, treatment and placement considerations." It was based on Dr. Buck's report that John Niland recommended to Alma that Ramirez undergo testing for neurological impairment.[8] Dr. Buck's report, like the others, corroborated the existence of Ramirez's belief that no one wanted him and he would amount to nothing. Nevertheless, she recorded that Ramirez's motivation to change was high and he wanted to show his family that "he is somebody." Dr. Buck thought Ramirez's prognosis for successful outcome was

---

[8] Alma did not follow up on Niland's advice.

fair and that his primary treatment need was in the area of substance abuse, because "without effective substance abuse treatment, he presents a high risk to re-offend after he returns to the community." Dr. Buck also recommended mental-health treatment for what she diagnosed as a mood disorder (Depressive Order NOS). She cautioned that Ramirez might have difficulty meeting the cognitive demands of the TYC resocialization program, given his history of learning difficulties and prior diagnoses of Learning Disorder. Lastly, but notably, Dr. Buck was the first evaluator to caution that "[t]here is also an indication of mental illness within the family;" needless to say, none of this readily available and compelling mitigation evidence was investigated by trial counsel.

Ramirez's state post-conviction proceedings revealed additional information that should have been investigated and presented by trial counsel. David Sergi was appointed on December 22, 2004 as Ramirez's first PCR counsel. (2 CR 599.) On July 28, 2008, Sergi was held in contempt for failing to file a timely PCR application and Paul Mansur was appointed as PCR counsel. Mansur hired Gloria Rodriguez as his mitigation specialist. She ultimately expended 111.5 hours interviewing 15 witnesses. She had a single interview with Ramirez. A multi-generational mitigation investigation was not conducted. No additional records were collected.

Mansur filed the PCR petition on July 9, 2009. (PCR 1.) Mansur alleged ineffective assistance of trial counsel for failure to investigate and present mitigation. He supported the allegation with evidence provided by several family members, friends of the family, and Ramirez's friends. These witnesses presented the evidence which Alma was unable to present during the sentencing due to the state's hearsay objections, and discussed the trauma, physical abuse, severe neglect, and domestic violence in Ramirez's childhood. They also presented evidence of Ramirez's substance abuse and the influence of gangs in his impoverished community.

Mansur also had Ramirez evaluated by neuropsychologist, Dr. Gilbert Martinez. In June 2009, Dr. Martinez administered the WAIS IV, the WMS III, the WRAT-4, as well as several tests to gauge Ramirez's visuospatial and executive functioning. Dr. Martinez also administered a measure for malingering, which Ramirez passed. However, Dr. Martinez did not administer a full battery of neuropsychological tests.

Dr. Martinez reported that Ramirez had a full scale IQ score of 59. Dr. Martinez noted problems with Ramirez's memory functioning on the WMS III, and he reported deficits in visuospatial and executive functioning. However, perhaps in view of Ramirez's two prior IQ scores (including the score of 92 in 1998, when Ramirez was 14, and the score of 90, when Ramirez was 16), Martinez did not

diagnose Ramirez with intellectual disability in his draft report. He went with Cognitive Disorder NOS, with a need to rule out polysubstance-induced persistent dementia.

However, after receiving the draft report, Mansur asked Dr. Martinez about the possibility of a diagnosis of intellectual disability. Interestingly, in his final report, Martinez deferred diagnosis on AXIS II, but nevertheless concluded that Ramirez was functioning in the Mild Mental Retardation range of intelligence and that he appeared to have acquired these deficits prior to the age of 18, "likely as a result of repeated insults to the brain."

After the filing of the PCR petition in July 2009, nothing happened for nearly three years. Then, in September 2012, the State filed its answer to the PCR petition. Following this, in November 2012, Mansur filed an application to withdraw due to a conflict of interest raised by his move to a new employer—his new office was representing one of Ramirez's co-defendants. The court then appointed the Office of Capital Writs ("OCW") to replace Mansur.

OCW took a number of steps to expand on Mansur's mitigation investigation. They retained Dr. Jane Maxwell as an expert to explain how Ramirez's abuse of inhalants would likely have caused brain damage, and they supplemented this with a separate report by Dr. Ruben Gur, who explained that Ramirez's incomplete brain

development at the time of the crime, when he was just 18, was compounded by his abuse of inhalants.

In addition, OCW presented evidence that Ramirez's use of inhalants increased between the years 2000 and 2002. Dr. Maxwell relied on this evidence to explain the precipitous drop in IQ score after the testing in 2000. In addition, OCW presented evidence that Ramirez and his mother had been exposed to pesticides consequent to agricultural work. For example, evidence showed that Ramirez's mother sometimes took her young children with her to the pesticide-covered fields while she worked.

Also on the subject of brain impairment, in February 2013, shortly after OCW's appointment, OCW consulted with Austin neuropsychologist Dr. James Underhill, presumably because OCW was concerned about the disparity between Ramirez's IQ scores from 1998 and 2000 and his score from 2009. OCW specifically asked Dr. Underhill to review Dr. Martinez's 2009 report.

Finally, OCW capped off this aspect of the investigation by having Ramirez undergo an MRI of the brain on October 25, 2013. The MRI report indicated Ramirez had a "history of dementia." This no doubt was based on Dr. Martinez's 2009 report, where he opined that "polysubstance induced persistent dementia" needed to be ruled out.  The MRI resulted in a positive finding that "subtle bioccipital

FLAIR hyperintensities may be seen in white matter disease, nonspecific." OCW does not appear to have shared this MRI image with Dr. Gur. However, OCW did retain Dr. John Bertelson, the Chief of Neurology at the Seten Brain and Spine Institute in Austin, to examine the image. Dr. Bertelson was asked to report on any clinically significant findings based solely on the MRI images, but the file lacks confirmation.

On June 18, 2014, almost 5 years after the filing of the PCR petition, the TCCA issued an order for the PCR proceedings to be concluded within 60 days, no later than August 18, 2014. Following the issuance of this order, OCW stipulated with the State to ask the CCA to move the deadline forward to November 17, 2014, so the State could have its expert, Dr. Thomas Allen, examine Ramirez for presence of intellectual disability, and to allow time to conduct an evidentiary hearing. The TCCA did not respond to the request to move the deadline. Nevertheless, the parties and the trial court ignored the TCCA deadline. The trial court scheduled an evidentiary hearing on the PCR petition to take place November 3-4, 2014, well past the TCCA's August 18 deadline.

Meanwhile, Dr. Allen completed his testing on August 25 and found Ramirez had a full scale IQ score of 92, in line with the testing done in 1998 and 2000. What happened next is unclear. It appears that once he learned of Dr. Allen's test results,

47

Dr. Martinez refused to testify in support of his own test results. OCW consulted again with Dr. Underhill. Dr. Underhill's file notes show that he did a rough comparison of the results of all of the IQ testing that had been done, and he concluded that the 59 IQ score obtained by Dr. Martinez was an outlier. It does not appear that OCW asked whether any and all forms of cognitive impairment could now be ruled out. Moreover, OCW did not request additional time to manage Dr. Martinez's change of position and did not consider hiring another neuropsychologist to reevaluate Ramirez.

On October 21, 2014, OCW filed a pleading labeled Notice of Intent to Withdraw Claims Regarding Mental Impairments. The pleading stated that "[i]n light of the evaluation of Ramirez conducted by Dr. Thomas Allen . . . the reliability and veracity of previous testing of Ramirez by Dr. Gilbert Martinez is significantly compromised." Based on this, PCR counsel explicitly withdrew four claims in the PCR Petition: (1) Claim #2, which alleged Ramirez was intellectually disabled and therefore ineligible for the death penalty under Atkins; (2) Claim #3, which alleged that trial counsel were ineffective for failing to present evidence of Ramirez's intellectual disability; (3) Claim #4, which alleged that, even if Ramirez was not intellectually disabled, his execution would violate the Due Process Clause and the Eighth Amendment, because the severity of his cognitive impairments would render

his sentence unconstitutionally disproportionate and (4) Claim # 14, which alleged that Ramirez was not competent to stand trial. Left intact was PCR Claim #1, which generally alleged a failure to investigate and develop mitigation. Included in Claim #1 were allegations that trial counsel had failed to develop and present evidence concerning Ramirez's mental health and brain impairment. However, because Dr. Martinez was the only professional to actually evaluate Ramirez, there was little left to support mental-health related mitigation under Claim 1. The lack of evidence bearing on Ramirez's mental health and cognitive impairments would virtually guaranty the failure of Claim 1.

The evidentiary hearing began more than two months after the TCCA's August 18 deadline for completion of the proceedings had expired. (Evid. Hr'g Tr., Nov. 3–4, 2014.) At the evidentiary hearing, OCW presented written declarations from Dr. Gur and Dr. Maxwell. It could be inferred from these declarations that Ramirez had a typically undeveloped 18-year-old brain at the time of the offense and that he was at serious risk for brain damage due to his history of inhalant abuse. Unfortunately, there was no testing to support their surmise about Ramirez's likely impairments. The bulk of the remaining mitigating evidence came from the declarations of family members and others who were able to corroborate some of the trauma, abuse, neglect and dysfunction in Ramirez's childhood. Inexplicably,

OCW did not offer into evidence at the evidentiary hearing any of the earlier psychological evaluations discussed above, which substantiate that Ramirez suffered from significant mental-health problems and learning disabilities causally related to his troubling childhood.

The evidentiary hearing focused on the reasonableness of trial counsel's failure to present witnesses to the jury concerning Ramirez's background and childhood. PCR counsel attacked trial counsel for relying on Dr. Kate Allen to present all of the mitigation evidence, a strategy which backfired when the trial court prevented Dr. Allen from testifying about the contents of the records she reviewed and about the witness accounts that had been given to mitigation specialist Gilda Bowen. The witnesses at the hearing were trial counsel Rolando Garza and Alma Garza, as well as Ramirez's mother and one of his sisters, Janie.

Both trial counsel testified that they had not planned to present all of the mitigation evidence through Dr. Allen. They had planned to call Ramirez's mother and sisters to present evidence about Ramirez's background but could not locate them. Alma testified that in preparation for presenting these witnesses, she had obtained mitigation evidence from Ramirez's mother and sister. Her files do not bear this out. Apart from Bowen's work, there is no mitigation work-product related to family interviews in trial counsels' files. Further, Alma's pre-hearing declaration

affirmed that all mitigation investigation was done by Bowen, but the contradiction between her hearing testimony and her pre-hearing declaration was never mentioned by PCR counsel.

During the PCR hearing, Alma testified that during Ramirez's trial, she learned that Ramirez's family had been threatened with gang-related violent retaliation and consequently the family (including Ramirez's sister, Janie, and his mother Juana) left Hidalgo County for Corpus Christi. Another sister, Bertha, was already living in Ohio, and counsel claimed that she too could not be reached. According to trial counsel, they could not locate either of Ramirez's sisters or his mother in order to get them back to testify for the sentencing. Trial counsel testified that they decided to rely exclusively on Dr. Allen for the mitigation phase only after they realized the family members could not be located.

However, trial counsel made no record of their "missing" witness problems during the sentencing proceedings before the trial court. During Dr. Allen's sentencing-phase testimony, the trial court sustained hearsay objections to Dr. Allen's testimony. On several occasions the trial court and the State admonished the defense that they could have brought witnesses to testify, rather than relying on the hearsay in the TYC records, or in Bowen's reports. In response to these admonishments, not once did Alma suggest that any of her witnesses had become

unavailable, nor did she request a brief continuance so the witnesses could be located and brought forth. Moreover, trial counsel's testimony is further contradicted by the fact that earlier, when one of the witnesses was not going to be in Texas on the date set for the suppression hearing, trial counsel alerted the court and sought help.

Ramirez's mother, Juana Ramirez, and his sister, Janie, testified at the PCR hearing. Janie testified that neither trial counsel nor Bowen had ever interviewed her to obtain mitigating evidence. Juana Ramirez testified that she and Janie had moved to Corpus Christi and that she had been encouraged to do so by Alma. Ramirez's mother also testified that she continued to attend portions of the trial after her move to Corpus Christi and that Alma had her contact information and cell phone number, but that Alma never contacted her about coming to court to testify at the sentencing. Alma's testimony corroborated Mrs. Ramirez's testimony at least in part. Alma testified that Ramirez's mother and sister were in court almost every day for quite some time, but she claimed they suddenly disappeared when the sentencing phase began. It defies logic that Ramirez's mother would religiously attend his trial and then disappear when his fate was to be decided. After the trial judge heard testimony to the effect that Alma had encouraged Ramirez's mother to move, he called Alma back to testify and she denied doing so.

Ultimately, the PCR court found that Ramirez's family left town and could not be located for sentencing, and therefore trial counsels' failed effort to present all of the mitigation evidence through Dr. Allen was not the result of deficient performance. The PCR court also found that the new evidence presented by PCR counsel from other witnesses was largely cumulative of what trial counsel was going to present from Ramirez's family and could have been presented if the family members had not made themselves unavailable. However, OCW's own files contain information that would have contradicted trial counsel's statements and supported the family's testimony, but it was never presented. Commendably, OCW requested and obtained records from the Social Security Administration related to Ramirez's mother's successful application for Social Security disability benefits. However, none of the information in these records was disclosed to the PCR court. These records contain key data confirming the truth of Juana Ramirez's PCR testimony and undermining the credibility of trial counsels' PCR testimony.

The social security files contain psychiatric records and progress notes of Mrs. Ramirez's psychiatrist, Dr. Elisa Sanchez. Dr. Sanchez's office was located in McAllen, near Mrs. Ramirez's residence in Donna, Texas. There is a progress note dated October 15, 2004, which corroborates Mrs. Ramirez's PCR testimony that Alma had encouraged her move to Corpus Christi. The note confirms Mrs.

Ramirez's account: that she had decided to move her family to Corpus Christi. "The attorney told them to [move] because the victims have threatened to kill her."

Dr. Sanchez's progress note of December 23, 2004, is especially telling in several respects. The December 23, 2004, note comes five days after Ramirez was sentenced to death on Saturday, December 18, 2004. First, the progress note confirms that Mrs. Ramirez was still seeing her local psychiatrist in McAllen; she was not incommunicado 160 miles away in Corpus Christi. Second, the December 23rd note indicates that she had not given up her local residence—she still had her house located nearby in Donna, Texas. Mrs. Ramirez reported to Dr. Sanchez that her house in Donna had been robbed the day prior. Third, contradicting trial counsel's contention that the family had vanished, the progress note proves that Mrs. Ramirez had been in communication with Alma nearly contemporaneous with the sentencing proceedings: Dr. Sanchez's notes specifically mention Alma Garza, the fact that Ramirez was sentenced to death, and that there would be an appeal. Fourth, in an obvious reference to the sentencing proceedings which took place on Saturday December 18, the same date when Dr. Allen testified and the death verdict was rendered, Dr. Sanchez's progress notes report this disclosure by Mrs. Ramirez: "Sat[urday] death they did not want me to be there."

Dr. Sanchez's December 23, 2004, progress notes dispositively rebut the PCR testimony of trial counsel that they had planned on calling members of Ramirez's family to testify, but that the family members had disappeared. Instead, Mrs. Ramirez was told to stay away from the courthouse. One need only look at Alma's closing argument to the jury to understand why Alma wanted Mrs. Ramirez to stay away. Alma attacked Mrs. Ramirez during her closing and told the jury, "[H]is mother didn't testify. She never asked for his life. I did." All of this information was available to PCR counsel but they apparently did not realize what they had in their files and it was never presented. However, even with OCW's failures in this case, Ramirez presented significant additional evidence illustrating both his counsel's deficient performance and his own significant mitigation evidence. The PCR court's ruling otherwise was unreasonable.

Finally, federal habeas counsel's investigation has revealed even more evidence that should have been presented to the jury in mitigation of Ramirez's crime. This evidence is attached to this Petition as exhibits, and reveals the following significant and persuasive evidence in mitigation of Ramirez's crime and relevant to his level of culpability. *See, e.g.*, Ex. 15 (Ramirez's childhood medical records: Ramirez reports depression in 1996; does not enjoy school; flagged as possible increased risk of lead exposure (although multiple testing was WNL); includes facts

re: risky sexual behaviors–Ramirez tests positive for herpes, claims not to remember who he had sex with because he was "high on acid and Roche pills"; discusses psych medications and allergy to Zoloft); Ex. 16 (Ramirez's mental health records, age 14: Ramirez reports that he hates his parents and is hanging out with the wrong crowd. Prescribed Zoloft for depression and referred to individual counseling for anger management Diagnosed with mood disorder, conduct disorder, polysubstance dependence. Ramirez reported wanting to get married to a 19-year-old girlfriend. Goals of intervention are to increase coping skills re depression and rebellious behavior); Ex. 17 (Ramirez's brain scan from 2013, shows evidence of impairment explained in Dr. Hyde's report and addendum. OCW had this done but did not use it.); Ex. 18 (pages from Ramirez's medical records from TDCJ, detailing prior addiction problems; treatment for depression; claims he suffered a head injury in a car accident; and reports physical abuse by father); Ex. 19 (pages of Ramirez's school records which were missing from the PCR exhibits; Debbie Dunn (learning disability expert) relied on these for her declaration. Also includes nursing notes missing from previous PCR filings and replacements for cut-off pages); Ex. 20 (Ramirez's mother's Social Security records, revealing poverty-level income); Exs. 21-22 (vital records); Exs. 23-25 (detailing Ramirez's prior criminal record); Exs. 27-50 (family records revealing family history of medical and mental-health issues,

substance abuse, poverty, etc.); Ex. 51 (no problems with Ramirez at TYC; gang problem was bad at TYC, and even more prominent at Evins Regional Facility (where Ramirez was mostly held); kids were on their own when they were released and Ramirez likely did not receive any follow-up services); Ex. 52 (Ramirez's teacher in 1998, noting that Ramirez needed extra help to get by and had to attend summer school one year to be promoted to the next grade, also noting presence of drug dealers and gangs in the school); Ex. 53 (supervised Ramirez at TYC, questioned his citizenship and age as they had no documentation for him. Felt Ramirez was especially mature. Remembered he had substance abuse problems and an abusive father, and that Ramirez told him his father's abandonment was why he started hanging out with gangs. Ramirez had suicidal tendencies. Not ready to take GED, low-level learner. Felt responsible for younger sister. Classified as lower-level mental health problems); Ex. 54 (family friend, Ramirez was respectful, very remorseful after being reprimanded by her, gang problem in Donna, TX); Ex. 55 (neighbor, Ramirez had abusive father, racism, drugs, and gangs in Donna, TX. Ramirez struggled in school and heard voices. So did his mother. Ramirez had a lot of anger inside him and began acting out); Ex. 56 (friend, Ramirez had little supervision, unhappy childhood, no father figure, heavy gang presence in Donna, TX. Gangs made Ramirez take the blame for things and he could not get out); Ex.

57 (Ramirez's teacher in 3rd grade, poor student, very far behind, did not receive help from school); Ex. 58 (Ramirez's mother Juana's psychiatrist 2004-2005, treated Juana for Major Depression with Psychotic Features and Dysthymic Disorder, SI and auditory hallucinations. Juana reported abuse and abandonment. Refused hospitalization. One child with Bipolar Disorder); Ex. 59 (Ramirez's case manager at TYC, Ramirez had an innocence, sincere, gentle, showed respect, was spiritual. Ramirez started partying when he was about 12, needed a role model. Suspected abuse and PTSD. Mother a roller coaster. Dependence on cocaine and inhalants. Some kind of neurocognitive delay. Donna, TX very bad town); Ex. 60 (friend, TCB recruited both him and Ramirez. Could not get out safely. Ramirez had SI since age 13-14. Father gone, mother only interested in church); Ex. 61 (Ramirez's Licensed Clinical Social Worker at TYC, likeable and respectful. Donna, TX bad town. Had chemical dependency treatment but Evins was a terrible facility); Ex. 62 (Ramirez's 8th grade teacher, Ramirez was genuine, and a follower. Language and reading problems. Ramirez spent a lot of time in detention and eventually dropped out); Ex. 63 (Ramirez's youngest sister, Ramirez was a good brother. She believes she has antisocial anxiety disorder, SI, and five alternate personalities whom she speaks to. Mother and older sister have MH issues); Ex. 64 (Ramirez's grandmother, Ramirez's father was abusive, Ramirez's mother was the product of incest); Ex. 65 (Ramirez's

great-uncle, Ramirez was a happy, respectful, and obedient kid. Ramirez's father was physically abusive to both Juana and the children); Ex. 66 (Ramirez's cousin, Ramirez was happy when he visited them and had a good relationship with his sisters. His father was abusive and his mother ignored her kids in favor of church. Berta, Ramirez's sister, is mentally ill); Ex. 67 (Ramirez's cousin, fond memories of Ramirez, treated aunt and uncle with respect, was happy and helpful when he stayed with them. Gang life changed Ramirez); Ex. 68 (Ramirez's teacher in 1992, Ramirez absent a lot, Ramirez needed help to pass class. Peer pressure to join gangs); Ex. 69 (TYC staff, Evins Unit had inadequate services for youth, drug problems, violence, abuse by staff, and gangs); Ex. 70 (Ramirez's academic performance not normal. Discussed challenges of at-risk, Spanish-speaking students at the school); Ex. 71 (TYC staff, Ramirez had extremely high score on substance abuse scale, was a follower, no behavior problems, did well with direction and structure, felt everyone was hostile until proven otherwise, learning disability and impairment in adaptive functioning. Hopeless, suicidal ideation, dysthymia. Suffered abuse and neglect. Had insufficient treatment at TYC); Ex. 72 (TYC Administrator, poor educational programming, poor facilities, ineffective treatment); Ex. 73 (Ramirez's great-uncle, Ramirez's father was abusive to his mother. Ramirez was nice and respectful, happy when away from home visiting him at his ranch); Ex. 74 (Ramirez's uncle,

59

Ramirez's mother was a sickly baby, she neglected her children in favor of church. Ignacio reports alcohol abuse, anxiety, depression, and hallucinations); Ex. 75 (worked at the Donna Alternative School, Donna, TX rough town (i.e. gangs), no problems with Ramirez, Oliver also came to alternative school, remembers multiple conferences with mom Juana and that older sister Berta had to translate. Berta looked after her brothers); Ex. 76 (Ramirez's sister, father was abusive daily to mother and all the kids, mother became depressed and stopped interacting with kids. She worked in the fields which made her sick. Hard to get to doctor appointments and school because mother could not drive. CPS investigated mom for child neglect after ignoring her (Berta's) psychological issues of anxiety, hallucinations, mood swings, and anger. Currently diagnosed with Bipolar Disorder and depression. Thinks that Ramirez may also be depressed and bipolar. Father's treatment of Ramirez destroyed his self-esteem and mother did not believe in treatment. Donna, TX bad environment); Ex. 77 (Ramirez's sister, father a violent alcoholic. Very poor, and mother did not openly discuss family's struggles. Maternal uncles Ignacio and Edmundo also problems with alcohol. Berta reports feeling depressed throughout her life. She was closer to Ramirez); Ex. 78 (Ramirez's mother, depressed for as long as she can remember. Saw a psychiatrist in 2004. Sexually abused by uncle, auditory hallucinations, and suicidal ideations. Believes all of her children have

mental health issues. Ramirez became unhappy and depressed after his father left the home. He had nightmares and suicidal ideations until about age 12. Sought refuge in church. Tried to speak to trial counsel but couldn't reach her); Ex. 79 (Worked for Donna Independent School District, Ramirez was quiet, never mean or aggressive. In Donna, TX it is common for a kid's gang to be their family. Gangs, violence, little discipline in school); Ex. 80 (TYC staff, discussed Marlin Unit of TYC and assessment process for new intakes); Ex. 81 (TYC Public Information Officer, discussed differences in each unit, how placements were determined, inadequately trained staff, sexual and physical abuse at Evins Unit, poor programming and healthcare); Ex. 82 (assessing the effect the TYC environment had on Ramirez. Conditions at the Evins facility where Ramirez was housed were so bad and well-publicized (gangs, violence, drugs, abuse by unqualified staff, lack of educational programming, substance abuse or mental health treatment, corruption, fear, intimidation) that the U.S. DOJ initiated an investigation a few years after Ramirez's release. The facilities in which Ramirez was housed "made it entirely predictable that youth would emerge worse." Staff reported that conditions were at their worst in 2000, when Ramirez was housed at the unit. Highly punitive environment, culture of military-style reform rather than treatment. This model "confirms youth's self-identity as criminals and increases their anger, trauma, and

reliance on physical force rather than communication to deal with challenging situations." "Evidence of the harms caused to incarcerated youth by dangerous conditions and ineffective programming would have been readily accessible to trial counsel."); Ex. 83 (discusses Ramirez's learning and emotional disabilities: Ramirez exhibited symptoms of learning disability, emotional disability likely secondary to his learning disabilities, should have been identified as a child with learning and emotional disabilities and given appropriate services under federal law, and the failure to identify Ramirez as a child with learning and emotional disabilities, and the consequent failure to provide him with special education, did him a disservice and negatively affected his ability to succeed in life.); Ex. 84 (neurologist opining that Ramirez suffers from a developmental brain disorder related to an abnormal in utero environment, genetic factors, and deleterious post-natal events including severe financial hardship, closed head injury, and polysubstance abuse beginning in late childhood and continuing through adolescence. This resulted in organic brain damage that had a marked adverse influence on Mr. Ramirez's cognitive function and behavior through adulthood); Ex. 85 (addendum to neurologist report stating, "Within a reasonable degree of medical certainly, the longstanding damage to Mr. Ramirez's thalamus, as noted on MRI scan, contributes significantly to the behavior problems he has manifested throughout adolescence, and contributed to the actions

that have led to this incarceration. Additionally, the thalamic lesions would act in concert with pre-existing neurodevelopmental problems, leading to greater brain dysfunction and functional disability."); Ex. 86 (summary of neuropsychologist testing); Ex. 87 (neuropsychologist report, discussing "Ramirez's pronounced and authentic neuropsychological impairment," finding that "[i]t is quite likely that Mr. Ramirez's documented cerebral dysfunction (i.e. brain damage) is a direct result of prenatal insult (e.g. physical abuse of mother during pregnancy) as well as exposure to severe childhood psychological trauma in the form of physical abuse . . . Given his record of severe academic difficulties, which predated his substance abuse, it is extremely likely that Mr. Ramirez suffers from brain damage that is independent from his substance abuse. Nevertheless, Mr. Ramirez's substance abuse did likely serve to exacerbate existing neuropsychological impairment. However, it is quite possible that if Mr. Ramirez had not had early brain dysfunction and/or, had received specialized services during elementary school, that he wouldn't have been at such high risk for self-medicating through polysubstance abuse.") Ex. 88 (trial expert summary of findings); Ex. 89 (trial expert's file, including billing records, notes).

This abundant evidence starkly illustrates the difference between that counsel could have presented and what actually was presented. Trial counsel's failures cannot be reconciled with the Eighth and Fourteenth Amendment requirements that

sentencing procedures "focus the jury's attention on the particularized nature of the crime," *Gregg v. Georgia*, 428 U.S. 153, 206 (1976), while also allowing "the particularized consideration of relevant aspects of the character and record" of the individual defendant, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). Because "an individualized decision is essential," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), the Eighth Amendment mandates that the sentencer "not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Id.* at 604. Likewise, the sentencer may not "refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). Relevant mitigating evidence is not limited only to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, there is no requirement that mitigating evidence even have a "nexus" to the offenses or that the defendant make any showing that "the criminal act was attributable" in any way to the mitigating factors. *Tennard v. Dretke*, 542 U.S. 274, 286 (2004).

Relevant mitigating evidence includes any evidence that would be "mitigating" in the sense that it "might serve 'as a basis for a sentence less than death.'" *Skipper*, 476 U.S. at 5 (quoting *Lockett*, 438 U.S. at 604). In essence, the

Eighth Amendment provides this fundamental premise: If the sentence fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors that warrant a less severe penalty. *Woodson*, 428 U.S. at 304.

A jury can consider evidence in mitigation, however, only if trial defense counsel reasonably and diligently investigates and then presents the available evidence. Because the scope of the evidence that may be considered by the jury in sentencing is extraordinarily broad, trial counsel is under a greater obligation to discover, investigate, evaluate, and digest evidence in mitigation. "The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community." *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001) (quoting Stephen B. Bright, *Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting*, 36 Santa Clara L. Rev. 1069, 1085-86 (1996)). Alma and Rolando utterly failed to meet this burden.

In short, the prevailing professional norms in 2004 required, at minimum, that defense counsel attempt through mitigation investigation and evidence to provide the jury with the complete picture of Ramirez's life and circumstances to allow the individualized consideration required by the U.S. Constitution. Trial counsel's performance here did not meet this burden, and the cumulative consideration of trial counsel's deficiencies and the abundant and compelling evidence in mitigation of Ramirez's crime undermines confidence in the death sentences and requires relief.

## CLAIM TWO

**As he was 18 at the time of the crime, Ramirez's execution would violate the Eighth Amendment prohibition on cruel and unusual punishment.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (DA Opening Br. at 22, Aug. 8, 2006.)

The Eighth Amendment prohibits "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins v. Virginia*, 536 U.S. 304, 311 n.7 (2002); *see also Enmund v. Florida*, 458 U.S. 782, 788 (1982). A punishment's proportionality is determined by the evolving standards of decency, since "the standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." *Kennedy v.*

*Louisiana*, 554 U.S. 407, 419 (2008) (citing *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, J., dissenting)). The Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

The concern over cruel and unusual punishment is even more significant when a person's life is at stake. In capital cases, "the Court has been particularly sensitive to insure that every safeguard is observed," because "[t]here is no question that death as a punishment is unique in its severity and irrevocability." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). Under the Eighth Amendment, a death sentence "is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes." *Id.* at 183. *See also Kennedy*, 554 U.S. at 441 (citing *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).

When assessing the proportionality of a death sentence under the Eighth Amendment, "the Court [also] insists upon confining the instances in which the punishment can be imposed." *Id.* at 420. The result has been that the death penalty is only proportionate when used for "'a narrow category of the most serious crimes' and on those whose extreme culpability makes them 'the most deserving of execution.'" *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 568 (2005)); *see also*

*Roper*, 543 U.S. at 568 (recognizing that the death penalty should be reserved for "the worst offenders").

The U.S. Supreme Court has made clear that the Eighth Amendment limits the sentences that may be imposed on children. Recognizing their diminished capacity and culpability, in 2005 the U.S. Supreme Court prohibited the death sentence for juveniles under eighteen at the time of the crime in *Roper v. Simmons*, 543 U.S. 551, 574 (2005). In *Graham v. Florida*, it held that children convicted of non-homicide offenses cannot be sentenced to life without parole and must have a "realistic" and "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. 48, 74–75 (2010). And in *Miller v. Alabama* and *Montgomery v. Louisiana*, the Court established that children must have this meaningful opportunity for release even in homicide cases—except in the rarest of cases where the sentencer determines that the particular child "exhibits such irretrievable depravity that rehabilitation is impossible[.]" *Montgomery*, 136 S. Ct. 718, 733 (2016); *Miller*, 567 U.S. 460, 473 (2012). *Roper*, *Graham*, *Miller*, and *Montgomery* are grounded in youths' reduced culpability and greater capacity for reform, an understanding gleaned in large part from "developments in psychology and brain science [showing] fundamental differences between juvenile and adult minds." *Graham*, 560 U.S. at 68; *see also Miller*, 567 U.S. at 471–72, 472 n.5.

In its *Roper* decision, the Court recognized that delineating the category of only juveniles who were under 18 years old as exempt from capital punishment may have been arbitrary and under-inclusive, but it stated nonetheless that "a line must be drawn." *Roper* 543 U.S. at 574 That line, however, was not drawn in *Roper*, but re-drawn. In *Thompson v. Oklahoma*, 487 U.S. 815 (1988), the Supreme Court held that the death penalty was unconstitutional for offenders under the age of 16. Evolving standards of decency, which must move apace with emerging scientific consensus, compel courts to continue to reevaluate arbitrary rules to ensure that only those who are most culpable and therefore "most deserving of execution" are sentenced to death. *Roper*, 543 U.S. at 568.

Moreover, since "the imposition of death by public authority is so profoundly different from all other penalties . . . an individualized decision is essential in capital cases." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). In general, the effects of brain development in youth twenty-one and under has reached the point of scientific consensus. The medical community has now overwhelmingly determined that adolescents in their late teens and early twenties are more comparable to their younger peers than they are to adults in their late-twenties or older with developed brains. For the same reasons *Roper* extended the categorical bar to all adolescents under eighteen, conformity with Eighth Amendment standards now counsels this

Court to apply the constitutional protection to youths twenty-one and under. But this is especially true for those who, like Ramirez, have other factors further delaying their development. Therefore, while 18 year olds should be categorically exempt from execution, under an individualized determination Ramirez's execution in particular would violate the Eighth Amendment's prohibition on cruel and unusual punishment.

### A. Evolving standards of decency no longer allow for the imposition of death sentences on people 18 years of age.

The Eighth Amendment's prohibition of cruel and unusual punishment requires that "punishment for crime should be graduated and proportioned to [the] offense." *Roper*, 543 U.S. at 560 (internal quotation marks omitted). This proportionality principle requires the court to "determine which punishments are so disproportionate as to be cruel and unusual" and limit the death penalty to those who commit "the most serious crimes" and are "most deserving of execution." *Id.* at 561, 568 (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958)). The death penalty is categorically barred for certain groups of offenders if a national consensus develops against executing the particular group, scientific consensus supports a finding of lesser culpability for certain classes of offenders, and if capital punishment fails to serve the purposes of punishment, namely retribution or deterrence. *See, e.g.*, *Roper*, 543 U.S. at 560; *Atkins*, 536 U.S. at 311; *Kennedy*, 554 U.S. at 441; *see also Gregg*,

428 U.S. 153 (the death penalty is said to serve two purposes, retribution and deterrence).

### 1.     National consensus

A national consensus has developed against executing offenders who were under 21 years of age at the time they committed their offense(s). A review of the laws and practices of the various states demonstrate this consensus. Upon information and belief, at the time of this writing twenty states plus the District of Columbia and five United States territories effectively ban the death penalty. Three additional states have imposed moratoria on executions, and during the last 15 years, seven states have demonstrated an actual practice of neither executing nor sentencing to death offenders who were under 21 years of age at the time they committed a capital offense. Added together, there are 30 states plus six additional jurisdictions that bar execution of offenders under 21 years by law or in practice.

Even in those remaining States with the death penalty as an authorized punishment for offenders under 21 years, executions occur in a minority of the States. In the last ten years, for example, only 12 States have actually executed offenders who were under the age of 21 years at the time of their offenses: Texas, Virginia, Oklahoma, Florida, Delaware, Mississippi, Alabama, Ohio, Georgia, South Carolina, Indiana, and South Dakota. Since 2011, that number has dropped to

nine States. Indeed, of the 29 States that have had executions since 2000, 14 States did not execute anyone under 21 years, and four of those States have since repealed the death penalty or imposed a moratorium on executions.

Recently, courts in some states have extended the Eighth Amendment protections of *Roper*, *Graham*, *Miller*, and *Montgomery* to young adults, at least in some circumstances. For example, a Circuit Court in Kentucky declared the death penalty unconstitutional for offenders under 21. *See Commonwealth v. Bredhold*, No. 14-CR-161, Order Declaring Kentucky's Death Penalty Statute as Unconstitutional (Fayette Circuit Court, 7th Div. Aug. 1, 2017) (Scorsone, J.). The court reasoned that "given the national trend toward restricting the use of the death penalty for young offenders, and given the recent studies by the scientific community, the death penalty would be an unconstitutionally disproportionate punishment for crimes committed by individuals under twenty-one (21) at the time of their offense." *Id.* (relying heavily on brain science-related testimony to conclude that the death penalty is a disproportionate punishment for offenders younger than 21 because such individuals are categorically less culpable and have a better chance at rehabilitation); *see also Commonwealth v. Diaz*, No. 15-CR-584-001, Order Declaring Kentucky's Death Penalty Statute as Unconstitutional (Fayette Circuit Court, 7th Div. Sept. 6, 2017) (Scorsone, J.). A New Jersey appellate court similarly

relied on *Miller* to support its decision to remand for resentencing a 75-year aggregate sentence imposed for murder committed by a 21-year-old defendant, reasoning that where the sentence is the practical equivalent of life without parole, courts must "consider at sentencing a youthful offender's failure to appreciate risks and consequences as well as other factors often peculiar to young offenders." *State v. Norris*, No. A-3008-15T4, 2017 WL 2062145, at *5 (N.J. Super. Ct. App. Div. May 15, 2017) (internal quotation omitted); *see also Cruz v. United States*, No. 11-CV-787 (JCH), 2017 WL 3638176 (D. Conn. April 3, 2017) (granting defendant's motion for a hearing on a § 2255 motion, concluding that he raised an issue of material fact as to whether a youth of 18 years and 20 weeks is legally and developmentally a child such that his mandatory life-without-parole sentence violates the Eighth Amendment).

National consensus is clear that, under evolving standards of decency, the execution of 18 year olds is no longer permissible under the Eighth Amendment.

### 2. Scientific Evidence

Based on findings from the medical and scientific community, the Supreme Court held in *Roper* that it is cruel and unusual punishment to impose death sentences on juveniles under eighteen. Given the knowledge about the human brain maturation process then available, the Court's cutoff at age eighteen made sense at

that time. As leading researchers in the field have explained, at the time of the Court's decision in *Roper*, available research in 2005 failed to focus on the brain development of late adolescents, and "[y]oung adults between the ages of eighteen and twenty-one constitute[d] a less well-defined category." *See* Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Authority: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 644 (2016). While evidence previously existed that "psychological and neurobiological development that characterizes adolescence continues into the midtwenties, [] the research [had] not yet produced a robust understanding of maturation in young adults age eighteen to twenty-one." *Id.* at 653.

After *Roper*, mental health professionals turned their attention to older adolescents and found that many of the same traits possessed by juveniles under eighteen—traits that make them ineligible for the death penalty—also apply to older adolescents in their late teens and early twenties. In the thirteen years since *Roper*, three major changes have altered the justification for a strict age-eighteen cutoff: (1) scientific research has developed to explain the effects of brain maturation, or the lack thereof, on the behavioral and decision-making abilities of late adolescents in their late teens and early twenties; (2) recent changes in the treatment of older adolescents in the criminal justice system reflect a more informed understanding of

late adolescents and the differences between late adolescents and adults with fully-matured brains; and (3) the Court decided *Hall v. Florida*, 572 U.S. 701 (2014), and *Moore v. Texas*, 137 S. Ct. 1039 (2017), which illuminated the interaction between law and science and sought to reduce the "unacceptable risk" that death sentences are imposed on those who lack the requisite culpability. *See Hall*, 572 U.S. 704.

Given the recently available research, the scientific community has since confirmed that individuals who are 18 years old do not have fully developed brains and continue to be vulnerable to peer pressure and risk-taking behavior just like their peers who are younger than 18 years old. Neuroscientific research has shown that the human brain does not fully mature until a person reaches her mid- 20s. In 2016, for example, scientists tested the degree to which the brains of 18-to-21 year-old persons functioned as compared to adolescents or adults with respect to critical regulatory tasks, and in "key brain areas," those studies found that the 18-21 year olds' brain activity during threat conditions was more similar to that of teenagers. *See* Leah H. Somerville, *Searching for Signatures of Brain Maturity: What are we Searching For?*, 92 Neuron 2 (2016), https://andl.wjh. harvard.edu/sites/default/files/pdf/somerville_neuron16.pdf?width=85%25&height=85%25&iframe=true (last visited Nov. 30, 2018). Scientific evidence has identified "a distinctive phase of development occurring between the ages of 18 and 24." House of Commons

Justice Committee, *The Treatment of Young Adults in the Criminal Justice System*, Seventh Report of Session 2016–17 at 6 (hereinafter "House of Commons Committee"), https://publications.parliament.uk/pa/cm201617/ cmselect/cmjust/169/169.pdf (last visited Nov. 30, 2018). This new knowledge demonstrates that "[y]oung adults are still developing neurologically up to the age of 25 and have a high prevalence of atypical brain development." *Id.* at 61.

Young adults do grow out of impulsive or reckless behaviors; they become more reflective, more risk-adverse, more mature, and less vulnerable to peer pressure.[9] But the national consensus that 18 year olds are categorically not as responsible and mature as those over 21 years is further confirmed by state and federal laws that impose minimum age requirements (e.g., consumption of alcohol,

---

[9] *See, e.g.*, A. Cohen, *et al.*, *When is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27(4) Psychological Science 549, 559 (2016) ("[T]hese findings suggest that young adulthood is a time when cognitive control is still vulnerable to negative emotional influences, in part as a result of continued development of lateral and medial prefrontal circuitry."), *available at* http://fablab.yale.edu/sites/default/files/publications/Cohen%2C%20Breiner%2C%20Steinberg%2C%20et%20al%20%282016%29%20When%20is%20an%20adolescent%20an%20adult.pdf (last visited Nov. 30, 2018); L. Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Dev. Rev. 78 (Mar. 2008) (noting that "rates of risk-taking are high among 18- to 21-year-olds" and explaining that adolescents and young adults are more likely than adults over 25 to engage in risky behaviors), *available at* https://pdfs.semanticscholar.org/747a/3357886da1e9ffee2fc64e949e00bdecdb9a.pdf?_ga=2.258212810.1129400954.1543606582-1919942920.1543606582 (last visited Nov. 30, 2018).

obtaining a concealed carry handgun permit), or that extend protections afforded to those under 18 years (e.g., extending educational opportunities and/or foster care benefits to children up to age 21 years). And the recent scientific literature confirms this consensus, as there is now "an irrefutable body of evidence from advances in behavioural neuro-science that the typical adult male brain is not fully formed until at least the mid-20s, meaning that young adult males typically have more psycho-social similarities to children than to older adults." House of Commons Committee at 8.

The new scientific consensus about brain development as it relates to someone like Ramirez, who was 18 years old at the time of the offense, is so significant that this year the American Bar Association's House of Delegates passed a resolution calling on American jurisdictions that still have capital punishment to prohibit its imposition against those who were twenty-one years of age or younger at the time of the offense. *See* L. Rawles, *Ban Death Penalty for Those 21 or Younger, ABA House Says*, ABA Journal (Feb. 5, 2018), http://www.abajournal.com/news/article/Ban_death_penalty_for_those_21_or_younger_aba_house_says   (last visited Nov. 30, 2018).

Because young adults (ages 18, 19, or 20) as a class are not fully mature, they should not be considered among "the worst offenders" for purposes of the death

penalty. *Roper*, 543 U.S. at 569. Therefore, "the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity" without violating constitutional principles. *Roper*, 543 U.S. at 573–74. Because Ramirez was merely 18 and well under the age of 21 at the time of the offenses charged in this indictment, he should not be subjected to the death penalty.

### 3.    Other judicial considerations

First, executions of 18 years olds serve no penological purpose. "(C)apital punishment is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes." *Kennedy*, 554 U.S. at 441; accord *Gregg v. Georgia*, 428 U.S. 153 (1976) (noting that the death penalty should serve these "two principal social purposes").

Executing a young offender under 21 years of age serves no retributive purpose. The culpability and blameworthiness of 18 year olds are diminished to a substantial degree by their youth and immaturity. American society recognizes the dual need to provide greater protections for this group and to prohibit them from participating in activities where youthful impulsivity and immaturity could put them or others at risk. The law does not grant these youth the same rights and entitlements of adults; and for purposes of punishment, they should not be treated the same as

adults. Just as with juveniles under 18 years of age, research suggests that this group can mature and "age out" of the recklessness and impulsiveness that can characterize this group of individuals. The fact that this group can mature—can attain a better understanding of their own humanity—necessarily means that they cannot be the "worst of the worst" so as to justify the ultimate sanction. *Roper*, 543 U.S. at 568. "Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.* at 571. Capital punishment is only lawful if the offender's "consciousness (is) materially more 'depraved' than that of any person guilty of murder." *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980). The characteristics of youthful offenders—for example, impulsivity and lack of full brain development—so affect their individual responsibility and moral guilt that it categorically precludes such a finding.

As for the rationale of deterrence, *Roper* stated, "the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence. In particular . . . (t)he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Roper*, 543 U.S. at 571–72 (internal quotations and citation omitted). The reasoning about the lack of deterrence

applies to individuals under 21 years of age, too. Deterrence as a rationale for punishment necessarily requires a group to reflect upon the consequences of its actions. Late adolescents suffer from the same impulsivity as younger teenagers: They act rashly, without reflection and full consideration of the consequences of their actions.

Second, the concerns raised in Roper about the heightened vulnerability of juvenile offenders are especially heightened in Texas, where future dangerousness is at issue. The Supreme Court's determination that certain groups of people must be categorically barred from capital punishment is based in part on the unacceptable risk that jurors would not give adequate weight to the offenders' diminished culpability in the face of the brutality of their crimes. For example, discussing the need for a categorical bar on executing juvenile offenders, the Court noted that

> (t)he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death. In some cases a defendant's youth may even be counted against him.

*Roper*, 543 U.S. at 572–73 (emphasis added).

This was true in the instant case, where the State's closing argument emphasized Ramirez's youth as evidence of his future dangerousness. Initially the state emphasized to the jury that Ramirez was not a child. "Throughout the trial, you kept hearing testimony about how young the Defendant is . . . He was 18 when he committed the crime. You heard from the child development specialist that they brought this morning. Child development? He was 18 when he committed this crime. He is in adult." (39 RR 118–19.) But then prosecutor used Ramirez's youth against him. After listing Ramirez's childhood crimes, he told the jury, "He is only going to get worse. It is not going to get better." (39 RR 138.) Rather than accurately portray Ramirez as a child in crisis and in desperate need of support, the State painted Ramirez as a hardened criminal who could never be redeemed *because of his young age*, rather than despite it.[10] Use of young age as a factor to support capital

_____

[10] This line of argument is also at odds with the findings relied upon by the Supreme Court in its cases regarding juvenile offenders. As the Court stated in *Miller v. Alabama*, holding that states may not impose mandatory life-without-parole sentences on juvenile offenders:

> Our decisions rested not only on common sense—on what any parent knows—but on science and social science as well. In *Roper*, we cited studies showing that only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. And in *Graham*, we noted that developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control. We reasoned that those findings—of transient

81

punishment when it is rather, as confirmed by scientific consensus, evidence of diminished culpability, renders the death sentences of young adults unreliable.

Given the complete lack of penological justification, the heightened risk of the unreliability of the sentence, and vulnerability of the defendant, executing an offender who was 18 years of age at the time of the crime violates the Eighth Amendment's prohibition on cruel and unusual punishment.

**B.** **Because of his impairments, the concerns raised in *Roper* apply to Ramirez and executing him would constitute cruel and unusual punishment in violation of the Eighth Amendment.**

Given the scientific evidence discovered since *Roper*:

> What was surmised at the time of this Court's decision in *Roper v. Simmons*, 543 U.S. 551 (2005); can now be stated as fact: an individual in his young twenties who has experienced lifelong trauma, been subjected to extensive abuse and neglect, and engaged in substance abuse is likely to bear many of the same cognitive and emotional characteristics as the juveniles at issue in *Roper*.

Brief of Concerned Psychiatrists, Psychologists and Neuropsychologists in Support of Petition for Writ of Certiorari, *Branch v. Florida*, (No. 17-7825) 2018

---

> rashness, proclivity for risk, and inability to assess consequences—both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed.

*Miller v. Alabama*, 567 U.S. 460, 471 (2012) (citations omitted) (internal quotation marks omitted).

WL 1010497 (Feb. 20, 2018). "[B]rain maturation is a multilayered process that does not map on to a single developmental timeline." Leah H. Somerville, *Searching for Signatures of Brain Maturity: What are we Searching For?*, 92 Neuron 1 (2016). "The ability to designate an adolescent as 'mature' or 'immature' neurologically is complicated by the fact that neuroscientific data are continuous and highly variable from person to person[.]" Sara B. Johnson, *et al.*, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolesc. Health 216, 218 (2009). The Supreme Court in recent holdings such as *Hall*, 572 U.S. at 712 (holding that legal decisions should follow "established medical practice[s]"), *Moore*, 137 S. Ct. at 1049 (stating that the Court's precedent does not "license disregard of current medical standards" and criticizing the state court's failure to follow "the medical community's consensus") and *Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015) (stating that it is unconstitutional to prevent further consideration of whether an individual is intellectually disabled "simply because a capital defendant is deemed to have an IQ above [the previous threshold]"(internal quotation omitted)) emphasize that an individual's "condition, not a number" must be considered when determining if execution would be cruel and unusual punishment. *See Hall*, 572 U.S. at 723. Therefore, and as required by Supreme Court precedent, an individualized determination as to the appropriateness

of capital punishment should be made for a defendant who was only 18 years of age at the time of the crime. *Lockett*, 438 U.S. at 605.

The concerns that *Roper* enumerated in establishing a categorical ban on the execution of those under 18 years old apply equally to Ramirez as an 18 year old struggling with significant deficits and organic brain damage.

There is ample evidence that Ramirez is afflicted with serious developmental and learning disabilities and brain damage. (Exs. 83, 84, 85, 87.) Born with those impairments and then raised in an environment rife with abuse, domestic violence and severe neglect, unsurprisingly the developmentally disabled Ramirez started using drugs, including marijuana, cocaine, and Rohypnol, when he was only ten years old. (38 RR 63–64.) He used inhalants like paint thinner, glue, or gasoline on a daily basis between the ages of 12-14 years, which may have aggravated his pre-existing brain impairments and undoubtedly further impaired Ramirez's brain development.[11] (Ex. 84 at 4.) Neuropsychologist James P. Sullivan, Ph.D.

---

[11] Recent research has demonstrated that alcohol and drug exposure in adolescence hinders brain development. *See* Anita Cservenka & Ty Brumback, *The Burden of Binge and Heavy Drinking on the Brain: Effects on Adolescent and Young Adult Neural Structure and Function*, 8 Front. In Psychol. 1111 (2017) (finding that heavy drinking by adolescents alters brain structure), https://www.issup.net/files/2017-07/The%20Burden%20of%20Binge%20and%20Heavy%20Drinking%20on%20the%20Brain%20Effects%20on%20Adolescent%20and%20Young%20Adult%20Neural%20Structure%20and%20Function.pdf (last visited Nov. 30, 2018); Center for Brain Health, *Starting Age of Marijuana Use May Have Long-Term Effects on Brain Development*, Science

determined Ramirez has "pronounced and authentic neuropsychological impairment." (Ex. 87 at 14.) Dr. Sullivan believes that Ramirez's brain damage "is a direct result of prenatal insult (e.g. physical abuse of mother during pregnancy) as well as exposure to severe childhood psychological trauma in the form of physical abuse." (Ex. 87 at 13.) And while Ramirez's developmental brain damage in the context of his abusive and neglectful childhood circumstances surely contributed to his substance abuse, and his addictions beginning in early childhood very likely exacerbated his pre-existent neurological impairment. (Ex. 87 at 13.)

School records also support the finding that Ramirez suffered from severe mental impairments from a very early age. There is clear evidence of learning disabilities and associated deficits in brain functioning since early primary school age and continuing thereafter. (Ex. 83 at 4.) Ramirez's school records repeatedly substantiate his ongoing struggles with low cognitive functioning and neurological impairments. (Ex. 83 at 13–21.) Ramirez's learning disability is a "is a neurological

---

Daily (Feb. 10, 2016) (adolescents "who began using marijuana at the age of 16 or younger demonstrated brain variations that indicate arrested brain development in the prefrontal cortex, the part of the brain responsible for judgment, reasoning, and complex thinking") (citing to Francesca M. Filbey, *et al.*, *Preliminary Findings Demonstrating Latent Effects of Early Adolescent Marijuana Use Onset on Cortical Architecture*, 16 Dev. Cognitive Neuroscience 16–22 (2015)), https://www.sciencedaily.com/releases/2016/02/160210135334.htm (last visited Nov. 30, 2018).

disorder that impairs the brain's ability to receive, process, store, and respond to information." (Ex. 83 at 4.) Thus Ramirez has cognitive, neurological, and intellectual disabilities that result in lack of impulse control, the inability to anticipate the future consequences of actions, poor perceptions of social cues, and suggestibility. (Ex. 83 at 10.)

Moreover, Ramirez has a developmental or acquired brain injury to the frontal lobes, impairing his ability to control impulses and self-regulate (otherwise known as "executive functioning"). (Ex. 84 at 4.) In addition, MRI imaging showed lesions of the lateral thalamus of Ramirez's brain. (Ex. 85 at 1.) As reported by neurologist Dr. Thomas M. Hyde, Ph.D., damage to the thalamus "has a wide range of clinical outcomes, including behavioral dysregulation, inhibitory control, and impaired decision-making." (Ex. 85 at 2.) Moreover, neuropsychological testing evidenced Ramirez's compromised ability to develop reasoned responses to complex situations, profoundly impaired executive functioning, and mild to moderate brain damage. (Ex. 85 at 2.) Dr. Hyde concluded that,

> Within a reasonable degree of medical certainty, the longstanding damage to Mr. Ramirez's thalamus, as noted on MRI scan, contributes significantly to the behavior problems he has manifested throughout adolescence, and contributed to the actions that have led to this incarceration. Additionally, the thalamic lesions would act in concert with pre-existing neurodevelopmental

> problems, leading to greater brain dysfunction and
> functional disability.

(Ex. 85 at 2.)

Ramirez qualifies for exemption from execution under each of the factors the *Roper* court relied upon to find that capital punishment of those under 18 years old at the time of crime is unconstitutional. At the time of the crime, Ramirez suffered from an inability to engage in "the kind of cost-benefit analysis that attaches any weight to the possibility of execution[.]" *Roper*, 543 U.S. at 561–62 (quoting *Thompson*, 487 U.S. at 836–38.) Ramirez suffered from "a lack of maturity," and the brain damage affecting his impulse control resulted in "impetuous and ill-considered actions and decisions." *Roper*, 543 U.S. at 569 (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). Because of his impairments, Ramirez at 18 years of age evidenced the same kind of reckless behavior typically seen in younger adolescents. *Roper*, 543 U.S. at 569 (citing Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339 (1992)).

In addition, Ramirez was "more vulnerable or susceptible to negative influences and outside pressures[.]" *Roper*, 543 U.S. at 569. At age 18 Ramirez had long struggled with depression and PTSD, had attempted suicide multiple times, and he began using drugs to self-medicate from the age of 10. (Ex. 83 at 23; 38 RR 63–64.) Raised in an abusive household and suffering from severe mental illness,

Ramirez had "less control, or less experience with control, over [his] own environment." *Roper*, 543 U.S. at 569. Finally, Ramirez's character was not fixed or as well-formed as that of an adult. *Roper*, 543 U.S. at 570. Though the State painted Ramirez as a killer because of his age, there was evidence that Ramirez was able to succeed when he had previously been placed in the more structured, supportive environments that children require (38 RR 84, 116), and detention officers testified during trial that Ramirez had been only respectful to them while in jail. (38 RR 33, 43–44.)

For all the foregoing reasons, executing Ramirez, an 18 year old with significant impairments at the time of the crime, would violate the principles articulated in *Roper*, *Graham*, *Miller*, and *Montgomery* as well as the Eighth Amendment's prohibition against cruel and unusual punishment. Based upon evolving standards of decency, this court must grant Ramirez relief.

## CLAIM THREE

### Ramirez's Sixth Amendment right to counsel was violated because trial counsel rendered ineffective assistance at the guilt phase.

The Sixth Amendment guarantees a defendant the right to effective assistance of counsel, which in turn protects the due-process right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684 (1984); *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The right to counsel is a fundamental right of criminal defendants;

it assures the fairness, and thus the legitimacy, of our adversary process."). Under *Strickland*, a defendant is denied effective assistance when (1) the "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694. Ultimately, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

With respect to the first prong of the *Strickland* test, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. The Supreme Court has consistently relied upon guidelines from the ABA and similar professional groups to inform the inquiry into reasonable professional conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010) ("We long have recognized that the '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .'" (omissions in original) (quoting *Strickland*, 466 U.S. at 688)); *see also* Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (American Bar Association 2003). Courts have regularly used these and similar guidelines to help determine whether counsel performed

deficiently. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005) (citing the 1982 ABA Criminal Justice Standards for Criminal Justice when deeming trial counsel ineffective for their failure to conduct a thorough investigation); *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003) ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable.'" (quoting *Strickland*, 466 U.S. at 688)) With respect to the prejudice prong of the *Strickland* test, the inquiry is whether there is a "reasonable probability" that the jury would have reached a different result absent counsel's errors. *Strickland*, 466 U.S. at 694. A "reasonable probability" is just one "sufficient to undermine confidence in the outcome"—a "defendant need not show that counsel's deficient conduct more likely than not altered the outcome[.]" *Id.* at 693–94.

When evaluating prejudice, a court must consider "the totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding*[*s*].'" *Wiggins*, 539 U.S. at 536 (alteration in original) (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 397–98 (2000)). And, critically, the question is not only whether each instance of deficient performance was on its own prejudicial, but also whether the combined effect of all of those instances was to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 694; *see also, e.g.*, *Martin v.*

*Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) ("[E]ven if these [unprofessional] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense.").

Ramirez suffered from ineffective assistance of counsel at all stages of the representation, including the guilt/innocence phase. His attorneys, Alma Garza and Rolando Garza, abdicated their responsibility to prepare for trial. This error infected the whole of Ramirez's trial, rendering it reasonably probable that the result would have been different but for trial counsel's ineffectiveness.

**A.   Ramirez's counsel's ineffective assistance in jury selection deprived Ramirez of his rights to counsel, a fair trial, impartial jury, reliable sentencing proceedings, due process, and equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (Initial Writ Appl. at 152, July 2, 2009; Second Writ Appl. at 122, Nov. 6, 2013.)

A defendant has a Sixth Amendment right to the effective assistance of counsel. The effective assistance of counsel is particularly necessary to ensure that a defendant's rights are protected during one of the most critical phases of trial: jury selection. "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate

*voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). The importance of jury selection is heightened in a capital case—jury selection can even be dispositive. *See Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1265 (W.D. Wash. 1994); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299 (1983).

To ensure a fair trial, defendants have a right to have their cases heard "by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). Voir dire is a critical tool in ensuring that those prospective jurors who cannot fairly assess the evidence and follow the law are removed from the jury pool. *See Rosales-Lopez*, 451 U.S. at 188 (plurality opinion).

The 1989 ABA Guidelines list requirements counsel must meet to adequately represent a capital defendant during voir dire. *See* 1989 ABA Guideline 11.7.2. These guidelines require capital counsel to familiarize themselves "with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding 'death qualification' concerning any potential juror's beliefs about the death penalty." *Id.* The standards therefore require counsel to ask about

more than just prospective jurors' views on the death penalty. It is critical counsel learn the juror's feelings on issues relevant to the case at bar. For example, a juror might personally feel that a lesser-included charge is never appropriate if a defendant has committed a crime involving children or domestic violence. Effective counsel must know of these impairments before they select the jury. In order to elicit the information necessary to avoid the selection of biased jurors, counsel must use vigorous voir dire to fully explore each prospective juror's views, knowing well ahead the information that both parties will likely present. Here, counsel failed to satisfy even the most minimal standards for competent jury selection for the below reasons.

> ### 1. Trial counsel were ineffective in failing to adequately and meaningfully question prospective jurors to ensure a fair and impartial jury, thereby prejudicing Ramirez.

The Constitution safeguards against a mandatory death sentence upon conviction. *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion). At the heart of that protection is the right to be sentenced by jurors who make an individualized, reasoned moral decision whether life or death is the appropriate sentence, by considering and giving full effect to all mitigation. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Hitchcock v. Dugger*, 481 U.S. 393 (1987). Thus, in selecting a capital jury, counsel must elicit

sufficient information to determine whether a prospective juror has a "substantial[]" impair[ment]" regarding sentencing—if the answer is yes, that juror cannot serve. *See Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

Jurors with absolutist views for or against the death penalty must be disqualified. *Wainwright v. Witt*, 469 U.S. 412, 424–26 (1985). Such jurors include those who would automatically vote for the death penalty if, for example, a certain type of aggravating circumstance were established. "The risk that such jurors may have been empaneled . . . and 'infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized.'" *Morgan*, 504 U.S. at 736 (quoting *Turner v. Murray*, 476 U.S. 28, 36 (1986)). To avoid such an outcome, counsel must learn jurors' feelings on issues relevant to the individual case. Counsel must utilize vigorous voir dire to fully explore each prospective juror's views and mitigation impairments, which requires familiarity with the information that both parties will likely present at the penalty phase. *See Rosales-Lopez*, 451 U.S. at 188 ("*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.")

94

While the Constitution "does not dictate a catechism for *voir dire*," it entitles a defendant to a voir dire proceeding that is adequate to ensure both that an impartial jury is empaneled and that unqualified jurors are identified. *Morgan*, 504 U.S. at 729; *Dennis v. United States*, 339 U.S. 162, 171–72 (1950). To effectuate that right, counsel must elicit information that goes to whether a prospective juror is unable to be impartial. *See Morgan*, 504 U.S. at 729; 1989 ABA Guideline 11.7.2. Defense counsel have a duty to question jurors beyond "general inquiries," as such inquiries are inadequate to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Morgan*, 504 U.S. at 734–735.

Finally, the right to adequate voir dire as guaranteed by *Morgan* hinges on counsel making reasoned professional judgments. While counsel's decisions are typically given deference, this deference applies only insofar as counsel makes a strategic decision based on reasonable professional judgment, based on "thorough investigation of law and facts relevant to plausible options[.]" *Strickland v. Washington*, 466 U.S. 668, 690–91 (1984); *Williams (Terry) v. Taylor*, 529 U.S. 362, 373 (2000). Deference is not warranted where a decision is based on inattention. *See Rompilla v. Beard*, 545 U.S. 374, 395–96 (2005) (O'Connor, J., concurring) (finding prejudice where counsel made a decision that prejudiced a defendant as "the result

of inattention, not reasoned strategic judgment") (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

On information and belief, Ramirez's trial counsel failed to adequately and meaningfully question jurors to ensure Ramirez's trial was heard in front of a fair and impartial jury. Moreover, trial counsel failed to use peremptory challenges on jurors who expressed bias. For example, Juror number 2, A. D.L., worked in law enforcement, had worked on a counter-drug task force while serving in the National Guard, had been a victim of a violent crime, had read media about the crime in Ramirez's case, and expressed sorrow that the crime had occurred. (15 RR 147–197.) Yet, Ramirez's trial counsel did not raise a challenge to him serving on the jury. At which point, even the judge appeared surprise, saying: "you are proof positive that a law enforcement agent can get selected." (*See, e.g.*, 15 RR at 197–199.)

Ramirez's counsel's failure to question and challenge jurors led to the impaneling of a jury that was not fair and impartial. This prejudiced Ramirez and he is entitled to relief.

### 2.   Counsel were deficient in failing to object to the State's discriminatory use of peremptory strikes.

The Equal Protection Clause of the Fourteenth Amendment prohibits litigants from peremptorily striking potential jurors on the basis of race. *See Batson v.*

*Kentucky*, 476 U.S. 79, 96 (1986). *See also Powers v. Ohio*, 499 U.S. 400, 413–16 (1991) (holding that the State violated equal protection when it excluded black veniremembers from jury service even though the defendant was white). The Supreme Court subsequently extended the *Batson* rationale to gender discrimination; thus, litigants cannot remove potential jurors based solely on their gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).

Ramirez's trial counsel could have established prima facie discrimination, *see Batson*, 476 U.S. at 94, and the burden would have shifted to the prosecutor to "explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes." *Johnson v. California*, 545 U.S. 162, 168 (2005) (internal quotation marks omitted).

However, Ramirez's trial counsel did not raise any *Batson* issues when the state impermissibly used 11 of its 15 peremptory strikes (this amounted to 73% of its peremptory strikes) to remove women from the jury, amounting to a prima facie case of purposeful discrimination. (8 RR at 89; 12 RR at 141–42; 13 RR at 222; 14 RR at 61, 133; 17 RR at 38; 18 RR at 128; 21 RR at 64; 22 RR at 67, 116; 24 RR at 28); *See Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992). On information and belief, Ramirez's counsel should have objected to the State not only striking women, but also to disproportionately striking non-white veniremembers.

97

At the time of Ramirez's trial, *Batson* was longstanding precedent. Further, the 2003 ABA Guidelines obligated counsel to consider "challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender)." 2003 ABA Guideline 10.10.2(A). By failing to object to the State's peremptory strikes, counsel's deficient performance not only prejudiced Ramirez at trial but also on appeal, where the issue was defaulted. Counsel's ineffective assistance violated Ramirez's constitutional rights.

### 3. Counsel were deficient in failing to raise a grand jury challenge.

Ramirez's counsel's ineffective assistance in failing to file a motion to remand for new grand-jury proceedings deprived Ramirez of his rights to counsel, reliable proceedings, due process, and equal protection in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

"Pretrial investigation and preparation are the keys to effective representation of counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983); *see also Strickland*, 466 U.S. at 684 (guaranteeing defendants the effective assistance of counsel under the Sixth Amendment); *supra*. Filing relevant pretrial motions— particularly one that counsel himself describes as significant—constitutes rudimentary trial preparation. Failure to file such motions "is not a strategic

decision." *Strickland*, 466 U.S. at 689–90; *Wiggins*, 539 U.S. at 521–22; *see also Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (finding counsel ineffective for failing to file a pretrial motion). It is deficient where counsel's decisions result from inattention instead of reasoned judgment. *See Wiggins*, 539 U.S. at 534. Further, under the 1989 ABA Guidelines, counsel were obligated to examine a case's charging documents to identify "any issues, constitutional or otherwise" that could be raised to attack them. 1989 ABA Guideline 11.4.1(D)(1)(C). The 1989 ABA Guidelines also include that counsel should consider pretrial motions related to "potential defects in the charging process." 1989 ABA Guideline 11.5.1(B)(3); *see also* 1989 ABA Guideline 11.5.1(B) (instructing counsel to consider all pretrial motions potentially available).

Upon information and belief, Ramirez's grand jury proceedings were constitutionally infirm and Ramirez's trial counsel failed to effectively challenge them. Trial counsel's failure prejudiced Ramirez, so he is entitled to relief.

**B.  Ramirez was denied effective assistance of counsel at his guilt-phase proceedings because counsel failed to investigate, develop, and present critical evidence, among other significant errors.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez's counsel failed to investigate and prepare adequately for the guilt phase of trial and consequently neglected to

develop and present Ramirez's viable defense to capital murder. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Ramirez and thereby violated his rights under the Sixth and Fourteenth Amendments to the U.S. Constitution. Ramirez presented this claim below. (Initial Writ Appl. at 149, July 2, 2009; Second Writ Appl. at 17, 32, 99, 131, Nov. 6, 2013.)

### 1.    Facts.

Ramirez was arrested on January 29, 2003. (1 CR at 2.) In April 2003, Ramirez was indicted on two counts, both alleging he murdered Jimmy Almendarez, Juan Delgado, III, Jerry Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo. (1 CR at 3–4.) Alma Garza was appointed to represent Ramirez on January 31, 2003, (1 CR at 2), and Rolando Garza was appointed co-counsel on September 3, 2003. (1 CR at 218.)

The day of Ramirez's arrest, Ramirez was under the influence of Roche pills. (7 RR at 57.) Ramirez asked for a lawyer and even called his friend Jerry Garcia to tell him to get Ramirez's lawyer, but police continued to interrogate Ramirez despite his request. (7 RR at 42.) Ramirez, who was only 18 at the time, and highly susceptible to influence based on his background and mental health issues, was not capable of voluntarily waiving his Miranda rights, and as a result, police obtained an involuntary and unreliable confession. (Tr. State Exs. 101–02.)

Ramirez entered a plea of not guilty on November 29, 2004. (27 RR at 37–38.) The State's case-in-chief began that day and lasted until December 14, 2004. (36 RR at 136.) The defense case began that same day and ended the following on December 15, 2004. (36 RR at 140; 37 RR at 75.) Later that night, the jury found Ramirez guilty of capital murder on both counts. (37 RR at 160.)

Ramirez's counsel did nothing to investigate or present evidence countering this false narrative. Among many other failures, they failed to timely consult with experts, and even then, they failed to hire experts who could adequately address the issues in Ramirez's case. Trial counsel knew of witnesses who could corroborate Ramirez's testimony about requesting a lawyer, yet they failed to make arrangements for the witnesses to be in court. (4 RR at 41–43.)

These failures continued throughout Ramirez's trial. Trial counsel did little to investigate the actual crime. Days before jury selection, trial counsel told the court that they "[were] unfamiliar with the alleged crime scene" and requested—for the first time—to view it. (1 CR at 266.) At trial, trial counsel failed to, among other things, preserve issues and make a complete record, failed to object to critical issues, and failed to present evidence in support of Ramirez's defense.

### 2.    A defendant has a Sixth Amendment right to the effective assistance of counsel at guilt-phase proceedings.

101

As described above, the Sixth Amendment guarantees to a defendant the right to effective assistance of counsel. *Strickland*, 466 U.S. at 684. Whether an attorney performed deficiently depends on the "reasonableness [of the attorney's actions] under prevailing professional norms." *Id.* at 688.

With regard to the *Strickland* test for the guilt/innocence phase specifically, the Fifth Circuit has long "recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case. This duty is reflected in the American Bar Association Standards for Criminal Justice, a proper guide for determining what is reasonable under the circumstances." *Nealy v. Cabana*, 764 F.2d 1173, 1177–78 (5th Cir. 1985) (footnotes omitted).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Counsel therefore "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003). When evaluating prejudice, a court must consider "the totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding*[*s*].'" *Id.* at 536 (alteration in original) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)).

### 3. Trial counsel were ineffective throughout the pretrial and guilt phase of Ramirez's trial.

On information and belief, Ramirez's trial counsel were ineffective in the following ways:

### a. Failure to request a change of venue.

Counsel was ineffective for failing to request a change of venue. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors" whose decisions "must be based upon the evidence developed at the trial." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal citation and quotation marks omitted).

This crime occurred in the city of Donna, in Hidalgo County, where Tri-City Bombers ("TCB") and Texas Chicano Brotherhood violence was widely known. The gangs were known for their violence and for taking revenge on those who crossed

them. *See* Sarah Ovaska, *Donna Still Recovering from Brutal Slayings*, The Brownsville Herald (Aug. 24, 2003, 12:00 AM), https://tinyurl.com/y9pprdyn. This trial positioned jurors in the middle of the gang rivalry—a guilty verdict would imply the jurors crossed the TCB but an innocent verdict would incur the wrath of the Texas Chicanos. On information and belief, jurors knew their lives were in danger by serving on this jury and this influenced their decisions. (*See* Ex. 59.)

In addition to the fear and threats felt throughout the community, counsel should have known the extensive media coverage generated by the crime and subsequent investigation. (*See* Ex. 90.) Before Ramirez's trial began, even the judge acknowledged that the "case may be in the media every day." (2 RR at 6.) The court later acknowledges a "camera man" and "a report for <u>The Monitor</u>" are present in the court room at the suppression hearing. (6 RR at 54.)

On information and belief, because counsel failed to request a change of venue, jurors' decisions were influenced by fear of retribution from rival gang members and negative media coverage.

Counsel performed deficiently in failing to request a change of venue and as a result, Ramirez's guilt and sentencing proceedings were prejudiced.

### b. Failure to preserve issues for review.

Ramirez's counsel made a practice of conducting proceedings off the record and of not making objections, which resulted in a failure to preserve critical portions of the record for subsequent review.

In the capital context, where heightened reliability is required, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) (recognizing mandatory appellate review as "an important procedural safeguard . . . to avoid arbitrariness[.]").

Trial counsel let significant portions of the pretrial and trial proceedings go unrecorded, despite the need for meaningful appellate review. *See Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). In doing so, counsel performed deficiently and prejudiced Ramirez. *See Strickland*, 466 U.S. at 688, 694.

Counsel's failure to ensure a complete record crippled Ramirez's ability to seek meaningful appellate review. This was deficient and prejudiced Ramirez. *See*

*Strickland*, 466 U.S. at 694; *see also* 2003 ABA Guideline 10.7 ("Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.").

"As any effective appellate advocate will attest, the most basic and fundamental tool of his profession is the complete trial transcript, through which his trained fingers may leaf and his trained eyes may roam in search of an error, a lead to an error, or even a basis upon which to urge a change in an established and hitherto accepted principle of law." *Hardy v. United States*, 375 U.S. 277, 288 (1964) (Goldberg, J., concurring). The Supreme Court has made clear that an indigent defendant has both due-process and equal-protection rights to the "basic tools" of a constitutionally complete and adequate judicial review—a constitutionally effective attorney acting as an advocate, *e.g.*, *Strickland*, 466 U.S. at 684–85; *Evitts v. Lucey*, 469 U.S. 387 (1985), and a record that will permit meaningful, effective presentation of his claims, *e.g.*, *Griffin v. Illinois*, 351 U.S. 12, 18–19 (1956).

In the death-penalty context, the opportunity to have "meaningful appellate review" is especially crucial "in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker*, 498 U.S. at 321. There must be a "'record of sufficient completeness,' for adequate consideration of the errors assigned." *Draper v. Washington*, 372 U.S. 487, 497 (1963) (quoting *Coppedge v. United States*, 369

U.S. 438, 446 (1962)). In the absence of a "complete verbatim transcript," a "record of sufficient completeness" must include an "equivalent report of the events at trial from which the appellant's contentions arise." *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971) (quoting *Draper*, 372 U.S. at 495–96).

Trial counsel failed to request relevant portions of the trial, including bench conversations, be recorded throughout pretrial and guilt phase proceedings. (*See, e.g.*, 2 RR at 7; 6 RR at 55; 7 RR at 12–13, 102; 26 RR at 1; 27 RR at 39, 147; 28 RR at 61, 108.) And, trial counsel failed to incorporate relevant arguments and case law into the record. (*See, e.g.*, 7 RR at 138–39, 179.)

But, on this incomplete and insufficient record, there is no way of knowing whether this or other errors of constitutional magnitude occurred during Ramirez's trial. Trial counsel's failure to object to the lack of recording was deficient performance. *See Strickland*, 466 U.S. at 688.

Trial counsel's failure to ensure that all proceedings were recorded and that all crucial documents and objections were preserved hindered Ramirez's ability to effectively challenge his convictions and sentences, violating his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. This prejudiced Ramirez, because it has deprived and continues to deprive him of an adequate and

complete review and undermines confidence in the reliability of his proceedings. *See Strickland*, 466 U.S. at 694. Ramirez is therefore entitled to relief.

> ### c.  Failure to request continuances when unprepared for hearing and trial.

Trial counsel were ineffective by failing to sufficiently prepare, and by failing to request additional time when counsel knew they were not ready to go to trial. On the eve of trial, trial counsel had not reviewed critical documents, viewed the crime scene, or hired experts. Counsel's lack of preparation can be seen throughout the trial record:

- Nine days prior to voir dire commencing, trial counsel, Alma Garza, complained to the trial court that she recently received over 800 pages from the State containing Ramirez's TYC record and she does not have time to review it prior to trial but she does not ask for a continuance. (3 RR at 19–21.)

- Alma Garza also tells the court at a pretrial hearing on October 12, 2004, that the defense still has not received a lab report from the State. (3 RR at 11.) The State informed the court that the report was not finished but it contained information about blood stains found on some of the suspected weapons. (3 RR at 11.) The State said it intended to give defense counsel the report by Friday, October 15. (3 RR at 12.) However, the State waited

until October 18 to provide this report. (4 RR at 3.) Trial counsel told the court that she would "like to have experts of our own" in response to the State's late disclosure, but trial counsel never objected or requested a continuance to review it or to hire an expert to follow up on this technical report. (4 RR at 5.)

- Moreover, less than one month prior to trial, Alma Garza had not yet responded to multiple other State's expert reports. At the October 18 pretrial hearing, Alma Garza told the court that she needed funding for experts in order to properly prepare. (4 RR at 8–10.)

- A week before voir dire began, Garza even said, "Judge, there is a lot of work to be done. The reports were basically, we have been catching up with those. But there is so much information. And then with so many co–defendants and so many victims, it is voluminous." (4 RR at 39.)

- Trial counsel knew of two critical witnesses for the suppression hearing, but had failed to properly interview them or arrange for their appearances. However, trial counsel never asked to continue the hearing. (4 RR at 42–43; 5 RR at 1.)

- On November 5, 2004, the State revealed that it had finally found the video of Ramirez's arrest as well as new photographs. (17 RR at 133–34.) Trial

109

counsel was ineffective for failing to request a continuance at this point to review the tape and new evidence. (17 RR at 135.)

Ramirez was prejudiced by trial counsel's failure to request more time to properly prepare, obtain experts, and secure witnesses. Had counsel performed effectively, there is a reasonable likelihood that the outcome would be different, so this claim warrants relief.

### d.   Failure to conduct an adequate pretrial investigation.

Trial counsel did little to investigate and prepare for Ramirez's suppression hearing and his guilt phase proceedings. Trial counsel were ineffective for failing to secure experts, interview key witnesses, and pursue critical evidence, which counsel knew the State would use. Based on information and belief, trial counsel failed to effectively investigate the following issues.

Counsel was ineffective for not timely securing and preparing experts and this prejudiced Ramirez. On October 22, 2004, trial counsel were notified of the State's potential expert witnesses. (2 CR at 420.) Yet, with voir dire beginning in a week, trial counsel had yet to retain necessary defense experts. (Sealed Exs. S1–S3.) The court granted at least three of counsel's requests for expert funding on November 9, 2004—after trial had begun. (Sealed Exs. S5–S7.) Based on information revealed in discovery by the State and on information Ramirez told them, trial counsel was

110

aware that this case involved issues about gangs, false confessions, trauma, Rohypnol and other drugs, DNA testing, and ballistics, among other things. However, counsel never secured or presented experts on most of these critical issues.

Trial counsel was also ineffective for failing to investigate key evidence and to follow up on issues that the State had retained experts to discuss. At a pretrial hearing on October 18, 2004, trial counsel informed the court that they had just begun considering the defense's response to what the State's experts would be presenting. (4 RR at 5.) Not only should trial counsel have requested more time, as discussed above, but trial counsel never attempted to confirm the State's report or present a counter-narrative.

Trial counsel also failed to investigate, examine, and test evidence. Less than a month before trial, trial counsel requested permission for the first time to view the crime scene and stated that "counsel is unfamiliar with the scene of the alleged crime." (1 CR at 266.) Police collected several pieces of evidence that could have been tested for DNA, including a black cap, which the State implied belonged to Ramirez at trial. (28 RR at 32; 37 RR at 150–52 (linking Gutierrez's description to Ramirez).) The "bent" frying pan collected from Gutierrez's home was also used as important evidence throughout the suppression hearing and trial, yet trial counsel never pursued conflicting testimony about where it was found and whether the

proper testing was ever done on the stain. (6 RR at 25; 29 RR at 25–26; 32 RR at 182; 33 RR at 80–81.) Despite the fact that the State's theory was that Ramirez had committed acts which co-defendant Marcial Bocanegra had ascribed to a person named Lenny, trial counsel never followed up, investigated, or presented available evidence that Ramirez was not Lenny. (Second Writ Ex. 40 at 1–2.)

Nor did trial counsel pursue any testing or crime scene reconstruction regarding ballistics. At trial, the State offered evidence that victims in both houses were shot with 7.62 x 39 caliber bullets, which all came from the same AK-47. The State argued that Ramirez confessed to carrying an AK-47 that night and implied that he could be linked to shooting all of the victims. (29 RR at 38; 37 RR at 150–52.) Trial counsel had a duty to investigate this evidence and present countervailing arguments.

Trial counsel's deficient performance prejudiced Ramirez. Had trial counsel done anything to investigate and present evidence combatting Ramirez's alleged confession and the State's other guilt-phase evidence, there is a reasonable likelihood that the jury would have found Ramirez not guilty of capital murder.

### e.   Failure to prepare for and represent Ramirez in suppression hearing proceedings.

After Ramirez was arrested, police conducted an unrecorded interrogation of Ramirez, which led to Ramirez giving a recorded statement to police. This statement

was the only direct evidence of Ramirez's guilt at trial. Because the statements Ramirez made to police were inadmissible and, without them, a different outcome at trial or sentencing was reasonably probable, counsel's deficient performance deprived Ramirez of the effective assistance of counsel.

Throughout the suppression hearing, trial counsel failed to provide effective assistance of counsel. They did not know the evidentiary rules (6 RR at 140–41), nor were they clear about what evidence needed to be suppressed. (7 RR at 164–66.)

Counsel had valid grounds to suppress all of Ramirez's statements because they were the product of police coercion and unreliable. However, trial counsel failed to prepare and present critical evidence to challenge the State's argument. On information and belief, trial counsel provided ineffective assistance in failing to suppress Ramirez's statements in the following ways.

### i. Trial counsel failed to investigate, prepare, and present evidence that demonstrated Ramirez's confession was coerced and unreliable.

Trial counsel failed to investigate or provide any supporting evidence to corroborate that Ramirez made his statement involuntarily or that it was unreliable. In order to determine the voluntariness of a confession, the court must examine the totality of the circumstances and consider the effect that the totality of the circumstances had on the will of the defendant. *See Arizona v. Fulminante*, 499 U.S.

279, 285 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973);
*Procunier v. Atchley*, 400 U.S. 446, 453 (1971). The "totality" test requires the court
to consider the police tactics, the details of the interrogation, and the characteristics
of the accused. *Fulminante*, 499 U.S. at 285; *Dickerson v. United States*, 530 U.S.
428, 434 (2000).

### 1.   Ramirez was under the influence at the time of his statement.

Trial counsel argued that Ramirez had taken Rohypnol around the time of his
arrest, yet failed to present readily available evidence supporting Ramirez's
testimony of taking 15 Roche pills. (7 RR at 57.) Trial counsel was also ineffective
for failing to investigate whether Ramirez was under the influence of any substances
during his arrest and subsequent interrogation.

An eye-witness to Ramirez's arrest testified that Ramirez appeared to still be
asleep when police removed him from the home on January 29, 2003. (6 RR at 176.)
Ramirez also testified that he had taken about 15 "Roches" and had been asleep at
the time of his arrest. (7 RR at 29, 32–33, 35, 57.) Ramirez also said in his taped
statement: "like I said earlier, I wasn't in all my five senses" at the time of the crime.
(Tr. State Ex. 101–02.)

The trial court suggested that a Rohypnol expert could offer testimony about
effects of the drug and someone's tolerance, but trial counsel never secured an expert

to discuss these issues. (7 RR at 72.) Trial counsel failed to develop any evidence about the effects of Roche pills, also known as Rohypnol, a powerful sleep aid.

Trial counsel had access to multiple evaluations establishing that Ramirez abused drugs. The two psychological evaluations administered to Ramirez by the juvenile authorities in Hidalgo County clearly demonstrated that he suffered from Polysubstance Dependence. (Second Writ Exs. 29 at 5; 30 at 7.) Counsel also had access to the Substance Abuse Subtle Screening Inventory evaluation of Ramirez when he was sixteen, which indicated "relatively serious substance dependence." (Second Writ Ex. 42 at 3.) Witnesses were also available to testify to Ramirez's drug abuse. (Second Writ Exs. 20 at 4; 17 at 1.) Reasonable counsel would have developed and presented this evidence in support of Ramirez's testimony.

Trial counsel also failed to investigate Ramirez's statements about being out of his "five senses." The recording of Ramirez's statement contains no other reference about when or whether Ramirez was in his "five senses." However, Ramirez's language clearly indicates he had discussed this topic with the detectives previously. This discrepancy highlights that Ramirez made additional statements to detectives concerning his drug use. This information would have supported Ramirez's account at the suppression hearing, yet trial counsel failed to investigate and present evidence about this discrepancy.

### 2. Trial counsel failed to properly interview witnesses and arrange for them to appear at the hearing.

Four days prior to the hearing on defendant's motion to suppress, trial counsel alerted the court that she had not made arrangements for two key witnesses to appear. Both witnesses lived out of state. (4 RR at 37–38, 40.)

The court questioned why trial counsel had not prepared, since they had notice of the suppression hearing since September 28, 2004. (4 RR at 42.) Alma Garza acknowledged that she was aware the witnesses existed and her investigator had located them. (4 RR at 42.) However, she told the court that she has not yet obtained all of the information needed from the witnesses and arranging travel in only three days would be impossible. (4 RR at 42–43.)

Even the trial judge recognized that trial counsel was failing to investigate in a timely manner:

> And you don't investigate independently, and in the same breath, rely on everything that the State gives you. You have been on this case for over a year and a half, and you are making it sound as though, I mean, I know for a fact that the statement, you got a long time ago.

(4 RR at 40.)

The trial judge then admonished trial counsel that they had a month to arrange witness travel and prepare for the suppression hearing. (4 RR at 44.) The trial court

116

insisted that trial counsel do whatever they needed to do to bring the witnesses to the suppression hearing in four days. (4 RR at 44.) However, trial counsel subsequently did not request funding or do anything else to ensure the witnesses were available to testify.

One of these witnesses was Ramirez's sister, Berta Ramirez, who could have addressed testimony offered by Detective Daniel Ochoa about alleged statements she made concerning Ramirez prior to his arrest as well as Ramirez having requested a lawyer. (6 RR at 93, 100, 117–18, 138, 143; 7 RR at 96.) What Berta said, or did not say, became a major issue at the suppression hearing. (7 RR at 116, 142–44.) Berta would have corroborated Ramirez's testimony about police misconduct and Ramirez's use of Rohypnol. (Second Writ Ex. 20 at 4.) The other witness was Jerry Garcia, the person Ramirez called after arriving at the Edinburg Police Department. Garcia would have testified that Ramirez asked him to contact a lawyer, corroborating Ramirez's testimony that he had requested an attorney when police began their interrogation of him. (6 RR at 138–140; 7 RR at 77.)

Trial counsel also failed to investigate in a timely manner whether the Edinburg police department maintained video and call records that could support Ramirez's testimony that he called Garcia asking for a lawyer. (7 RR at 44, 149.) However, counsel did nothing until the suppression hearing to obtain those

117

recordings only to discover that by that time, the video recordings had been erased. (26 RR at 5.) When the State eventually confirmed that the police department maintained those records, trial counsel failed to object to the timeframe and dates of records that the State had requested. (26 RR at 5.)

Ramirez was prejudiced because his statement would reasonably have been suppressed had trial counsel demonstrated that he actually invoked his Fifth Amendment rights for a lawyer prior to police questioning.

### 3.   Trial counsel subpoenaed the wrong booking officer.

Trial counsel knew that Ramirez had repeated his request for a lawyer in front of one of the booking officers who worked at the county jail. Ramirez described this officer to trial counsel and requested they subpoena him. In advance of the suppression hearing, trial counsel subpoenaed Alberto Alvarez, a booking officer who worked at the Edinburg jail (6 RR at 6), but they failed to confirm it was the correct, or only, booking officer on duty at the time of Ramirez's arrest. Trial counsel should have called Ricardo Garcia, who on information and belief, was the booking officer present at the time Ramirez requested a lawyer.

### 4.   Trial counsel failed to present all of the evidence regarding Ramirez's interrogation.

Trial counsel also failed to present sufficient evidence through the direct examination of Ramirez. Among other things, trial counsel was deficient for not asking about whether Detective Ramiro Ruiz interviewed Ramirez prior to the recorded statement. (7 RR at 187–88.)

> **5.     Trial counsel were ineffective for failing to present evidence corroborating that Ramirez's age, background, and intoxication rendered him highly susceptible to influence at the time of his statements.**

Ramirez's statements were unreliable because, as discussed above, Ramirez's statement was made under the influence of Rohypnol and, on information and belief, Ramirez's statements were influenced by detectives. Trial counsel failed to investigate and present evidence corroborating this.

Trial counsel were ineffective for failing to present evidence demonstrating the effects Rohypnol would have had on Ramirez's ability to be influenced, his memory, and anything else relevant to Ramirez's ability to understand and appreciate what happened at the police department.

Trial counsel were also ineffective for failing to present evidence about how Ramirez's age and background rendered him more susceptible to influence during an interrogation. Ramirez was only 18 at the time of his arrest. However, trial counsel did not present any expert testimony explaining how trauma, age, and

specifically Ramirez's social history, would determine how susceptible Ramirez was to influence in making his statements.

Trial counsel were also ineffective for failing to retain a false confession expert to provide testimony about why people frequently make false confessions, in part because false confessions dramatically reduce innocent defendants' likelihood of success at trial. (*See* Second Writ Ex. 2 at 2–3.)

> **6. Trial counsel had information to undermine the credibility of key State witnesses but failed to do so.**

Trial counsel failed to impeach the state's key witness, Edgardo Ruiz, the officer who interrogated Ramirez. Edgardo Ruiz testified at the suppression hearing that Ramirez was the first person to tell police that a victim was struck in the head with a frying pan. (6 RR at 77, 82–83.) Edgardo Ruiz said that after Ramirez's statement, police returned to the crime scene and found the frying pan. (6 RR at 69–70, 77.)

Trial counsel attempted to impeach Edgardo Ruiz's testimony with Rosie Gutierrez's affidavit. However, Gutierrez's affidavit only mentioned that her son was hit—she did not mention whether a frying pan was used. (6 RR at 81–82.) Trial counsel should have impeached Edgardo Ruiz with Marcial Bocanegra's statement

that was taken a week prior to Ramirez's and which had mentioned a frying pan. (Second Writ Ex. 40 at 1–2.)

Had trial counsel undermined Ruiz's credibility, the accuracy of the remainder of Ruiz's testimony would have been called into question. There is a reasonable likelihood that the outcome of the suppression hearing would be different.

> ### ii. Trial counsel was ineffective for failing to investigate and present pattern of disregard of rights and corruption by Edinburg Police Department.

Finally, counsel had ample grounds to challenge the credibility of the detectives' testimony at the motion to suppress, a particularly important attack given how much of the interrogation appeared not to be recorded. (6 RR at 200–03.) First, Ramiro Ruiz—in direct contradiction of his own testimony and evidence on the taped statement—denied that he questioned Ramirez prior to taping Ramirez's statement. (6 RR at 200–03.) Counsel attempted to point out that Ramiro Ruiz had ignored a co-defendant, Robert Gene Garza's, request for an attorney in Garza's interrogation. (6 RR at 204–06.) But trial counsel failed to present evidence that Edinburg police routinely violated suspects' Miranda rights. (6 RR at 207.)

The City of Edinburg is known to have one of the most corrupt law enforcement/criminal justice systems in the United States. *See generally*, *Report Brands Edinburg the Most Corrupt Border City*, 4ValleyCentral.com (July 21,

121

2015, 7:14 PM), https://valleycentral.com/news/local/report–brands–edinburg–the–most–corrupt–border–city. A wealth of information about the Edinburg police department's corruption could have been presented to establish this pattern, yet counsel failed to do so. *See, e.g.*, John Burnett & Marisa Peñaloza, *With Corruption Rampant, Good Cops Go Bad in Texas' Rio Grande Valley*, National Public Radio (July 6, 2015, 4:30 PM), https://tinyurl.com/ychdc8uv; (*See also* Second Writ Ex. 6, ¶¶ 3, 9.) As a result of counsel's inadequate performance, Ramirez was prejudiced.

Absent the errors by Ramirez's counsel, the trial court, after considering the totality of the circumstances would have suppressed Ramirez statement and that without the statements, there is a reasonable probability that Petitioner would not have been convicted of capital murder and/or received the death penalty.

### iii. Trial counsel was ineffective for failing to investigate and present timing of arrest, waiver, and confession.

Trial counsel were ineffective for failing to investigate and present evidence concerning the discrepancy in the timeline of how Ramirez's statement was allegedly obtained. Ramirez was arrested around 2:45 PM on January 29, 2003, in Hargill, Texas. (6 RR at 120; Ex. 26 at 4.) At the suppression hearing, Detective Edgar Ruiz testified that he read Ramirez his Miranda rights around 3:27 PM and that Ramirez had acknowledged and signed the waiver around 3:29 PM. (6 RR at

15–19; Supp. Hr'g State Ex. 1.) Detective Ramiro Ruiz testified that he entered Ruiz's office and first made contact with Ramirez around 3:15 PM, but then leaves for an arraignment. (6 RR at 183.) The audio recording begins at 4:20 PM, with Ramiro Ruiz reading a Miranda warning, and ends around 4:40 PM. (Tr. State Exs. 101, 102 at 1, 9.)

At the suppression hearing, Edgar Ruiz testified that "ten minutes, the top" went by between Edgar Ruiz reading Ramirez his Miranda warning at 3:29 PM and Ramirez giving him a statement. (6 RR at 64.) However, that would have left an unexplained 45 minutes between the Miranda warning and the beginning of the 4:20 PM recording. Ramirez testified that after arriving at Edinburg Police Department, he asked for a lawyer, (7 RR at 40–41), then was placed in a cell and went to sleep prior to talking with Edgar Ruiz. (7 RR at 34–35.) Counsel was deficient for failing to investigate or argue about the discrepancies in timing.

### iv. Trial counsel failed to request reconsideration of the motion to suppress after arrest–video discovery.

At the suppression hearing on October 22 and 23, the State maintained that it did not know of a video taken during Ramirez's arrest. (6 RR at 181; *see also* 4 RR at 23.) However, a few weeks after the suppression hearing, the video that police took of Ramirez's arrest was found. (17 RR at 133.) Even though the State gave trial

123

counsel a copy and the trial court admonished trial counsel to view the original that weekend (17 RR at 133–35), at the pretrial hearing on November 22, 2004, trial counsel had still not seen the entire recording. (26 RR at 9.) This recording could have impeached Detective Daniel Ochoa's testimony as well as undermined the credibility of the other detectives concerning facts around Ramirez's arrest. Yet, trial counsel failed to object, request a continuance, or file a motion to reconsider the trial court's previous decision on Ramirez's motion to suppress evidence and statements he had made subsequent to his arrest. Trial counsel performed deficiently and this prejudiced Ramirez.

### f.    Failure to investigate and raise innocence claims.

Trial counsel was ineffective for failing to present evidence of Ramirez's innocence. The prosecution's case against Ramirez rested almost exclusively on his statement to the police. Yet the substance of Ramirez's statement were supplied by the police and were drawn from the statement of a co-defendant, Marcial Bocanegra, who said that a man named "Lenny" committed the actions that the police attributed to Ramirez. (28 RR at 42–46; Second Writ Ex. 40 at 2–3.) At trial, Detective Ramiro Ruiz testified that Ramirez and "Lenny" were the same person, but he offered no evidence to support this statement. (36 RR at 143.) Upon information and belief, surely by that time, Ruiz knew that Bocanegra had not identified Ramirez as Lenny.

Apart from whether Ruiz had withheld evidence that Ramirez was not Lenny, compelling evidence existed that Ramirez was not "Lenny," and trial counsel performed deficiently by failing to investigate and present it. Among other things, Bocanegra has confirmed that Ramirez is not the same person as "Lenny." (Second Writ Ex. 7 at 1.) Bocanegra said that he did not meet Ramirez until after the crime when they were both incarcerated in Hidalgo County Jail and that Ramirez was not Lenny. (Second Writ Ex. 7 at 1.)

Considerable evidence exists that Ramirez falsely admitted to the actions done by "Lenny" which were described by Bocanegra in his statement to police. Had trial counsel presented evidence that someone else named Lenny committed the acts that Ramirez confessed to, it is highly likely that at least one juror would have voted to acquit Ramirez.

Second, on information and belief, trial counsel were ineffective for failing to retain a ballistics expert and introduce evidence concerning the ballistics–related evidence and the DNA evidence. Trial counsel should have identified several troubling anomalies that would have impeached Detective Ramiro Ruiz's testimony about the crime as well as challenged the State's argument that Ramirez was "Lenny."

125

The Supreme Court has determined that "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).

Failing to do so cannot be described as a reasonable exercise of professional judgment or as "part of a calculated trial strategy, but is likely the result of either indolence or incompetence." *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) (internal quotation marks and citation omitted).

### g.   Failure to introduce evidence at trial that confession was involuntary, false, and unreliable.

Trial counsel was ineffective for failing to present evidence to the jury that Ramirez's statements to police were involuntary, false, and unreliable. Ramirez incorporates all argument and facts from above.

It is well established law that "[c]onfessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be 'insufficiently corroborated or otherwise . . . unworthy of belief." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (quoting *Lego v. Twomey*, 404 U.S. 477, 485–86 (1972)). This is especially true when the defendant is not the only person charged with committing the crime.

126

Even though the trial court allowed the State to present evidence of Ramirez's statements to the police, trial counsel should have presented evidence to undermine the credibility of Ramirez's statements. As discussed above, trial counsel should have investigated and presented evidence about the discrepancies in the detectives' testimony, should have presented witnesses, including Ramirez's sister, the booking officer Ricardo Garcia, as well as Jerry Garcia, to confirm Ramirez requested a lawyer prior to submitting to police interrogation, and should have presented an expert to explain Rohypnol. Trial counsel should also have introduced the video taken of Ramirez's arrest to further undermine the detectives' testimony as to his alleged well-being.

There was abundant evidence that cast doubt on the voluntariness and reliability of the statements police obtained from Ramirez.

At trial and sentencing, counsel failed to present any evidence or make any arguments which would cast doubt on the voluntariness, believability or veracity of Ramirez's statements. Counsel failed to present and argue the available evidence of involuntariness (police intimidation tactics, promises made, Ramirez's substance use, his youth, and his susceptibility).

Ramirez was prejudiced. Without any other evidence linking Ramirez to the crimes, the prosecutor made vigorous use of the statements to support the State's

case. Had trial counsel presented this evidence and made these arguments there is a reasonable probability the jury would have convicted Ramirez of a lesser offense or spared his life.

### h.      Failing to object to evidence.

#### i.      Failing to object to gruesome photographs depicting victims' dead bodies.

Despite the excessively disturbing nature of some of the photographs of the victims, Ramirez's counsel failed to make proper objections to their admission and repeated display at trial. When the photographs were first introduced, trial counsel only objected to five of them. Later, counsel says that she has reviewed all of them and objects to a few more saying:

> [The photos] would bias the jury and cause them to be more sympathetic toward the victims and just because of that find the defendant guilty because there is dead people and, you know, it is a gruesome scene.

(27 RR at 76–77.)

Trial counsel's failure to state a coherent objection was particularly abject with respect to the photographs admitted into evidence of the victims' wounds and brain matter. (*See, e.g.*, Tr. State Ex. 88, 89 (depicting bullet wounds and brain matter around the victim's head).) Trial counsel was also deficient for only objecting to some, but not all, of the photographs, which the Court of Criminal Appeals of Texas ("CCA") later determined waived Ramirez's right to appeal those

photographs. *See Ramirez v. State*, No. AP-75,167, 2007 WL 4375936, at *22 (Tex. Crim. App. Dec. 12, 2007). Trial counsel also failed to object to the admission of the video taken by police of the crime scene. (27 RR at 147.)

Because of the particularly haunting nature of these images, counsel's failure to make proper objections to their admission at trial was ineffective. *See Strickland*, 466 U.S. at 688, 694; *see also, e.g.*, *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam) (recognizing due-process violation when evidence is admitted that is so inflammatory as to prevent a fair trial).

Defense counsel knew or should have known how inflammatory the photographs depicting the victims' wounds and brain matter were. Had the jury not been repeatedly shown these exhibits, there is a reasonable probability that its verdicts would have been different. *See Strickland*, 466 U.S. at 694.

### ii.   Failing to object to untranslated statement going to the jury.

Trial counsel were ineffective when they failed to object to the jury reviewing an untranslated transcript of Ramirez's statement to the police. (29 RR at 36–37.) Ramirez makes several statements in Spanish throughout his recorded statement. Trial counsel was ineffective for failing to object and argue that these statements must be in English for the jury's consideration. Did trial counsel object to Detective Ramiro Ruiz testifying to a translation of a statement that Ramirez make about

"cuerno de chivo" (29 RR at 38–40), or about what was said at the crime scene. (29 RR at 42–43.) Trial counsel had a duty to object to false, misleading, or unsupported statements, but they failed to do so.

### iii. Failing to challenge admission of other bad acts.

Prior to trial, the State gave notice of its intention to use evidence of prior bad acts attributed to Ramirez. (1 CR at 216; 1 CR at 233–35; 2 CR at 458.) During trial, the State solicited testimony implying Ramirez was connected with other violent crimes. (*See, e.g.*, 28 RR at 50 (referencing the Donna murders, for which Ramirez was never suspected).) On information and belief, trial counsel was ineffective for failing to properly object to the State raising issues connecting Ramirez to other criminal acts and this deficient performance prejudiced Ramirez.

### iv. Failing to contest State's evidence of gang membership.

Trial counsel knew that gang membership would be a pivotal issue in Ramirez's trial. (1 CR at 4.) Even the trial court acknowledged that Ramirez's case had "everything to do with gang relation." (27 RR at 12.) Yet, trial counsel did nothing to contest the State's evidence. The State called Robert Alvarez, a detective with the Edinburg Police Department, as an expert on gangs. (35 RR at 54, 60, 66–67.) Trial counsel failed to effectively object that Alvarez was not qualified as an expert in this case and went so far as to solicit information about gangs that would

benefit the State's case. (35 RR at 67–80.) During Alvarez's testimony, the State offered a photograph depicting Ramirez that was obtained from a co-defendant's home. (Tr. State Ex. 312.) Alvarez testified that photographs are an important way to identify gang membership, then said everyone in the photograph is a TCB member. (36 RR at 13–16.) Trial counsel did not object to this unsupported testimony to the admission of the photograph. (36 RR at 16.)

Trial counsel failed to present any evidence from a defense expert to counter Alvarez's testimony about gangs and Ramirez's alleged gang associations. Trial counsel's deficient performance prejudiced Ramirez and this error warrants relief.

> **i.** **Failing to challenge the language charged, failing to request instruction on criminal responsibility for anticipated result of a conspiracy under Texas Penal Code Ann. § 7.02(b) (2003), and failing to request special verdict forms.**

On information and belief, trial counsel were ineffective for failing to challenge the charge in Count One as being insufficient to sustain a capital murder conviction. (2 CR at 559–61.) The charge as written does not adequately ensure sufficient culpability under *Tison v. Arizona*, 481 U.S. 137 (1987), and trial counsel should have raised this objection to the trial court.

On information and belief, trial counsel were also ineffective for failing to request that the jury be instructed on criminal responsibility for the anticipated result of a conspiracy under Texas Penal Code Ann. § 7.02(b) (2003), which says:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* Trial counsel failed to request critical instructions to assist the jury's understanding of the requisite level of culpability to warrant a capital conviction, and the court, accordingly, neglected to instruct the jury appropriately. Trial counsel's failure to request clarifying instructions on key issues, with respect to the capital murder charges, prejudiced Ramirez. *See Strickland*, 466 U.S. at 688, 694.

Finally, on information and belief, trial counsel were ineffective for failing to request special verdict forms. The complexities and seriousness of Ramirez's case required the jury make individualized factual findings. This necessity became evident in Ramirez's direct appeal proceedings when the CCA ruled that Ramirez had been convicted twice of the same crime. *Ramirez*, 2007 WL 4375936, at *9. Had trial counsel requested special verdict forms, the CCA would have known more about the jury's decision. Because counsel's failure prejudiced Ramirez with respect

to his conviction for capital murder, counsel provided ineffective assistance. *See Strickland*, 466 U.S. at 688, 694.

> **j.    Failure to object to Ramirez's improper confinement and excessive security presence in front of the jury.**

Ramirez's trial counsel were deficient for failing to object to Ramirez's shackling as well as excessive security presence in the courtroom, which prejudiced Ramirez. On information and belief, throughout guilt-phase proceedings, Ramirez was confined by a leg brace and security in the courtroom was excessive. However, Ramirez had a right under the Due Process Clause not to be tried wearing shackles unless there were no acceptable alternatives. The Supreme Court has defined shackling and the presence of security personnel as "the sort of inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). Counsel had a duty to protect Ramirez from the inherent prejudice of shackling, but failed to do so. *See Roche v. Davis*, 291 F.3d 473, 483 (7th Cir. 2002) (holding that counsel's performance was deficient in failing to object to client's shackling and in failing to ensure that shackles were not visible to the jury); *see also Strickland*, 466 U.S. at 688. By extension, counsel performed deficiently in failing to ensure that Ramirez's due-process rights were vindicated. *See Roche*, 291 F.3d at 483.

133

The prejudice arising from excessive security precautions—and the ways in which it undermined Ramirez's rights—is manifold. First, it compromises the defendant's right to a fair trial by (1) crippling the presumption of innocence, and (2) denying the defendant an impartial jury. *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970); *Estelle v. Williams*, 425 U.S. 501, 504–05 (1976) (recognizing shackles as a "constant reminder of the accused's condition . . . [that] may affect a juror's judgment" and are "so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play."); *see also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that shackles imply that the court considers the defendant dangerous, which is "nearly always a relevant factor in jury decisionmaking" in a capital case). Second, restraints inhibit the defendant, thereby impeding his ability to assist counsel in his own defense, which is critical to his ability to present a meaningful defense. *See id.* at 631–32 ("The use of physical restraints diminishes that right."). Shackling has been found to impede easy communication with counsel. *See Allen*, 397 U.S. at 344.

Given the degree of prejudice on multiple fronts from Ramirez's restraints, there is a reasonable probability that, absent counsel's failures, at least one juror would have voted differently. *See Strickland*, 466 U.S. at 694.

**C.   Ramirez was denied effective assistance of counsel due to his trial counsel's conflicts.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (Initial Writ Appl. at 151, July 2, 2009; Second Writ Appl. at 137, Nov. 6, 2013.)

The Sixth Amendment right to counsel requires effective assistance by an attorney, which has two components: competence and conflict-free representation. *Wood v. Georgia*, 450 U.S. 261, 271–72 (1981). The right to conflict-free representation is a right to counsel's undivided loyalty, and it is evaluated by a different standard than one measuring competence. *See Cuyler v. Sullivan*, 446 U.S. 335, 348–49 (1980); *Wood*, 450 U.S. at 271. The Supreme Court has stated that to establish a Sixth Amendment violation based on a conflict of interest, a defendant must make two showings: (1) that counsel actively represented conflicting interests and (2) that the actual conflict of interest adversely affected the lawyer's performance. *Cuyler*, 446 U.S. at 348–50. Prejudice is presumed if the defendant shows both prongs have been met. *Strickland v. Washington*, 466 U.S. 668, 692 (1984).

In Ramirez's case, both lead counsel, Alma Garza, and co-counsel, Rolando Garza, had conflicts that, based on information and belief, adversely affected their ability to represent Ramirez.

Alma Garza's husband, at the time, represented one of Ramirez's co-defendants, her nephew represented another, and her brother-in-law represented a third. Moreover, the relationship between Ramirez and Alma Garza was not functional and highly strained. On information and belief, Alma Garza and Ramirez routinely fought, Alma Garza did not communicate with Ramirez, and Ramirez felt Alma Garza put his life in danger. After one particularly bad fight, Ramirez requested new counsel. (Ex. 4, at 5.) Alma Garza consistently failed to advocate for Ramirez's rights[12] and, on information and belief, this failure can be attributed to her conflict of interest. *See Cuyler*, 446 U.S. at 350.

Alma Garza did not provide effective assistance throughout her representation of Ramirez, so Rolando Garza, as co-counsel, had a duty to speak to the court on behalf of Ramirez, which he never did. Additionally, Rolando Garza also had a conflict of interest in representing Ramirez. Rolando's cousin, Andres Garza, fathered a child with Ramirez's sister, Berta Ramirez, prior to Ramirez's trial. (Evid. Hr'g Ex. 24, ¶ 5.) Prior to the crime, Ramirez confronted Andres about the issues Berta was having with him, which led to an altercation. (Evid. Hr'g Ex. 24, ¶ 6.)

---

[12] In addition to Alma Garza's failings at trial, Ramirez has reason to believe that Alma Garza made false representations to the court in Ramirez's post-conviction proceedings.

Andres allegedly gave police information leading to Ramirez's arrest. (Evid. Hr'g Ex. 24, ¶ 7.)

Berta Ramirez could have offered valuable evidence to corroborate Ramirez's testimony as well as to support Ramirez's mitigation presentation. (Evid. Hr'g Ex. 24, ¶ 8; Ex. 76, ¶ 22.) Rolando Garza's decisions throughout his representation of Ramirez were subsequently tainted by this conflict. (Evid. Hr'g Ex. 24, ¶¶ 2–4, 8–9; Ex. 76, ¶ 22.)

"The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975). In Ramirez's case, the State received partisan advocacy, while Ramirez's counsel had divided loyalties. Moreover, counsel's interests directly contradicted Ramirez's interests. Prejudice must be presumed, as a conflict between Ramirez and his counsel existed and adversely affected counsel's performance. *Cuyler*, 446 U.S. at 348–50. Accordingly, Ramirez is entitled to relief.

### D. The cumulative effect of counsel's deficiencies prejudiced the defense at both the guilt-innocence and the penalty phases.

While each instance of deficient performance described above is prejudicial on its own, counsel's guilt-phase errors were decidedly prejudicial when considered cumulatively. When evaluating an ineffective–assistance claim, this Court must

consider the cumulative impact of counsel's various errors. As the Supreme Court has stated, "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see Williams (Terry) v. Taylor*, 529 U.S. 362, 397–98 (2000).

Here, had counsel not performed deficiently, the jury would have heard a legally cognizable and factually supported defense, would have seen the State's evidence get undercut, and would have been properly instructed on the charges. Further, the jury would have been spared unduly prejudicial photographs. Had counsel performed competently, there is at least a reasonable probability that one juror would have decided differently. *See Strickland*, 466 U.S. at 694.

In assessing prejudice, a reviewing court considers the effects of more than one deficiency cumulatively:

> In *Strickland,* the Supreme Court explained that in order to show that counsel's deficient performance prejudiced the defendant, it must be shown that "counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687 (emphasis added); *see also id.* at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (emphasis added)). This court has previously applied a cumulative *Strickland* prejudice analysis when confronted with a case in which there were multiple instances of deficient

performance by counsel. *See, e.g.*, *White*, 610 F.3d at 912[13] (holding, in the alternative, that "[t]he combined prejudicial effect of the post–arrest silence and the death of the unborn child inexorably leads us to conclude that White has shown that the state court's conclusion that there was no reasonable probability of a different outcome is objectively unreasonable"); *Richards*, 566 F.3d at 564[14] ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (stating in a pre–AEDPA case that "we are unable to state that ... the cumulative effect of all deficiencies at the guilt phase[ ] is sufficient to render the guilty verdict ... unreliable.).

*Dodson v. Stephens*, 611 F. App'x 168, 178–79 (5th Cir. 2015) (footnote omitted) (assuming that cumulative prejudice analysis is required).

Trial counsel's deficient performance resulted in cumulative prejudice that warrants relief.

## CLAIM FOUR

### The trial court's numerous errors during the guilt phase of trial violated Ramirez's constitutional rights.

The trial court committed numerous errors during Ramirez's trial, infringing upon his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the

---

[13] *White v. Thaler*, 610 F.3d 890 (5th Cir. 2010).

[14] *Richards v. Quarterman*, 566 F.3d 553 (5th Cir. 2009).

U.S. Constitution. Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

### A. The trial court erred by not appointing qualified, un-conflicted counsel, violating Ramirez's rights under the Sixth and Fourteenth Amendments.

The trial court failed to conduct an appropriate inquiry into trial counsel's conflicts and into whether trial counsel was qualified to be appointed in a capital case. Ramirez presented this claim below. (Initial Writ Appl. at 151, July 2, 2009; Second Writ Appl. at 137, Nov. 6, 2013.)

On information and belief, Ramirez's counsel, Rolando Garza, had a conflict representing Ramirez. Rolando Garza's cousin, Andres Garza, was in a relationship with Ramirez's sister, Berta, prior to the crime. (Evid. Hr'g Ex. 24, ¶ 5.) Andres and Ramirez had recently fought about Berta, and Andres allegedly provided police information on Ramirez's whereabouts after the crime. (Evid. Hr'g Ex. 24, ¶ 7.) Rolando Garza's decisions throughout his representation of Ramirez were subsequently tainted by this conflict. (Evid. Hr'g Ex. 24, ¶ 8; Ex. 76, ¶ 22.) The conflict demonstrated a denial of the "right to have the effective assistance of counsel." *Glasser v. United States*, 315 U.S. 60, 76 (1942); *see also Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980).

On information and belief, Alma Garza also had a conflict representing Ramirez. Alma Garza's husband, at the time, represented one of the co-defendants, her nephew represented another, and her brother-in-law represented a third. Alma Garza consistently failed to advocate for Ramirez's rights and, this failure can be attributed in part to her conflict of interest. Alma Garza's working relationship with Ramirez was also strained to the point where Ramirez believed Alma Garza was not acting in his best interests. (Ex. 4 at 5.) The trial court should have been aware of these conflicts but did nothing. *See Cuyler*, 446 U.S. at 350.

Moreover, the trial court failed to appoint qualified counsel to represent Ramirez denying his Sixth Amendment rights. To provide the "counsel" guaranteed by the Sixth and Fourteenth Amendments, a lawyer must satisfy standards set by the court for practice. *See Reese v. Peters*, 926 F.2d 668, 669 (7th Cir. 1991) ("[T]he 'Counsel' to which the sixth amendment refers is a professional advocate who meets the standards set by the court." (citing *Solina v. United States*, 709 F.2d 160 (2d Cir. 1983))).

A court that appoints counsel who falls short of those standards also falls short of ensuring the constitutional rights of due process and effective representation. *See id.* at 670. Especially in a capital case, the defendant "has a substantial and legitimate expectation that he will be deprived of his liberty" only after the state has followed

141

its own statutory guidelines setting forth the mandatory protections guaranteed to preserve a defendant's right to a fair trial and adequate representation. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). On information and belief, Alma Garza was not qualified to be appointed as Ramirez's lead counsel in a capital murder trial involving six victims, thereby violating Ramirez's right to effective assistance of counsel.

The trial court failed to address counsel's conflicts or to appoint competent counsel, and as a result Ramirez was denied effective assistance of counsel in violation of the Sixth Amendment.

### B.     The trial court's admission of excessively gruesome photographs during Ramirez's trial resulted in the denial of a fair trial and due process.

The trial court violated Ramirez's rights to a fair trial and due process when it admitted sixty-nine, enlarged, color photographs that depicted unnecessarily gruesome and repetitive images of the victims and crime scene. (27 RR at 89–90.) Ramirez presented this claim below. (DA Opening Br. at 97, Aug. 8, 2006.)

In Ramirez's case, the photographs were so unduly prejudicial that admitting them for the jury to consider rendered Ramirez's trial unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994); *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

Several of the photographs depicted the victims' blood-covered bodies splattered with brain matter. (*See, e.g.*, Tr. State Exs. 79–80.) Others contained images of the victims' injuries, their bodies at the crime scene, and general crime scene characteristics. The photographs were highly inflammatory and offered no probative value.

Here, the admission of these photographs undermined the fairness of the trial and amounted to a denial of due process. *See Romano*, 512 U.S. at 12; *Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) ("An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence."). The highly prejudicial effect of these photographs easily outweighed any potential minimal probative value, and the introduction of the photographs undermined the fairness of the trial and sentencing proceeding. They had a "substantial and injurious effect" on Ramirez's conviction. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The trial court abused its discretion by allowing the photo to be admitted by the jury, violating due process. *See Romano*, 512 U.S. at 12; *Bruton*, 391 U.S. at 131 n.6.

**C.   The trial court unconstitutionally required that Ramirez be physically restrained at the guilt and penalty phase violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments.**

The trial court abused its discretion by requiring that Ramirez be physically restrained during the guilt-phase proceeding in violation of Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. Ramirez had a due-process right to be tried without physical restraints absent a compelling justification that those restraints were necessary. *See Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). Without any individualized determination of necessity by the court, Ramirez was forced to wear a leg brace. On information and belief, Ramirez's shackling and the presence of security in the courtroom prevented him from fully participating in his defense and prejudiced the jury.

By failing to determine that shackling was necessary before requiring restraints, the trial court denied Ramirez the right to a fair trial. Juror observance of shackling undermined the presumption of innocence to which Ramirez was entitled, and it denied him an impartial jury. *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970); *Estelle v. Williams*, 425 U.S. 501, 504–05 (1976). In Texas, shackling a defendant is particularly prejudicial because a jury must affirmatively find that a capital defendant poses a future danger in order to impose a sentence of death. *See* Tex. Code Crim. Proc. art. 37.071 § 2.

As the restraints were not justified, the court violated Ramirez's due-process rights and substantially affected his trial. *See Brecht*, 507 U.S. at 623.

**D.    The trial court's failures to ensure that all of Ramirez's trial proceedings were recorded violated his Sixth, Eighth, and Fourteenth Amendment rights to a public trial and meaningful appeal.**

The trial court erred by conducting critical proceedings off the record. During Ramirez's trial, numerous off the record proceedings were conducted by the trial court. (*See, e.g.*, 28 RR at 61 (concerning admission of Ramirez's contested statements to the police); 26 RR at 1 (regarding motion to strike language in indictment).)

The context surrounding these unrecorded discussions reveals that they involved critical subject matters, including objections to evidence or argument (*e.g.* 32 RR at 124), and discussions about witnesses (*e.g.* 32 RR at 75).

Further, the failure to ensure that these proceedings were recorded deprived Ramirez of his Fourteenth Amendment right to meaningful appellate review. *See Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Draper v. Washington*, 372 U.S. 487, 500 (1963); *Gregg v. Georgia*, 428 U.S. 153, 195 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). This is especially true in capital cases, which demand heightened reliability. *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion).

Because of the omissions from the record, it was impossible for subsequent counsel or the courts to conduct a proper review of the proceedings against Ramirez.

145

The trial court's failure to ensure a complete record deprived Ramirez of a meaningful appellate review and violated his rights under the Eighth and Fourteenth Amendments. This error had a "substantial and injurious effect" on Ramirez's sentence. *See Brecht*, 507 U.S. at 623. Accordingly, Ramirez is entitled to relief.

### E.      The trial court erred by denying Ramirez's requests for new counsel, violating Ramirez's constitutional rights.

On information and belief, Ramirez petitioned the trial court for appointment of new counsel on at least one occasion. (Ex. 4 at 5–6.) The trial court never followed up on Ramirez's requests and never granted a hearing to ensure Ramirez received effective representation. As a result, Ramirez's Sixth and Fourteenth Amendment rights were violated. *See Cuyler*, 446 U.S. at 347.

### F.      The trial court erred by failing to continue the suppression hearing.

Ramirez's Sixth and Fourteenth Amendment rights were violated when the trial court refused to reschedule the suppression hearing. Four days prior to the suppression hearing, trial counsel informed the court that two key witnesses would not be available for the hearing. (4 RR at 37–40.) Trial counsel told the court that "there is a lot of work to be done," (4 RR at 39), and that they still "need more information" from their witness (4 RR at 43).

Trial counsel was clearly unprepared, yet the trial court did nothing to ensure that the witnesses Ramirez needed could be present. Instead, the trial court scolded

defense counsel for making excuses and said that jury summons were already sent, so timing could not be changed. (4 RR at 43–44.)

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also Simmons v. South Carolina*, 512 U.S. 154, 175 (1994) (O'Connor, J., concurring) ("[O]ne of the hallmarks of due process in our adversary system is the defendant's ability to meet the State's case against him.").

The trial court's failure to reschedule the suppression hearing, or do anything to ensure Ramirez's counsel were prepared, deprived Ramirez of his right to due process, a fair trial, and to effective counsel. *See Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) ("Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."); *see also Wheat v. United States*, 486 U.S. 153, 160 (1988) (requiring a court to "take adequate steps" to ascertain whether defendant was receiving effective counsel). This error had a substantial and injurious effect on Ramirez's trial, so Ramirez is entitled to relief. *See Brecht*, 507 U.S. at 623.

### G.     The trial court erred in allowing Mendiola's testimony about Ramirez's statements during the booking process, violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments.

The trial court erred when it permitted testimony about what Ramirez told police when Ramirez was being booked into the Hidalgo County jail. Ramirez raised this claim below. (DA Opening Br. at 81, 87, Aug. 8, 2006.)

Robert Mendiola, the officer who processed Ramirez when he was transferred to jail the day after his arrest, testified for the State during Ramirez's trial. (35 RR at 29.) Mendiola testified that the booking process included questioning the prisoner about gang-affiliation. (35 RR at 33.) The State argued Mendiola should be able to testify to Ramirez's response since questions about gang-affiliation were routine, administrative questions. (35 RR at 36–37.) Trial counsel objected that Mendiola's answer would be hearsay and violate Ramirez's Fifth Amendment rights. (35 RR at 50.) The trial court implied without deciding that Mendiola may testify to Ramirez's statement. (35 RR at 102–03.) After an off-the-record bench conversation, (35 RR at 169), the State recalled Mendiola, who testified, over trial counsel's objection, that Ramirez told Mendiola that Ramirez was a "Bombita." (35 RR at 170.)

The Fifth and Fourteenth Amendments "secure[] against state invasion the . . . right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v.*

148

*Hogan*, 378 U.S. 1, 8 (1964). Thus, for a statement to be admissible, it "must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43 (1897) (citation omitted); *accord Malloy*, 378 U.S. at 7.

On information and belief, evidence demonstrates that Ramirez did not voluntarily agree to answer Mendiola's question about gang affiliation. Because Ramirez's statement was obtained without an acknowledgement that he was waiving his *Miranda* rights, the statement was involuntary and obtained in violation of the Fifth, Sixth, and Fourteenth Amendments. The trial court erred in overruling trial counsel's objections and admitting Mendiola's testimony. The admission of this unconstitutionally obtained statement had a substantial and injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 623.

### G.     The trial court erred in admitting statements Ramirez made during police interrogation.

The trial court violated Ramirez's Fifth, Sixth, and Fourteenth Amendment rights by admitting statements involuntarily obtained from Ramirez. Ramirez raised this claim below. (DA Opening Br. at 84, Aug. 8, 2006; Initial Writ Appl. at 143, July 2, 2009.)

As discussed above, after Ramirez's arrest, he was interrogated by police and gave an involuntary and unreliable confession. Ramirez did not make a knowing, intelligent, and voluntary waiver of his Miranda rights, and the subsequent recorded statement taken by police should not have been admitted at trial.

Before trial, Ramirez moved to suppress statements given to police during their interrogation of him on January 29, 2003. (1 CR at 79–81.) At the suppression hearing, Ramirez argued that he had invoked his right to an attorney, but the detectives neither provided him with an attorney nor ceased questioning. (7 RR at 40–41.) Ramirez also argued that he could not knowingly and voluntarily waive his Miranda rights because he was under the influence of Rohypnol, a powerful sleep-aid, and the detectives were employing tactics to force him into waiving his rights. (7 RR at 32–33, 35, 41, 123.) Ramirez also argued that the detectives interrogated him prior to giving him his Miranda warnings (7 RR at 52), then they told him what to say. (7 RR at 83.) The trial court denied Ramirez's motion, and Ramirez's recorded statement was then introduced at trial. (7 RR at 203, 208; 29 RR at 35.)

On information and belief, the evidence strongly supports Ramirez's argument that his confession was not free and voluntary. Furthermore, had the trial court not insisted on holding the suppression hearing without Ramirez's witnesses present (4 RR at 43–44), Ramirez could have corroborated his claims.

The trial court's error was a violation of Ramirez's Fifth, Sixth, and Fourteenth Amendment rights. "An accused's request for attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.*, 442 U.S. 707, 719 (1979). Police cannot reinitiate interrogation once a suspect invokes his rights, even if additional warnings follow and a defendant expressly waives those rights. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Ramirez testified that he requested an attorney, but the detectives ignored his request. This was a clear violation of Ramirez's constitutional rights.

Moreover, for a statement to be admissible, it "must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram*, 168 U.S. at 542–43 (citation omitted). The evidence demonstrates that Ramirez's statement was not voluntary, so the trial court erred in admitting it.

Texas law at the time of Ramirez's trial also required that the trial court make an independent finding as to the statement's voluntariness and enter an order stating its specific finding of facts upon which the conclusion was based. Tex. Code Crim. Proc. art. 38.22 § 6. The trial court failed to make these findings until July 13, 2006. (1 Suppl. CR at 6.) The trial court failed to explain its reasoning, thereby prejudicing Ramirez.

Moreover, the trial court admitted Ramirez's statement without an official translation of the statements from Spanish into English. On information and belief, not all members of the jury spoke Spanish, so those jurors would not have a complete understanding of what Ramirez was asked and how he responded. This error prejudiced Ramirez.

Finally, a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. at 296 (internal quotation marks and citation omitted). Although Ramirez never confessed to shooting any of the victims, Ramirez's statement was the key evidence used by the State to link Ramirez to the crime. Thus, the admission of the unconstitutionally obtained statements had a substantial and injurious effect on Ramirez's trial. *See Brecht*, 507 U.S. at 623.

## H. The trial court erred in allowing Champion to testify about Ramirez's statement admitting that he had marijuana.

The trial court erred in admitting Ramirez's statement to police that Ramirez possessed marijuana while in county jail awaiting trial. Ramirez raised this issue below. (DA Opening Br. at 12, Aug. 8, 2006.)

At Ramirez's penalty phase proceedings, the State called Sergeant Alex Champion, a police officer with the Hidalgo County Sheriff's Department, to testify. (38 RR at 3.) Champion testified that on June 29, 2004, he responded to a jail cell

containing Ramirez and seven other men after having smelled marijuana. (38 RR at

5.) Champion said that all but Ramirez and one other, Jeffrey Juarez, were removed

from the cell while officers searched it. (38 RR at 8.) In the search, police found a

small bag of marijuana. (38 RR at 10.) Champion testified that he asked Ramirez if

it was his and Ramirez said yes. (38 RR at 11.)

Ramirez was already represented by counsel at the time of this incident, and

on information and belief, Champion did not warn Ramirez of his *Miranda* rights.

Permitting Ramirez's statement to be used against him later at his capital murder

trial violated Ramirez's Fifth and Sixth Amendment rights. *Miranda*, 384 U.S. at

444; *Massiah v. United States*, 377 U.S. 201, 206 (1964).

Finally, even though Ramirez's trial counsel failed to object to Champion's

testimony, the trial court erred by admitting this testimony because it was irrelevant

and prejudicial to the issue of future dangerousness at sentencing. Fed. R. Evid. 403;

*id*. at 404(b). Champion's testimony was so unduly prejudicial that it violated

Ramirez's Due Process rights and rendered the trial fundamentally unfair. *See*

*Darden*, 477 U.S. at 179–183.

## I.   The trial court erred when it overruled Ramirez's motion for a mistrial.

The trial court erred in denying Ramirez's motion for a mistrial after the State

intentionally and improperly referred to information that a different death row

153

inmate had stabbed a security guard. (38 RR at 198–99.) Ramirez raised this issue below. (DA Opening Br. at 6, Aug. 8, 2006.)

Ramirez was denied a fair trial when the trial court denied his motion for a mistrial after the State introduced irrelevant, unduly prejudicial information. This error was so extreme as to deny Ramirez fundamental fairness under the Due Process Clause. *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988).

### J.   The trial court erred in allowing Alvarez to testify as a gang expert.

Ramirez's Due Process rights were violated when the trial court permitted Robert Alvarez to testify as a gang expert when Alvarez lacked the qualifications to do so. Alvarez testified about local gangs and their activities. (35 RR at 61–62.) Alvarez also testified that he was familiar with how to recognize gang members and gang affiliation. (35 RR at 64–65.) The trial court then held a hearing outside of the jury's presence concerning Alvarez's qualifications as a gang expert. (35 RR 66–116.) While the trial court never made a ruling on the record, Alvarez was recalled by the State and testified to Ramirez's gang membership. (36 RR at 2.) Alvarez then testified about the Bombita gang and their activities. (36 RR at 4–5, 8.)

The trial court erred in permitting Alvarez to offer opinions about Ramirez's gang affiliation and local gang activity because Alvarez was not qualified to offer reliable evidence as to either topic. *See Daubert v. Merrell Dow Pharm., Inc.*, 509

U.S. 579, 589–92 (1993) ("relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline"); Fed. R. Evid. 702. Alvarez was not properly qualified as an expert, thereby making his opinion testimony inadmissible. This testimony had an unduly prejudicial effect on the jury and biased the outcome of Ramirez's trial. *See Brecht*, 507 U.S. at 623.

### K.   The trial court erred in admitting evidence of other bad acts.

Ramirez's rights to a fair trial were violated when the trial court admitted evidence that implied Ramirez was connected to additional crimes. At trial, the State presented testimony through Detective Ramiro Ruiz that he had received a lead in the investigation concerning Ramirez from an investigation into another crime. (29 RR at 152.) The other crime Ruiz was referring to was the murder of four victims in Donna, TX, allegedly committed by the same gang, known as TCB. (29 RR at 142–46, 150–151.) While the trial court did not permit the State to explicitly reference the Donna murders, the State was able to elicit testimony that the detective received a list of names connected to gang members who were involved in another Hidalgo County investigation. (29 RR at 152–53.) On information and belief, jurors associated this testimony to the Donna murders. Even if the jurors did not make this association, the implication was that Ramirez was connected to another crime.

This information was unduly prejudicial and inflammatory. The trial court erred when it allowed the State to introduce evidence linking Ramirez to other crimes. *See Darden*, 477 U.S. at 179–183.

### K.    The trial court erred in ordering Ramirez to show the jury his arms for the State to obtain testimony about the content of Ramirez's tattoos in the guilt phase.

The trial court violated Ramirez's Fifth and Fourteenth Amendment rights when it required Ramirez to remove part of his shirt to reveal his tattoos. (36 RR 38–39.) During the guilt phase, the State's gang expert, Robert Alvarez, testified that tattoos help identify whether someone belongs to a gang. (36 RR at 18), after which the State requested Ramirez remove his shirt in front of the jury. (36 RR at 21.)

Then, outside of the presence of the jury, the trial court ordered Ramirez to remove his shirt, over trial counsel's objection. (36 RR at 24.) The State noted that Ramirez had obtained new tattoos, which the State "would be interested in" (36 RR at 24), and the State commented that they "don't know what else he has on [his body]." (36 RR at 26.)

The State informed the court that the content of Ramirez's tattoos mattered, specifically pointing out the word "ghost" and a cross-hairs. (36 RR at 25.) The trial court then decided to order Ramirez to roll up his sleeves in front of the jury and admonished Ramirez not to act out when the State's expert approaches him to view

the tattoos. (36 RR at 36–37.) Subsequently, in the presence of the jury, Ramirez was forced to show his arms to the jury, allowing Alvarez to testify that the content of Ramirez's tattoos linked Ramirez to gang activity. (36 RR at 40–41.)

Evidence of Ramirez's tattoos was testimonial in nature and incriminating. *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 189 (2004). Where the government relies on evidence of the defendant's tattoos for the content of the communication, "[t]he tattoo [is] testimonial." *United States v. Greer*, 631 F.3d 608, 613 (2d Cir. 2011) (holding that evidence of a tattoo which "in combination with other evidence, allowed jurors to infer" key facts about the defendant was testimonial).

The State did not contend that it would use Ramirez's tattoos to physically identify him as a participant in the crime. Thus, this was not a case where the presence of a tattoo stood in for other readily identifiable physical characteristics such as a defendant's height, hair color, voice, or handwriting style. *See United States v. Hubbell*, 530 U.S. 27, 34–35 (2000). Instead, the State introduced evidence of Ramirez's tattoos because the tattoos allegedly helped to establish gang membership. Accordingly, evidence of Ramirez's tattoos was testimonial and incriminating, and the trial court erred in compelling Ramirez to reveal his arms. *See Greer*, 631 F.3d at 613; *see also United States v. Doe*, 465 U.S. 605, 614 n.13 (1984).

157

In addition to violating Ramirez's Fifth and Fourteenth Amendment rights, the trial court's error was highly prejudicial and had a "substantial and injurious effect" on the outcome of Ramirez's trial. *See Brecht*, 507 U.S. at 623. Accordingly, Ramirez is entitled to relief.

**L.     Ramirez's Sixth, Eighth, and Fourteenth Amendment right to have all potentially mitigating evidence considered at trial was violated when the trial court prevented Ramirez from presenting relevant mitigating evidence.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (DA Opening Br. at 3, Aug. 8, 2006; Initial Writ Appl. at 114, July 2, 2009.)

The Eighth and Fourteenth Amendments guarantee a capital defendant the right to present and have considered all potentially mitigating evidence at trial. Moreover, a defendant has a Sixth Amendment right to confront and cross-examine witnesses and to call witnesses in his defense. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14 (1967). The trial court erred in excluding evidence at the punishment phase when it restricted Ramirez's presentation of mitigating evidence. For example, the trial court prevented Ramirez from presenting testimony from his psychological expert and restricted what Ramirez's expert, Kate Allen, could say. (*E.g.*, 39 RR at 70–75.) The excluded

evidence was relevant to both of these mitigation themes, and its exclusion warrants a new trial on punishment for Ramirez.

The Supreme Court has held that the Eighth and Fourteenth Amendments require that the jury "not be precluded from considering, *as a mitigation factor*, any aspect of a defendant's character or record and any circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The Constitution "requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]." *Boyde v. California*, 494 U.S. 370, 377–78 (1990).

Exclusion on technical grounds of potentially mitigating evidence violates these fundamental rights. *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam). The Supreme Court has held: that the court cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990)).

The trial court prevented Ramirez's expert Kate Allen from testifying about mitigating evidence concerning Ramirez's life history and background, his abusive family life, and the consequent abandonment and drug addiction he suffered. (39 RR at 70–75, 78.) The evidence was excluded on technical (and incorrect) grounds at

159

the punishment phase, which if even one juror believed would have been mitigating enough (in light of all other mitigation evidence) to warrant a life sentence.

This error had a "substantial and injurious effect" on Ramirez's sentence. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Accordingly, Ramirez is entitled to relief.

### M.    The exclusion of venire members for cause violated Ramirez's right to an impartial jury and due process under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. The Supreme Court has held that a capital defendant's due process rights are violated, requiring reversal of a sentence of death, when the "'inadequacy of *voir dire*' leads [] to doubt that [the defendant] was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 739 (1992). The Court has "not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections" regarding the "adequacy of *voir dire*." *Id.* at 730. For example, "general fairness and 'follow the law'" questions are insufficient "general inquiries" that fail to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 734–35. The Court has specifically held "that a sentence of death cannot be

carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 521–22 (1968); *see also Lockhart v. McCree*, 476 U.S. 162, 176 (1986). A venire member with such general opposition to the death penalty may not be excluded for cause unless his or her views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotation and citation omitted).

Here, on information and belief, the trial court dismissed venire members who merely voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction, in violation of *Witherspoon*. These "dismissal[s] of [] juror[s] in violation of *Witherspoon* . . . is constitutional error that requires vacation of a death sentence." *Rivera v. Illinois*, 556 U.S. 148, 161 (2009).

The trial court's error violated Ramirez's constitutional right to be tried by an impartial jury that was not "uncommonly willing to condemn a man to die." *See Witherspoon*, 391 U.S. at 521. The trial court's erroneous failure to strike those persons left Ramirez with insufficient peremptory challenges to remove jurors who were biased against him. Because a juror's qualification to serve on a capital jury

under *Witherspoon* and *Witt* is "rooted in the constitutional right to an impartial jury, and because the impartiality of the adjudicator goes to the very integrity of the legal system," such an error can never be harmless. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (internal citations omitted).

Second, upon information and belief, the trial court dismissed veniremembers based on their views about the death penalty without giving counsel the opportunity to rehabilitate those persons. Constitutional principles carefully restrict the disqualification of jurors based on anti-death penalty views. The Supreme Court has made clear that the exclusion of prospective jurors from service solely because they had reservations about capital punishment violated capital defendants' due process right not to be placed on trial before a "tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521–22. The Court has reformulated this rule to forbid courts from disqualifying a juror on the basis of death-penalty opposition unless that opposition is so categorical that it "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 420 (internal quotation and citation omitted). The trial court improperly dismissed jurors in violation of *Wainwright* and *Witt*, violating Ramirez's constitutional rights.

Finally, upon information and belief, the trial court had improper contact with, and thus improperly influenced, the jury's deliberations in Ramirez's proceedings. This is a violation of Ramirez's rights under the Constitution. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Given that the bias of even a single juror can render a sentence unconstitutional, *see Parker v. Gladden*, 385 U.S. 363, 366 (1966) (holding a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors"), Ramirez's death sentence must be vacated.

### N  The trial court erred by giving an insufficient voluntariness instruction that was contrary to Texas law and in violation of Ramirez's Fourteenth Amendment due process rights.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Under Texas law, when a defendant disputes the admission of a confession, the voluntariness of the confessions is a question of fact submitted to the jury. In full, the law states:

> (a)  No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Tex. Code Crim. Proc. art. 38.23(a).

The law thus requires a jury to determine whether, based upon federal constitutional principles, the facts surrounding a confession support the confession as voluntarily given.

Ramirez's attorneys requested a voluntariness instruction from the court that would inform the jury of the constitutional requirements by which a statement may be considered voluntary. The defense's instruction requested that the jury be informed that a confession must only be regarded as evidence if a defendant had knowingly, voluntarily, and intelligently waived his rights before giving it. (2 CR at 514–15); *Miranda v. Arizona*, 384 U.S. 436 (1966). The court denied that instruction, saying that the charge from the court would be "sufficient." (37 RR at 81–82.)

The court gave this instruction regarding the voluntariness of Ramirez's confession instead:

> You are instructed unless you believe from the evidence beyond a reasonable doubt that the alleged confession or statement introduced into evidence was freely and voluntarily made by the Defendant without compulsion or persuasion, or if you have a reasonable doubt thereof, you shall not consider such alleged statement or confession for any purpose nor any evidence obtained as a result thereof.

(2 CR at 545.) No further definitions or explanations were provided.

164

This was constitutionally insufficient.

Juries must evaluate the facts surrounding a confession to determine if they allowed a defendant the "free choice to admit, to deny, or to refuse to answer." *Lisenba v. California*, 314 U.S. 219, 241 (1941); *Garrity v. New Jersey*, 385 U.S. 493, 496 (1967). In order to determine this, there are constitutional criteria that juries must consider before a confession can be factually determined to have been un-coerced. For instance, voluntariness is not assumed without physical threat; coercion of an accused can be "mental as well as physical." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). Other factors determining whether a confession is voluntary include the length of time for which the interrogation continues (*Corley v. United States*, 556 U.S. 303, 313–14 (2009); *Ashcraft v. Tennessee*, 322 U.S. 143, 154 (1944)), the length of detention, the amount and manner of interrogation, and whether the defendant had been held incommunicado by the police (*Reck v. Pate*, 367 U.S. 433, 442 (1961)) whether coercive government conduct or deception was involved in obtaining the confession (*Spano v. New York*, 360 U.S. 315, 318–19 (1959); *Colorado v. Connelly*, 479 U.S. 157, 165–68 (1986)), actual threats of physical violence (*Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)), the mental capacity or impairments of the suspect (*Townsend v. Sain*, 372 U.S. 293, 307–08 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992);

*Reck*, 367 U.S. at 442), and whether the environment producing the confession is "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect (*Ashcraft*, 322 U.S. at 154).

In sum, "voluntariness" has a constitutional, legal definition to which specific legal standards attach. Without any criteria or standards, a jury will substitute its lay understanding of the word, resulting in improper admissions of coerced confessions and unreliable sentences. Juries must be instructed to consider the totality of the circumstances under which the confession was given, as well as given legal standards against which they may evaluate the facts and make a determination. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973). And Texas law, which requires that confessions admitted as evidence comply with federal constitutional standards for voluntariness, compels courts to give jurors adequate instructions to guide their deliberations.

As the court gave instructions that were unconstitutionally vague and insufficient—as well as insufficient under Texas law—Ramirez's confession was improperly admitted into evidence, and it had "substantial and injurious effect" on his sentence. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).

### O. Ramirez's constitutional rights were violated when the trial court failed to use special verdict forms.

The trial court's failure to use special verdict forms for the sentencing phase of Ramirez's trial violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, as it unconstitutionally prohibits effective review of his sentence.

Under Texas law, three special issues were submitted to Ramirez's jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased; (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. art. 37.071 § 2(b)(1)-(2), (e)(1).

However, the jury is statutorily misinformed about the full impact of the way it answers these special issues. The jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. Tex. Code Crim. Proc. art. 37.071 § 2(d)(2). Similarly, the jury is to be instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. Tex. Code Crim. Proc. art. 37.071 § 2(f)(2). The jury is informed by the judge that if the jury unanimously finds

a mitigating circumstance under the third special issue, the defendant will be sentenced to life without parole. Tex. Code Crim. Proc. art. 37.071 (e)(2).[15]

Critically, the statute expressly bars the jury from being instructed that if the jury is unable to reach a unanimous verdict, or have at least ten members agree, on either of the special issues, the trial court is required to sentence the defendant to life in prison. Tex. Code Crim. Proc. art. 37.071 § 2(a)(1) (barring instruction on the effect of a failure to agree); Sec. 2(g) (life sentence required if jury is unable to agree). Thus the instruction violates *Mills v. Maryland*, 486 U.S. 367 (1988). *See* Claim Eighteen *infra.*

Because the statute and instructions also create an unconstitutional risk of jury coercion, wherein the jurors perceive that they must reach a certain result—s*ee Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)—the court should have required a special verdict form. Without a special verdict form the trial court had no way to know if the jury verdict was constitutionally sound. In addition, without such a record there could be no meaningful appellate review of Ramirez's sentence.

---

[15] Though the current statute has the language "life imprisonment *without parole*," the jury in Ramirez's case was instructed only on "life imprisonment" because his offense occurred on January 5, 2003, before Texas law and the jury instruction on this point was changed.

In the capital context, where heightened reliability is required, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) (recognizing mandatory appellate review as "an important procedural safeguard . . . to avoid arbitrariness") The trial court's failure to employ a special verdict form crippled its own and Ramirez's ability to ensure his sentence is constitutionally sound. As such, Ramirez's sentence must be vacated.

## P. The cumulative effect of these trial-court errors prejudiced Ramirez.

The trial court committed numerous errors during Ramirez's trial. Even if this Court were to find that none of them merits relief alone, the cumulative effect of all the errors is so prejudicial that Ramirez is entitled to relief. The errors "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also*, *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc).

## CLAIM FIVE

**Ramirez's convictions and sentence should be vacated because the trial judge was biased, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this petition. Ramirez's rights to due process and fair proceedings required that the judge presiding over his trial be impartial and free from bias or prejudice. *See In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); *see also Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986). Moreover, the Eighth Amendment's requirement of a heightened degree of reliability demanded that Ramirez be tried by a neutral decision maker rather than one predisposed to his guilt and culpability. *See, e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).

A defendant does not have to prove actual bias. Even the appearance of bias violates his rights. *See Liteky v. United States*, 510 U.S. 540, 558 (1994) (Kennedy, J., concurring) ("One of the very objects of law is the impartiality of its judges in fact and appearance."); *Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 467 (1952) (opinion of Frankfurter, J.) ("The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact.").

Here, the appearance of bias requires reversal. Judge Noe Gonzalez, who presided over Ramirez's trial, had been the committing judge in several of Ramirez's juvenile proceedings. (Tr. Def. Ex. 11 at 34, 101, 106.) On information and belief, Judge Gonzalez's bias against Ramirez manifested itself throughout trial. In pretrial proceedings, Judge Gonzalez told Ramirez that "there hasn't been anyone in this County that has sentenced more people in accordance with death sentences. . . ." (2 RR at 13.) Then, Judge Gonzalez warned Ramirez to "[b]e very careful" (2 RR at 13), and said that he did not "want any outbursts in the Court." (2 RR at 14.)

The trial court's comments also bear on his impartiality. During trial, Judge Gonzalez routinely asked questions that supported the State's case and made statements aligning himself with the prosecutor. (*E.g.*, 6 RR at 202 (asking the State's witness leading questions); 7 RR at 205 (referring to the prosecutor as "my Clint Eastwood").) On information and belief, the trial court also made various statements reflecting prejudgment of Ramirez's case.

Because a violation of the defendant's right to be tried before an impartial judge is structural and not susceptible to harmless error review, Ramirez is entitled to relief. *See Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Moreover, the trial judge's failure to recuse itself had a substantial and injurious effect on both phases of the proceedings. *See Brecht*, 507 U.S. at 623. Accordingly, Ramirez is entitled to relief.

171

## CLAIM SIX

**Ramirez was denied the right to confront a witness against him and therefore his convictions and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Sixth Amendment's Confrontation Clause prohibits prosecutors from introducing out-of-court statements of declarants unless the declarant is unavailable and the defendant has had the opportunity to examine them. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004) (prohibiting the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."). At the penalty phase of Ramirez's trial, the State called Ricardo Leal to testify about his role as Ramirez's juvenile probation officer and Ramirez's participation in the Texas Youth Commission. (38 RR at 71.) This testimony violated Ramirez's confrontation rights because Leal relied on out-of-court statements from declarants whom were not established to be unavailable or previously available for cross-examination.

As a general matter, Leal's testimony violated Ramirez's confrontation rights because, on information and belief, and subject to further investigation, it turned on

a review of probation records which were prepared at least in part by others who were unavailable and whom Ramirez did not have the opportunity to cross-examine. (*E.g.*, 38 RR at 83, 89, 129.) *Cf. Russeau v. State*, 171 S.W.3d 871, 880–81 (Tex. Crim. App. 2005) (sustaining confrontation challenge where the trial court admitted incident and disciplinary reports from the county jail and Texas Department of Criminal Justice containing statements written by corrections officers and which documented the appellant's disciplinary offenses, statements which were read to the jury during the penalty phase and argued in closing).

More specifically, Leal testified regarding particular, prejudicial examples of misconduct which Leal learned second-hand. For example, Leal testified that in January 2002 he "got information that Juan might have been arrested by the Alamo PD." (38 RR at 91.) Leal clarified that this information did not come from Ramirez himself, and his use of the passive voice obscured the declarant who provided this information. (38 RR at 92.) This information was testimonial in nature, including because it caused Leal to "issue[] out a directive—what we call a Texas Youth Commission directive, similar to a warrant." (38 RR at 92). Similarly, Leal testified that in March 2002 he was informed (again by an unidentified declarant) that Ramirez had been arrested, information which caused TYC to initiate a revocation hearing. (38 RR at 93–94.) The court was not presented with any evidence that the

173

out-of-court declarants were unavailable or that Ramirez had an opportunity to cross-examine them. Because the State used Leal as a "mere conduit[]" for out-of-court statements contained in the probation records, Ramirez's confrontation rights were violated and he is entitled to relief. *Williams v. Illinois*, 567 U.S. 50, 80 (2012).

## CLAIM SEVEN

**Ramirez's due process rights were denied, rendering his sentence unreliable, under the Eighth and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Ramirez's fundamental due process rights were denied in two key ways, depriving him of a fair trial and a reliable and non-arbitrary death sentence. *See Furman v. Georgia*, 408 U.S. 238, 274 (1972) (holding that "the State does not respect human dignity when, without reason, it inflicts upon some people a severe punishment that it does not inflict upon others. Indeed, the very words 'cruel and unusual punishments' imply condemnation of the arbitrary infliction of severe punishments").

First, upon information and belief, the State presented inconsistent theories across Ramirez's co-defendants' cases. While the U.S. Supreme Court held that prosecutorial inconsistencies do not require voiding a conviction, it left open the

question of whether the State's inconsistent theories across cases require a new sentencing hearing. *See Bradshaw v. Stumpf*, 545 U.S. 175, 186–88 (2005).

Where, as here, the State argued that Ramirez was "Lenny," the most culpable of the co-defendants, the State's inconsistent (and factually insupportable) theory had a direct effect on Ramirez's sentence. As such, Ramirez is entitled to resentencing.

Second, the admission of juvenile evidence at sentencing in support of aggravating factors violated Ramirez's due process rights. The State brought in significant juvenile records and reports from Ramirez's time in TYC. These records allowed the State to assert that Ramirez was given every opportunity to succeed by juvenile probation authorities but failed because of his own incorrigibility. However, upon information and belief, there were significant, rampant, and chronic problems and abuses with the Texas juvenile reform system. The evidence that the State relied upon is questionable with regard to its accuracy, completeness, and professionalism. Other petitioners have developed and presented evidence which calls into question the capacity of the juvenile probation authorities and the TYC to appropriately assess and treat youth with difficult life, educational, and trauma histories. *See* Amended Habeas Petition at 50–73, *Luna v. Stevens*, 5:15-cv-00451-XR (W.D. Tex. Oct. 21,

2016), ECF No. 22. Admitting Ramirez's juvenile records was a violation of his due process rights.

Habeas relief is warranted where the improper admission of evidence "rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir.1995) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)). The untested admission of such key evidence offered by the State formed a significant part of the State's case for guilt and case for death eligibility and prejudiced Ramirez at trial. Without the State's admission of this evidence and use of it to paint Ramirez as irredeemable (*see* Claim Two *supra*), there is a reasonable probability that jurors would have voted for life, and it had a "substantial and injurious effect" on Ramirez's sentence. *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).

Because Ramirez's due process rights were violated and his sentence is unreliable in violation of the U.S. Constitution, Ramirez respectfully requests that this Court grant his writ of habeas corpus and reverse his sentence of death.

## CLAIM EIGHT

### Ramirez's execution would be unconstitutional because he is actually innocent.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez is actually innocent, so his

conviction and death sentence violate the Due Process Clause of the Fourteenth Amendment and the prohibition against cruel and unusual punishment of the Eighth Amendment to the U.S. Constitution.

Ramirez presented this claim below. (DA Opening Br. at 7, 14, Aug. 8, 2006; Initial Writ Appl. at 133, July 2, 2009; Second Writ Appl. at 32, Nov. 6, 2013.)

## A.    Legal Standard.

"The quintessential miscarriage of justice is the execution of a person who is entirely innocent." *Schlup v. Delo*, 513 U.S. 298, 324–25 (1995); *see also Herrera v. Collins*, 506 U.S. 390, 419 (1993) ("the execution of a legally and factually innocent person would be a constitutionally intolerable event.") (O'Connor, J., joined by Kennedy, J., concurring); *id.* at 431 ("The Constitution forbids the execution of a person who has been validly convicted and sentenced but who, nonetheless, can prove his innocence with newly discovered evidence.") (Blackmun, J., joined by Stevens, J., and Souter, J., dissenting); *accord House v. Bell*, 547 U.S. 518, 554–55 (2006).

Ramirez can demonstrate that he is actually innocent, making his imprisonment and execution unconstitutional.[16] *Herrera*, 506 U.S. at 417; *see also*

---

[16] Ramirez preserves the right to argue an actual innocence claim pursuant to *Schlup*, 513 U.S. at 324–25 should any of his claims be found procedurally barred. A *Schlup* "claim of innocence is thus not itself a constitutional claim, but instead a gateway

*Jackson v. Virginia*, 443 U.S. 307 (1979). In a capital case, the Eighth Amendment requires a reliable determination of guilt. *Beck v. Alabama*, 447 U.S. 625, 638 (1980); *see also Spaziano v. Florida*, 468 U.S. 447, 456 (1984) ("We reaffirm our commitment to the demands of reliability in decisions involving death[.]"), *overruled on other grounds by Hurst v. Florida*, 136 S. Ct. 616 (2016). Moreover, the Due Process Clause of the Fourteenth Amendment also paves the way for a petitioner to challenge his punishment on the ground that he is actually innocent. *See Herrera*, 506 U.S. at 437 (Blackmun, J., joined by Stevens, J., and Souter, J., dissenting).

In considering whether a prisoner is entitled to relief on an actual-innocence claim, a court should take all the evidence into account, giving due regard to its reliability. *See Sawyer v. Whitley*, 505 U.S. 333, 339 (1992); *Kuhlmann v. Wilson*, 477 U.S. 436, 455, n.17 (1986).

Below, Ramirez explains how exculpatory evidence renders his conviction and death sentence unconstitutional in violation of the Eighth and Fourteenth Amendments. *See Herrera*, 506 U.S. at 417.

**B.      Discussion.**

_____

through which a habeas petitioner must pass" in order to bring a valid constitutional claim. *Id.* at 315 (internal quotation marks and citation omitted).

The evidence used to convict Ramirez and sentence him to death is unreliable, as explained throughout the claims in this Petition. At trial, the State did not present any physical evidence linking Ramirez to the crime. The State's case relied on Ramirez's confession to being at the crime scene, his statement to the booking officer about being a member of the "Bombitas," and evidence generally linking unknown Tri-City Bombers ("TCB") gang members to the crime. *Ramirez v. State*, No. AP-75,167, 2007 WL 4375936, at *1–4 (Tex. Crim. App. Dec. 12, 2007). However, prior to trial, a co-defendant, Marcial Bocanegra, told police that a man named "Lenny" had committed the actions that the State argued linked Ramirez to the crime. (Second Writ Ex. 40 at 2.) The State offered no evidence to support the theory that "Lenny" and Ramirez are the same person, nor did Ramirez's trial counsel do anything to investigate it.[17]

Evidence exists showing Ramirez is factually innocent of the crime. Newly-discovered evidence further and conclusively exculpating Ramirez of committing the shootings is relevant to his actual-innocence claim because it supports Ramirez's assertions that his confession was false. To establish actual innocence, Ramirez presents below substantial exculpatory evidence related to the crime.

---

[17] At trial, Ramirez's trial counsel solicited brief testimony from Detective Ramiro Ruiz about "Lenny," but trial counsel failed to develop this issue. (36 RR at 143.)

179

Ramirez's co-defendant, Marcial Bocanegra, was the first to be arrested and he provided police a statement that proved to be the "key break in the case." (Evid. Hr'g Ex. 13, ¶ 6.) Bocanegra's statement explained that a man known as "Lenny" was involved in the robbery. (Second Writ Ex. 40 at 2.) Bocanegra described going inside the house with Lenny, who began giving Bocanegra orders. (Second Writ Ex. 40 at 2.) Bocanegra saw Lenny tie up the man, hit the man with a frying pan, and ask him about money and drugs. (Second Writ Ex. 40 at 2.) Bocanegra saw Lenny reenter the first house and then heard shots fired from within the house. (Second Writ Ex. 40 at 2.) On information and belief, detectives showed Bocanegra a photo line-up that included Ramirez's picture. (Ex. 14 at 14.) While Bocanegra identified some individuals, he did not identify Ramirez. The State did not provide the photo line-up associated with Bocanegra's identification to Ramirez's counsel.

However, new evidence reveals that Ramirez and Lenny are not the same person. First, Bocanegra has confirmed that "Juan Ramirez is not Lenny . . . I do not know how the police linked Juan Ramirez to Lenny." (Evid. Hr'g Ex. 14, ¶¶ 2–4.)

Second, evidence shows that Lenny's true identity is likely one of two suspects who are brothers, Manuel Martinez and Ricardo Martinez, who fled to Mexico shortly after the crime. Manuel Martinez is alleged to have gone by the nickname Lenny. (Evid. Hr'g Ex. 27, ¶ 10.) It is also possible that his brother Ricardo

Cabello Martinez, who is a TCB gang member and fled to Mexico after confessing that someone else was paying for something he had done in the past, is Lenny. (Evid. Hr'g Ex. 15, ¶ 22.)

Finally, Ramirez has never gone by the nickname "Lenny." (Evid. Hr'g Ex. 27, ¶ 10; Second Writ Ex. 10, ¶ 23.)

Upon information and belief, ongoing ballistics and DNA testing will also support Ramirez's claim that he is actually innocent of this crime.

The evidence will show that Ramirez did not commit the crime for which he was convicted. His execution, therefore, would violate the Eighth and Fourteenth Amendments. *See Herrera*, 506 U.S. at 417, 431.

## CLAIM NINE

**The State committed misconduct throughout Ramirez's proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The State committed prosecutorial misconduct in various ways, described more particularly below. Taken individually and cumulatively, these errors demonstrate that Ramirez's convictions and sentence are unlawful under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

181

A prosecutor in a criminal case is not simply a party to a controversy; he represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all[.]" *Berger v. United States*, 295 U.S. 78, 88 (1935). His interest should not be to win a case or obtain the maximum penalty. It should be "that justice shall be done." *See id.*; *see also United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (prosecutor's "job isn't just to win, but to win fairly, staying well within the rules"). While it is his duty to prosecute a case with earnestness, it is "as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88. As the United States Supreme Court has explained, "the average jury, in a greater or less degree, has confidence that these obligations . . . will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.*

Among other things, a prosecutor oversteps "the bounds of . . . propriety and fairness which should characterize the conduct of such an officer" when he misstates facts in examination of witnesses; puts "into the mouths of such witnesses things which they had not said"; suggests "by his questions that statements had been made to him personally out of court, in respect of which no proof was offered"; pretends

to understand a witness "said something which he had not said" and persistently examines the witness on that basis; assumes prejudicial facts not in evidence; bullies and argues with witnesses; and, in general, conducts "himself in a thoroughly indecorous and improper manner." *Id.* at 84. He further oversteps these bounds when his arguments are "undignified and intemperate" or contain "improper insinuations and assertions calculated to mislead the jury." *Id.* at 85.

Moreover, prosecutors may not knowingly present false testimony, knowingly misrepresent the evidence, permit a witness to give a false impression of the evidence, or fail to correct evidence it knows to be false. *See Miller v. Pate*, 386 U.S. 1 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam). Even when the false testimony goes only to the credibility of the witness that is testifying, the defendant's rights are violated. *Napue*, 360 U.S. at 269 ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.").

### A. The State committed misconduct when it denied the existence of the arrest video until the start of trial.

Ramirez raised this issue below. (DA Opening Br. at 37–38, Aug. 8, 2006.) In May 2003, Ramirez filed a discovery motion requesting that the State produce

183

copies of any and all "videotapes made in connection with this case." (1 CR at 198.) On October 12, 15, and 18, 2004, counsel for Ramirez noted the presence of a camera at his arrest and specifically requested a copy of any video recorded at that time pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). (3 RR at 30; 1 CR at 280–81; 4 RR at 23.) The State denied that any such video recording existed. (3 RR at 31; 4 RR at 23–25.) Nonetheless, at the October 22, 2004 suppression hearing—on the first day of Ramirez's trial—the testimony made clear that in fact the arresting officers had a video camera and strongly suggested that the camera was recording while on the property where Ramirez was arrested. (6 RR at 102–04, 163–67, 178, 180; 7 RR at 31.)

Had the State timely disclosed the videotape, the testimony at the suppression hearing supports that it would have revealed, at a minimum, that Ramirez was in possession of the "Roche pills" (7 RR at 57–61), corroborating Ramirez's explanation that his statements to police were compromised by the effects of drugs (7 RR at 152–54).[18]

Beyond violating its duty to disclose exculpatory evidence, *see United States v. Agurs*, 427 U.S. 97 (1976), and its duty of candor to the tribunal, the State's action

---

[18] On information and belief, and subject to additional investigation, the video may have also revealed other material and/or exculpatory information, including but not limited to additional evidence of Ramirez's intoxication or evidence that the police committed misconduct during the search.

amounts to prosecutorial misconduct. As noted above, a prosecutor occupies a unique position in the bar, and is subject to uniquely rigorous standards. *Berger*, 295 U.S. at 88. Here, the prosecutors' conduct did not meet those standards. The State's failure to disclose the arrest video before the suppression hearing—indeed, its persistent denial of any such video—prevented Ramirez from offering evidence to corroborate his testimony. The State's misconduct is particularly prejudicial because it deprived Ramirez of evidence undermining the voluntariness of statements that were critical to the case against him. *See Kojayan*, 8 F.3d at 1323–24 (finding misconduct where the State "deprived the defendants of an opportunity to put on what could have been a powerful defense"); *see also Davis v. Zant*, 36 F.3d 1538, 1549–50 n.17 (11th Cir. 1994) ("[P]rosecutorial misconduct is least acceptable under the Constitution when aimed [at] the core of the defense's case"). He is entitled to relief.

### B.   The State committed misconduct when it engaged in or allowed police to engage in spoliation of evidence.

Ramirez raised this issue below. (DA Opening Br. at 38, Aug. 8, 2006.) The record from the final pretrial conference supports that the State deleted three minutes from the copy of the arrest video it ultimately produced to Ramirez. (26 RR at 9–11.) As noted above, the video likely contained evidence that, at a minimum, corroborated Ramirez's explanation that he was intoxicated when arrested. The

recording omitted from the video thus may have undermined the admissibility and/or persuasive force of statements he gave to police, which became powerful evidence against him. He therefore submits that the State's failure to preserve the complete video should give rise to the inference that the footage was favorable to Ramirez, *cf. White v. State*, 248 S.W. 690, 692 (Tex. Crim. App. 1923) ("In a case of circumstantial evidence, inferences from evidence not introduced which are in the possession of the state are in favor of and not against the accused."), and that the State's failure, in light of its unique obligations to ensure justice is done, amounted to reversible misconduct.

### C. The State committed misconduct when it sponsored false testimony at the suppression hearing.

Ramirez raised this issue below. (Second Writ Appl. at 110, Nov. 6, 2013.) At the suppression hearing, Edinburg Officer Edgardo Ruiz testified that Ramirez's post-arrest statement included previously unknown information—that Ramirez had struck one of the victims in the head with a frying pan. (6 RR at 69, 77, 81–83.) According to Ruiz, Rosie Gutierrez had previously told police that she heard her son being struck with something, but she did not specifically identify the object used to strike him.  (6 RR at 81–82.) On redirect, Ruiz confirmed that the description of the object as a frying pan was first supplied by Ramirez:

| Counsel: | As far as Rosie Gutierrez goes, she never told you she heard or saw Jerry get hit in the face with a pan, did she? |
|---|---|
| Witness: | No, just that she heard them hitting. She didn't know who they were. |
| Counsel: | And she didn't know what was being used to hit him with? |
| Witness: | No. |
| Counsel: | But there was a skillet there at the house, and that skillet was later recovered? |
| Witness: | Was recovered. |
| Counsel: | And at the time of the crime, the time of the incident, that skillet was in the living room; is that correct? |
| Witness: | Yes, that's correct, yes. |
| Counsel: | And that skillet was bent up, and based on the Defendant's statement, that might explain why the skillet was bent up? |
| Witness: | Yes. |
| Counsel: | And that was information you learned from the defendant's statement? |
| Counsel: | From the defendant. |

(6 RR at 83–84.)

In fact, Marcial Bocanegra had told Edinburg police employees Daniel Ochoa and Jose Luis Soto on January 22, 2003, that "Lenny was beating the guy on the head with a frying pan." (Second Writ Ex. 40 at 2.) This was several days prior to Ramirez's January 29, 2003 statements. (*Compare* 6 RR at 11, *with* Second Writ Ex. 40 at 1.) It is a fair inference that the prosecutors were in actual possession of Marcial

187

Bocanegra's statement. But even if they were not in possession of his statement, the information in the possession of police is imputed to the State. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also Ex parte Adams*, 768 S.W. 2d 281, 292 (Tex. Crim. App. 1989) ("[I]t is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge will be imputed to state prosecutors." (quoting *Williams v. Griswald*, 743 F.2d 1533, 1542 (11th Cir. 1984))). Thus, the State is responsible for information obtained by police showing Ruiz's testimony to be false.

Here, the State sponsored Ruiz's false testimony on direct examination that the information about the frying pan first came from Ramirez, and they aggravated the harm by re-eliciting this information on redirect. They then failed to correct it. This violated Ramirez's due process rights. *Mooney*, 294 U.S. at 112; *Napue*, 360 U.S. at 269.

Moreover, the violation likely affected the outcome of the proceedings against Ramirez. At the suppression hearing, the primary dispute was between Ruiz's and Ramirez's conflicting testimony regarding what occurred prior to Ramirez giving a recorded statement. Ruiz testified that Ramirez agreed to give him a recorded statement after his arrest on January 29, 2003. (6 RR at 11.) Ruiz testified further that he read Ramirez his *Miranda* warnings prior to questioning him, and that after

Ruiz explained to Ramirez what information police already obtained from others, Ramirez agreed to cooperate and give a statement. (6 RR at 13, 19.) Moreover, Ruiz testified that he perceived no signs that Ramirez was intoxicated when he provided his statement. (6 RR at 21–22.)

Ramirez, by contrast, testified that he was not read his *Miranda* rights until after being subject to interrogation for thirty to forty minutes, and that he explained to police officers prior to the interrogation that he was high on Rohypnol. (7 RR at 48, 52, 57.) Additionally, Ramirez described abusive tactics employed by police during the unrecorded, pre-*Miranda* interrogation to obtain his statement, including that the police failed to heed his unambiguous requests for a lawyer, pointed a gun at him, and threatened that he would receive a death sentence if he failed to talk. (7 RR at 39–41, 45–50, 123.) Ramirez believed in light of the police's conduct that he would continue to be subjected to abuse until he provided a statement. (7 RR at 56–57.) At the end of the hearing, the court declined to suppress Ramirez's statements. (7 RR at 203, 208.)

The judge's ruling at the suppression hearing entailed a determination of the credibility of Ruiz's account. Had the State corrected Ruiz's false testimony regarding the frying pan as due process requires, *see Napue*, 360 U.S. at 269–70, there is a reasonable likelihood that the judge would not have credited his testimony

189

and instead credited Ramirez's contrary testimony supporting suppression of his statements. Moreover, Ramirez's statements were integral to proof of his guilt. *See generally Colorado v. Connelly*, 479 U.S. 157, 182 (1986) ("Triers of fact accord confessions such heavy weight in their determinations that 'the introduction of a confession makes the other aspects of a trial in court superfluous . . . .'" (citing E. Cleary, *McCormick on Evidence* 316 (2d ed. 1972))). If the jury had not considered Ramirez's statements to police, it likely would have acquitted him. Thus, there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury," and Ramirez is entitled to relief. *Agurs*, 427 U.S. at 103.

### D.   The State committed misconduct regarding Marcial Bocanegra.

The State concealed evidence that was exculpatory or, because the evidence was not disclosed, that this Court should infer was exculpatory. Beyond violating *Brady*, the State's disclosure violations also amounted to prosecutorial misconduct because the State misled the court regarding the nature of the undisclosed information and thereby misrepresented the evidence.

#### 1.   The State concealed and then misrepresented the nature of the cooperation agreement it reached with Marcial Bocanegra.

Edinburg police records reflect that Detective Jose Soto and investigator Daniel Ochoa interviewed Marcial Bocanegra on January 21, 2003, at Bocanegra's

request. (Ex. 14 at 10.) The report reflects that Bocanegra quickly asked "what he could receive in return" for discussing the murders with Soto and Ochoa. (Ex. 14 at 10.)

After obtaining some preliminary information from Bocanegra about what information he was willing to provide, Soto describes meeting with the Hidalgo County District Attorney, Rene Guerra. (Ex. 14 at 11.) According to Soto's report, Guerra "stated that the deal was that if Marcial Bocanegra provided details in the case that he would do away with the death penalty *and life sentence and would start the sentence at 50 years.*" (Ex. 14 at 11 (emphasis added).) Guerra advised that Bocanegra's information would have to be "checked out and that the information would have to help in the arrest and conviction of the person(s) involved in the crime." (Ex. 14 at 11.)

Soto related the terms of Guerra's offer to Bocanegra, who "was not too happy with the 50 years and stated that he needed something better tha[n] the 50 years." (Ex. 14 at 11.) Soto explained to Bocanegra that 50 years "is where it started and that depending on the information the years could be reduced." (Ex. 14 at 11–12.) Soto also explained that "the investigation was going to continue and that if the information he was providing was not true that the district attorney could refuse to help him out." (Ex. 14 at 12.) Bocanegra gave a statement to Soto and Ochoa, which

was subsequently reduced to writing (Ex. 14 at 12–16; Second Writ Ex. 40.). Soto then relayed to a Hidalgo County Assistant District Attorney that Bocanegra had provided a statement "and that he had been cooperating in the investigation." (Ex. 14 at 16.)

As early as April 30, 2003, within four months of Bocanegra's bargained-for cooperation, Ramirez repeatedly requested through counsel that the State disclose any agreements, promises, or inducements made to each witness, "including, but not limited to, plea bargain agreements . . . , agreements to dismiss or reduce or not bring charges, or any other agreement of leniency." (1 CR at 69; *see also, e.g.*, 1 CR at 176 (requesting "[a]ll 'consideration' or promises of 'consideration' given to or on behalf of all State's witnesses or expected or hoped for by said State witnesses," including "absolutely anything . . . which arguably could be of value or use to a witness" such as "leniency, favorable treatment or recommendations or other assistance with respect to any pending or potential criminal action"); 1 CR at 113 (seeking "any agreement entered into between the District Attorney . . . and any prosecution witness that could conceivably influence said witness' testimony").

Notwithstanding Ramirez's requests and Soto's report that Bocanegra cooperated after receiving a promise to cap his sentence at 50 years, the State initially denied any cooperation agreement whatsoever. On August 28, 2003, the prosecutor

denied in open court that any deal had been made with any codefendant. (Ex. 2 at 6.) Even after the court granted a defense motion requiring the State to disclose any agreements with witnesses that could conceivably affect their testimony (1 CR at 219), the prosecutor denied the existence of any deal (Ex. 4 at 9), even as late as August 2004 (Ex. 7 at 10).

On October 12, 2004, however, just two weeks before trial began, the prosecutor announced to the court, in response to yet another defense request for information regarding the existence of any deals made with codefendants, that the State had extended an agreement to Bocanegra. (3 RR at 23.) Still, the State did not disclose the true nature of the deal. Rather, the prosecutor revealed only that the "State has decided not to seek the death penalty against a co-defendant, Marcial Bocanegra . . . [a]s part of his cooperation in this case." (3 RR at 23.) Defense counsel tried to clarify whether "that's the only part, that's the only thing you offered him, basically, an offer that the death – actually, you decided not to seek the death penalty; is that correct?" (3 RR at 24.) The prosecutor responded only that the State had "decided not to seek the death penalty against him, Bocanegra." (3 RR at 24; *see also* 3 RR at 24 (repeating that in exchange for Bocanegra's cooperation "the State came off the death penalty"); 3 RR at 27 ("The agreement was to cooperate. We have come off the death penalty on him.").

193

On information and belief, based on Soto's police report and subject to further investigation, the State had entered into an agreement with Bocanegra in which he would cooperate in exchange for a term-of-years sentence that would not exceed 50 years. That is supported by Bocanegra's actual sentence for murder, which was 35 years. (Ex. 91 at 1.) *See* Tex. Dep't of Crim. Justice, Offender Information Details, available at https://offender.tdcj.texas.gov/OffenderSearch/offenderDetail.action ?sid=05388935 (last visited Nov. 28, 2018). The prosecutor's failure to timely and accurately disclose the existence of the cooperation agreement with Bocanegra, who was identified as a State's witness, violated *Brady*. *See Giglio*, 405 U.S. at 154–55.

Worse, perhaps, once the State did disclose its cooperation agreement with Bocanegra, it affirmatively misled the court and Ramirez to believe that the bargained-for sentence could be anything short of death, when in fact it was capped at 50 years. The State's evasive, misleading statements to the court and to Ramirez regarding the nature of the agreement gave a false impression of the evidence and constitutes misconduct. *Cf. Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (explaining that misleading the court in seeking to persuade it to grant a motion, no less than misleading a jury, is "'inconsistent with the rudimentary demands of justice'" (quoting *Mooney*, 294 U.S. at 112)). He is entitled to relief.

**2.    The State concealed evidence obtained from Bocanegra exculpating Ramirez and instead misleadingly suggested that**

**Bocanegra would provide inculpatory testimony as a State witness.**

According to Soto's reports, after Edinburg police arrested Marcial Bocanegra they showed him "some photo line ups . . .  Marcial Bocanegra identified some of the individuals in the photo line ups and . . . sign[ed] the photo line ups." (Ex. 14 at 14.) The lineup was not admitted at trial, and neither Bocanegra nor Soto testified.

Ramirez alleges on information and belief that Bocanegra did not identify him in the photo lineup. Indeed, had Bocanegra identified Ramirez among the photographs, the State would have admitted the lineup into evidence or called Bocanegra or the police officers who participated in the photo lineup to testify about it and bolster the State's case. That the State took none of these actions supports that Bocanegra did not identify Ramirez among the photographs shown to him.

Notwithstanding that this evidence would have been favorable to Ramirez and material to guilt and punishment, the State never disclosed the signed photo lineups. This violates due process. *See Brady*, 373 U.S. at 87.

Moreover, in addition to the lineup, the State knew from interviewing Bocanegra that he did not identify Ramirez as among those who participated in the murders. Neither Soto's notes of Bocanegra's interview nor his written statement refer to Ramirez. (Ex. 14 at 12–16; Second Writ Ex. 40.) And, contrary to the State's position at trial, no evidence established that Ramirez ever went by the nickname

"Lenny," one of the perpetrators described by Bocanegra. In fact, in 2014 Bocanegra signed a statement declaring under penalty of perjury that he "met Juan Ramirez for the first time in Hidalgo County Jail" and that "Juan Ramirez is not Lenny." (Evid. Hr'g Ex. 14, ¶ 3.)

Thus, Bocanegra's failure to identify Ramirez in the lineup, failure to describe him as one of the perpetrators, and failure to identify Ramirez as Lenny, demonstrates that Bocanegra could not tie Ramirez to the murders. Nonetheless, the State listed him as a witness, suggesting the inference that at trial Bocanegra would testify for the State and link Ramirez to the crime. Indeed, although both defense counsel and the trial court attempted to ascertain pretrial whether Bocanegra's cooperation agreement required him to testify, or whether he would be called as a State's witness, the prosecutor would not provide a direct answer. (3 RR at 25–28.)

For example, when the court specifically asked the prosecutor whether the agreement was "that the cooperation would include him voluntarily testifying," the prosecutor responded, "The agreement was to cooperate. We have come off the death penalty on him." (3 RR at 27.) When the court asked further whether the State intended to call Bocanegra, the prosecutor responded, "He is in our witness list." (3 RR at 28.) When the court pressed and suggested that the State "may call him, but

you don't know at this point," the prosecutor responded, "We are not revealing that at this point. But that's certainly a possibility." (3 RR at 28.)

Thus, not only did the State fail to disclose evidence obtained from Bocanegra that would have exculpated Ramirez, the State misled the court and defense counsel to believe that Bocanegra possessed inculpatory information that he might be called upon to provide as a State's witness. Beyond the *Brady* violation, giving such a false impression of the evidence amounts to misconduct and deprived Ramirez of due process.

### E. The State committed misconduct when failed to disclose conditions in the TYC and made false arguments regarding those conditions.

As noted above, the State may not suppress favorable evidence that is material to guilt or punishment, *Brady*, 373 U.S. at 87; nor may it present false testimony or allow it to go uncorrected, *Napue*, 360 U.S. at 269, or create a false impression of the evidence, *see Miller*, 386 U.S. at 6–7.

At trial, the State called Ramirez's former juvenile parole officer from the Texas Youth Commission, Ricardo Leal. (38 RR at 73.) The State elicited from Leal that there were "a range of options" for placements that "would best be suited for Juan Ramirez, and what services he might need." (38 RR at 74.) The State further elicited that Ramirez was placed at the Evins Regional Juvenile Center, where he was eligible for and placed into a "resocialization program" focusing on

"interpersonal skills, the independent skills . . . their counseling, or with the programs that they faced when they were out there in the community prior to TYC." (38 RR at 75–76.) Leal testified that Ramirez had a case worker and that his progress at TYC was assessed by the case worker as well as a program administrator, other program staff, and teachers. (38 RR at 77.)

The State asked Leal specifically to describe the Evins facility that housed Ramirez. (38 RR at 78.) Leal described an environment in which juveniles routinely attended group sessions under the direction of staff who "make[] sure everything is okay," attended academic classes, receive time for physical activity, attend a "treatment group" working on social skills like anger management, independent living, and family issues. (38 RR at 78–80.) He elaborated: "The goal on Juan Ramirez after he completed Evins was to teach him skills to live on his own, for him to have that option or that privilege." (38 RR at 82.) Leal also described the living conditions at Evins, which he testified ensured the youths' "basic needs." (38 RR at 80.)

He further testified that after leaving Evins, Ramirez was placed in a halfway house to continue working on "independent living" skills. (38 RR at 82.) The halfway house placement provided opportunities to learn about "savings accounts, checking accounts. They give him the opportunity to go out into the community and

look for employment." (38 RR at 85.) When Ramirez was discharged on juvenile parole, the TYC provided "intensive" surveillance, including guidance for completing financial aid packages to enroll in community college and help finding a job. (38 RR at 89–90, 97.) After Ramirez's parole was revoked, he was returned to a detention facility where he was again managed by various program administrators and enrolled in education and resocialization programs. (38 RR at 95–96.)

Thus, the thrust of Leal's testimony was that the State of Texas, through the TYC, had provided Ramirez with exhaustive rehabilitative programs. This left the jury to infer that Ramirez's involvement in the charged conduct reflected his rejection of the State-offered help and that he was incorrigible.

The State reinforced this inference through argument. During closing argument at the penalty phase, the State argued that, although only 18, Ramirez had kept "getting more and more violent" throughout his adolescence. (39 RR at 119.) The State asserted that Ramirez had "proven through his past that he is a violent individual, he is a threat to our society." (39 RR at 125.) The State argued that although Ramirez had been "given the opportunity" to rehabilitate in treatment facilities, he nonetheless committed assaultive conduct upon his release. (39 RR at 137–38.) In its closing rebuttal argument, the State belittled the defense's argument

that "society . . . let his defendant down." (39 RR at 140–141.) The effect of the prosecutors' argument was to suggest to the jury that the TYC had provided effective resources to help Ramirez get his life on track, and that Ramirez had failed to take advantage of those resources. This could reasonably have caused the jury to believe that Ramirez was more likely to be incorrigible, a future danger, and deserving of death.

The State's TYC Youth Commission, which was responsible for providing the programs Leal described and the "opportunit[ies]" to which the prosecutor referred, was in fact plagued by highly publicized problems involving the mistreatment of its wards, including violence, neglect, sexual abuse, riots, gang activity, drug use, and suicide. (Ex. 82 at 4, ¶ 18.) Indeed, severe mistreatment of juveniles within the TYC caused the U.S. Department of Justice to investigate one facility, the Evins facility, where Ramirez had been housed. (Ex. 82 at 4, ¶ 18.)

Unsurprising, a leading researcher on the TYC has opined that

> the punitive and dangerous conditions, staffing problems, and inadequate programming in TYC facilities at the time of Mr. Ramirez's commitment, especially in the Evins and Coke County facilities where he was housed for the longest periods of time, undermined any effort to rehabilitate youth in these facilities. Indeed, these conditions made it entirely predictable that youth would emerge from TYC made worse by their time in the agency's custody.

(Ex. 82 at 5, ¶ 20.)

On information and belief, the State had actual or constructive knowledge of these rampant problems within the TYC, problems which ultimately led to appointment of a conservator to oversee the agency and eventually to its dissolution. This information would have been favorable to Ramirez and material at least to the question of the proper penalty. Moreover, by failing to disclose it, the State created the false impression that Ramirez would have benefited from his placement with TYC but for his own conduct. The State's failure to disclose this information therefore violated due process, undermined the reliability of Ramirez's sentence, and requires reversal.

**F.     The State committed misconduct by urging an unconstitutional limitation on mitigating evidence.**

The Eighth and Fourteenth Amendments require that a capital sentencer, along with a reviewing court, consider and give effect to any and all relevant mitigating evidence. *Eddings*, 455 U.S. at 114. This requirement furthers the fundamental underpinnings of constitutional capital sentencing by avoiding arbitrary death sentences and evaluating the character and record of an individual defendant. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 436, *modified on denial of reh'g*, 554 U.S. 945 (2008). The Supreme Court has reiterated that the State may not preclude a capital sentencer "from considering any mitigating factor, neither may the

201

sentencer refuse to consider, as a matter of law, any relevant mitigating evidence."
*Eddings*, 455 U.S. at 113–14; *Penry*, 492 U.S. at 317; *Lockett*, 438 U.S. 586.

During its closing rebuttal argument at the penalty phase, the prosecutor suggested that evidence that a capital defendant suffered trauma in childhood is only mitigating to the extent it explains the defendant's participation in the same type of violence that once traumatized him. Belittling the defense's evidentiary showing that Ramirez had suffered privation as a child, the prosecutor argued:

> [I]f you your mom gets beaten by your dad, then maybe that is a mitigating factor for a person to engage in domestic violence.
>
> . . . .
>
> You see one parent abuse the other, then maybe somewhat that is an extenuating circumstance when you abuse your own spouse, because you saw it when you were growing up.
>
> And child abuse, maybe that's a mitigating – maybe that reduces the person's blame when they abuse their own child. Maybe you can make that kind of argument.

(39 RR at 141.) The prosecutor then contrasted these examples with Ramirez's homicide convictions:

> Is it sufficient that because somebody says his mom didn't love him or love him enough, is it sufficient to reduce the punishment that he deserves for these six cases?
>
> Now, maybe it is sufficient if this was a child abuse case. Maybe that background would be sufficient if this was a domestic violence case.

(39 RR at 142.) Thus, the prosecutor sought to discourage the jurors from finding evidence of Ramirez's privations to be mitigating because his conduct did not replicate the traumatic behavior inflicted on him as a child.

The imposition of the prosecutor's proposed rule—indeed, the imposition of any threshold standard other than the "most expansive" interpretation of the general relevance standard—has "no foundation" in the Supreme Court's jurisprudence and violates the Eighth and Fourteenth Amendment. *Tennard*, 542 U.S. at 284–85. It is not enough for the state court to merely permit the admission of relevant mitigating evidence when, at the same time, the prosecutor impedes a sentencer from giving complete effect to that evidence. "[F]ull consideration of evidence that mitigates against the death penalty is essential if the [sentencer] is to give a reasoned moral response to the defendant's background, character, and crime." *Penry*, 492 U.S. at 328 (internal quotation marks omitted). The Eighth and Fourteenth Amendments require that "[t]he sentencer must [ ] be able to consider and give effect to that evidence in imposing sentence." *Id.* at 319. Because here the prosecutor's improper arguments circumscribed the evidence which the jury could find mitigating, it resulted in a violation of the Eighth and Fourteenth Amendments and Ramirez is entitled to relief.

### G.   The State committed misconduct when the prosecutors made inflammatory and improper comments during arguments.

203

The purpose of a closing argument "is to explain to the jury what it has to decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000). Arguments that frustrate this purpose and are inflammatory or prejudicial to a defendant are improper. *Id.*; *see also Berger*, 295 U.S. at 85 (proscribing arguments that are "undignified and intemperate" or are "calculated to mislead the jury"). Additionally, a prosecutor's comments are improper and prejudice a defendant where they constitute personal and institutional guarantees of the trustworthiness of the State's case. *United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992).

Here, the prosecutors made inflammatory and vouching comments during argument at both the guilt and penalty phase intended to arouse the jury's passions, depriving Ramirez of his right to due process at his guilt and penalty proceedings and to a reliable penalty verdict.

The prosecutors' intemperate comments at the guilt-phase argument included but were not limited to arguing or suggesting that Ramirez was somehow more culpable because the defense called Rosie Gutierrez as a witness (37 RR at 115); that the jury instructions required the jurors to "render a decision, a decision that is justice for the six deceased" (37 RR at 121); that Ramirez was more likely a gang member because he "has got a picture with other people" the prosecutor said he

"know[s] that are gang members" (37 RR at 145); and that the State's case was stronger because "federal agents" participated in solving it (37 RR at 155). The prosecutors' intemperate comments at the penalty-phase argument included but were not limited to arguing that age was not mitigating because two of the victims were young (39 RR at 119–20); that Ramirez was a "cold-hearted killer" (39 RR at 120); that one of the victims "didn't live to see another Christmas" (39 RR at 120); and that Ramirez was likely to a future danger because some other condemned inmate assaulted a guard (39 RR at 137).

These arguments did not explain "what evidence is relevant to [the jury's] decision" but instead simply inflamed the jury's passions to ensure verdicts of guilt and death, *Sandoval*, 241 F.3d at 776, or placed the institutional imprimatur of the State or its agents behind its case. This misconduct violated due process and undermined the reliability of Ramirez's capital proceedings, and he is entitled to relief. *See Berger*, 295 U.S. at 85.

### H.    The State committed various other forms of misconduct.

In addition to these specific examples of misconduct described above, Ramirez also alleges on information and belief, and subject to additional investigation, that the State committed misconduct in various other ways that violated Ramirez's rights to a fair trial, to present a defense, to the due process of

law, to a reliable and accurate determination of guilt and penalty, and to be free from cruel and unusual punishment.

This misconduct included but was not limited to making statements to the media in the jury's presence; sponsoring false testimony regarding prison classification and/or conditions; mischaracterizing Ramirez's juvenile record, including with respect to his future dangerousness; failing to turn over its experts' criminal history; failing to investigate, disclose, or timely disclose material evidence and issues related to Ramirez's guilt, innocence, penalty, or related to the witnesses with information in his case; knowingly or with implied knowledge elicited false testimony and evidence or allowed false testimony and evidence to go uncorrected; questioning witnesses in ways which were argumentative or misleading; misstating the law or evidence (or failing to correct misstatements of the law or evidence) to potential jurors, the jury, and the court; presenting to the court and jury charges and theories of the case known to be false or that that could not be supported with testimony and evidence; continuing to prosecute Ramirez despite conflicts of interest; urging the court to proceed against Ramirez while he was potentially incompetent; failing to maintain or supervise the proper handling and maintenance of crucial evidence; introducing testimony and evidence in violation of Ramirez's fair trial, due process, and confrontation rights, and that violated the rules of court

and evidence which protect those constitutional rights; and limiting trial counsel's investigation of the case and defense, including through the following non-exhaustive means: failing to disclose or correct evidence and limiting Ramirez's defense through police misconduct, tampering with evidence or witnesses, mishandling evidence, or improperly limiting defense access to evidence and witnesses.

### I.      Cumulative prejudice.

Prosecutorial misconduct is not evaluated based on isolated instances alone; rather, the reviewing court must consider the cumulative effect of the harm. *Berger*, 295 U.S. at 89. Here, to the extent it is necessary to prove any prejudice, the foregoing demonstrates that through all phases of Ramirez's trial court proceedings, the prosecutors committed misconduct including but not limited to the instances discussed above. Taken together, these instances of misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Ramirez is entitled relief.

## CLAIM TEN

**Juror misconduct at Ramirez's guilt- and sentencing-phase proceedings deprived Ramirez of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

207

Because of juror misconduct, Ramirez was denied the right to be tried by a fair and impartial jury, and to a fair trial, among other rights, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. The Supreme Court has long held that "[t]he requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). The integrity of the jury is paramount, and "any ground of suspicion that the administration of justice has been interfered with" cannot be tolerated. *Mattox v. United States*, 146 U.S. 140, 149 (1892), *superseded by rule as stated in Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). Additionally, "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Id*.

Ramirez's right to a fair and impartial jury was violated for the reasons explained below.

First, a defendant's right to a fair trial and impartial jury is violated when jurors feel threatened or intimidated. "A juror must feel free to exercise his functions without . . . anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Remmer v. United States*, 347

U.S. 227, 229 (1954). "Due process requires that the defendant be tried by a jury capable and willing to decide the case solely on the evidence before it," *Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1997), and not on biases, prejudices, threats, or intimidation. On information and belief, jurors in Ramirez's trial felt threatened and scared to be involved in a gang-related case. (*See* Ex. 59 at 7.)

Second, Ramirez's rights to due process, confrontation, and a fair and impartial jury, among others, were violated by the introduction of extraneous information into a juror's deliberations. *See generally Turner*, 379 U.S. at 472.

The court admonished Ramirez's guilt-phase jury on multiple occasions to avoid media about the case during the trial. (*See, e.g.*, 24 RR at 84.) Media coverage about Ramirez's case, his co-defendants case, and the crime was prevalent throughout the trial. Given the pervasive news coverage of trial, on information and belief, the jury would have been exposed to extrinsic information about the case on which he was empaneled.

In addition, upon information and belief there was additional juror misconduct such as considering extraneous information in deliberations among other things.

The jury's knowledge of and reliance upon extrinsic evidence violated Ramirez's constitutional rights to confrontation, due process, a fair trial, assistance of counsel, and a fair and impartial jury. A jury's verdict "must be based upon the

evidence developed at the trial" to ensure the integrity of the constitutional right to trial by jury. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see also Fields v. Brown*, 503 F.3d 755, 779 (9th Cir. 2007). In addition, bringing extrinsic facts into deliberations implicates the Confrontation Clause. *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). Upon information and belief, these constitutional violations were not harmless errors; the extrinsic information had a "substantial and injurious effect or influence" in determining at least one juror's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Mach*, 137 F.3d at 634.

Given the importance of the mitigation phase of a capital trial, it is critical that the jurors charged with determining the appropriate punishment consider all of the mitigation evidence presented to them, without being influenced by information outside the proceedings. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases."). In Ramirez's case, instances of misconduct demonstrate that jurors were improperly influenced in multiple ways, individually and cumulatively causing a substantial and injurious effect on the juries' verdicts and rendering Ramirez's convictions and death sentence unreliable. *See Brecht*, 507 U.S. at 623. Ramirez is therefore entitled to relief.

## CLAIM ELEVEN

**The jury instructions given during Ramirez's trial violated his rights to a reliable sentence and to due process as enshrined by the Eighth and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised the first of these claims below. (Initial Writ Appl. at 124, July 2, 2009.)

Ramirez's death sentence was imposed in violation of due process guarantees under the Fourteenth Amendment because the jury instructions given in his case: (1) failed to define "mitigating evidence" and effectively required a causal nexus; and (2) failed to define terms regarding future dangerousness and thus are unconstitutionally vague.[19]

> **A.    The Texas mitigation special issue given in Ramirez's case failed to adequately define "mitigating evidence," and the instruction created a reasonable possibility that the jury would construe mitigating evidence narrowly, requiring a cause nexus to the crime.**

In capital cases, the Eighth Amendment requires heightened reliability because death is a qualitatively different punishment. *Lockett v. Ohio*, 438 U.S. 586,

---

[19] As the jury instructions given at Ramirez's trial were constitutionally infirm, it was ineffective assistance of counsel not to object to them and trial court error to give them. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

211

605 (1978) (plurality opinion). Resultantly, the capital sentencer must undertake an individualized assessment of a defendant's culpability when assessing punishment. *See id*.; *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.").

Individualized sentencing requires that the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604–05 (footnote omitted) ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.").

Texas's statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. art. 37.071 § 2(f)(4). The charge given to the jury was:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(2 CR 563, 569.)

As neither "mitigating evidence" nor "mitigating circumstance(s)" were defined for the jury, the instructions effectively instructed the jury to disregard important classes of mitigating evidence if they were not linked to "blameworthiness" or "culpability" for the crime. *See also* Claim 122 infra (the one on TX unconstitutionally limits mitigation).

By requiring a casual nexus between mitigation and the crime at issue, the jury instructions were unconstitutional. In *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme Court held that the Eighth Amendment is violated when courts impose a requirement that evidence must satisfy a "causal nexus" test before it is considered mitigating. While mitigating evidence must be relevant to be admitted, the Court held that courts cannot apply a screening mechanism such as a heightened relevance standard to take mitigating evidence out of the sentencer's effective reach. *Id.* at 285 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990) ("[A] State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it

warrants a sentence less than death.'"). "Once this low threshold for relevance is met, the Eighth Amendment requires that the [sentencer] be able to consider and give effect to a capital defendant's mitigating evidence." *Id.* at 285 (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)).

The *Tennard* Court expressly disapproved of the causal nexus portion of the test utilized by the Fifth Circuit, finding that the test would screen out much traditionally mitigating evidence. 542 U.S. at 285–86. In *Smith v. Texas*, 543 U.S. 37 (2004), the Supreme Court again condemned a state appellate court's application of a causal nexus to find mitigating evidence irrelevant. *Id.* at 45. The Court characterized the causal nexus test as "a test we never countenanced and now have unequivocally rejected." *Id.* Because the jury could not give full effect to Ramirez's mitigation as required by the Eighth and Fourteenth Amendments, Ramirez's sentence is unreliable and unconstitutional.

### B.   The mitigation special issue instruction given in Ramirez's case was unconstitutionally vague and a violation of Ramirez's Eighth and Fourteenth Amendment rights.

Texas's capital sentencing statute required Ramirez's jury to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).

214

Capital sentencing schemes must be tailored to minimize the arbitrary and capricious imposition of the death sentence. Texas courts have held that the circumstances of the crime itself can be sufficient to meet the State's burden under the first special issue. *See, e.g.*, *Fuller v. State*, 253 S.W.3d 220, 231–32 (Tex. Crim. App. 2008). Thus, since any defendant who reaches the penalty phase of trial has necessarily been convicted of capital murder, the special issue performs absolutely no narrowing function. Therefore the special issue, as interpreted by the state courts, fails to genuinely narrow the class of defendants eligible for the death penalty, and thus violates the Eighth Amendment.

Additionally, the instruction submitted to the jury is unconstitutionally vague on its face and as applied to Ramirez, as it fails to constitutionally guide the jury's discretion. Neither the statute nor the required jury charge define the terms "probability," "criminal acts of violence," or "continuing threat to society." The use of the term "probability" is unconstitutionally vague. As many judges and commentators have noted, "a probability is simply a chance—however large or small—as measured and defined in mathematical or statistical terms." *See Jurek v. State*, 522 S.W.2d 934, 948 (Tex. Crim. App. 1975) (Roberts, J., dissenting). Notwithstanding the obviously plain meaning of "probability," the Texas courts have for decades held that "probability" in special issue number one means

"[l]ikelihood," or "true, real, or likely to occur." *See, e.g.*, *Granviel v. State*, 552 S.W.2d 107, 117 n.6 (Tex. Crim. App. 1976); *Renteria v. State*, 206 S.W.3d 689, 706 (Tex. Crim. App. 2006) ("This Court has repeatedly held that the trial court need not define this term because the jury is presumed to understand it without further instruction."). Yet juries in general are not—and Ramirez's jury in particular was not—instructed of that definition. Therefore, the jury in Ramirez's case could have answered the special issue with a "yes" based on their belief that there was a probability anywhere from 1% to 99% that Ramirez would be dangerous in the future. Thus a failure to define "probability" in the jury instruction is patently unconstitutionally vague. Moreover, the use of "probability" without defining precisely what degree of probability is required undermines the State's burden of proof of a special issue that is ostensibly to be proven beyond a reasonable doubt.

The "continuing threat to society" is similarly vague and constitutionally infirm. The vagueness of this term turns on the term "society:" the Texas Court of Criminal Appeals has held that "society" means both the prison society to which any life- or death-sentenced prisoner would be confined, and society at large. *See, e.g.*, *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007) (vacating death sentence for lack of sufficient evidence of future dangerousness where defendant is dangerous only toward her own children, and it is very unlikely she will have more children

while sentenced to life imprisonment); *cf. Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010) (future dangerousness special issue is construed as whether a defendant would be a threat "whether in or out of prison"). That approach alone injects unconstitutional arbitrariness into capital sentencing, because whether a defendant is sentenced to death or a term of 40 years, the defendant will not be soon released back into society and cannot therefore be a continuing threat to it. In conclusion, the mitigation special issue on future dangerousness is unconstitutionally vague and Ramirez's rights under the Eighth and Fourteenth Amendment have been violated.

Finally, upon information and belief, a special verdict form for the mitigation special issues (*see* Tex. Code Crim. Proc. art. 37.071 § 2(b)) should have been required under Texas law to ensure the reliability of Ramirez's death sentence, as provided under the Eighth Amendment.[20]

As Ramirez's sentence is constitutionally infirm, it must be vacated.

## CLAIM TWELVE

**Ramirez was sentenced based in part on an invalid murder conviction in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

---

[20] As the lack of a special verdict renders Ramirez's sentence unreliable and thus unconstitutional, it was ineffective assistance of counsel not to request a special verdict form and trial court error not to provide one. *See Strickland*, 466 U.S. at 694; *Brecht*, 507 U.S. at 623.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Ramirez was charged with two counts of capital murder. Count one alleged that Ramirez murdered multiple people in the same criminal transaction, and count two alleged that he murdered the same people named in count one during the course of a robbery. (1 CR at 4.) The jury returned guilty verdicts on both counts (2 CR at 529–49), and Ramirez was sentenced to death (2 CR at 591–98). On appeal, the CCA vacated the conviction on count two because it violated double jeopardy. *See Ramirez v. State*, No. AP-75,167, 2007 WL 4375936, at *5 (Tex. Crim. App. 2007).[21]

The Eighth Amendment demands heightened reliability in capital sentencing proceedings given the qualitative difference of the death penalty to all other forms of punishment. *See Zant v. Stephens*, 462 U.S. 862, 884 (1983); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.). Similarly, because of the additional due process safeguards required of capital cases, the Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is

---

[21] The court noted that "[w]hen a defendant is convicted of two offenses that are the same for double jeopardy purposes, the most serious offense is retained and the other conviction is set aside." *Ramirez*, 2007 WL 4375936, at *5 (internal quotation marks and citation omitted). The court then vacated count two at the State's request. *Id.*

humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring).

To ensure this heightened reliability and additional due process, close scrutiny of a death sentence is required when the jury considers a factor that should not have otherwise affected its sentencing determination. *See Stringer v. Black*, 503 U.S. 222, 230 (1992) ("We require close appellate scrutiny of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases."). Here, it is nearly certain that, in deliberating on the appropriate punishment for count one, the jury considered as a factor militating in favor of death the fact that it had returned guilty verdicts on two separate counts of capital murder, even though one of the counts was invalid. The jury's consideration of this invalid factor very likely skewed its punishment selection.

Indeed, the invalid factors considered here is more prejudicial than the invalid aggravating factor considered by the juries in *Stephens* and *Stringer*. In those cases, the Supreme Court scrutinized death sentences returned after the jury considered aggravating circumstances subsequently invalidated. *Stephens*, 462 U.S. at 885–91; *Stringer*, 503 U.S. at 225. Here, by contrast, Ramirez's jury was permitted to

219

consider an entire unconstitutional count of capital murder. Because consideration of an invalid factor likely influenced the jury's punishment selection, Ramirez's sentence fails to meet the heightened reliability required for capital sentences. *See Stephens*, 462 U.S. at 884. He is entitled to a new sentencing hearing on count one at which the unconstitutional count of capital murder cannot be considered.

## CLAIM THIRTEEN

**The evidence presented at trial was factually and legally insufficient to convict Ramirez and to sentence him to death, violating Ramirez's Eighth and Fourteenth Amendment rights.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. The evidence presented at Ramirez's trial is factually and legally insufficient to sustain his conviction and death sentence under the Eighth and Fourteenth Amendment's protections against disproportionate punishment. *See Jackson*, 443 U.S. 307; *Enmund v. Florida*, 458 U.S. 782 (1982); *Tison v. Arizona*, 481 U.S. 137 (1987).

Ramirez presented this claim below. (DA Opening Br. at 14–16, Aug. 8, 2006; DA Supp. Reply Br. at 6, Jan. 11, 2007; DA Post Argument Br. at 10, July 25, 2007; Initial Writ Appl. at 133, 141–42, July 2, 2009.)

### A. Legal Standard.

The Fourteenth Amendment protects a defendant in criminal proceedings against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Jackson*, 443 U.S. at 315–16.

Furthermore, the Eighth Amendment does not permit imposition of the death penalty on a defendant who aids and abets a felony during which a murder is committed by others when the defendant does not kill, attempt to kill, or intend that a killing will occur. *Enmund*, 458 U.S. at 797. American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to "the degree of [his] criminal culpability," *Mullaney v. Wilbur*, 421 U.S. 684, 698 (1975), and the Supreme Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing. *Enmund*, 458 U.S. at 800.

Moreover, the Constitution requires "individualized consideration" when imposing a death sentence, *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), which requires the sentencer to focus on "relevant facets of the character and record of the individual offender[.]" *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).

## B.    Discussion.

In this case, Ramirez did not kill nor did he intend to kill. No rational factfinder could readily have found that Ramirez was guilty beyond a reasonable

doubt of first-degree murder. *Jackson*, 443 U.S. at 319. Nor does the evidence presented at trial support that Ramirez was a major participant in this crime. *See Tison*, 481 U.S. at 158.

At trial, no evidence physically linked Ramirez to the crime. The State relied on Ramirez's alleged confession and Ramirez's alleged statement about gang involvement to secure Ramirez's conviction of capital murder.[22] Of note, the prosecutor never connected Ramirez to any weapon used at the crime scene nor any DNA evidence. Other than Ramirez's own statement, which was tainted with indications of a false confession, nothing places him at the scene of the crime.

Even if Ramirez assumes without conceding that his statements to the police were admissible, these statements do not provide proof beyond a reasonable doubt that Ramirez killed or intended to kill anyone the night of the crime. Ramirez's alleged connections to the TCB do not prove he shot anyone or that he was even a major participant in the events leading up to the crime. *Tison*, 481 U.S. at 158. Ramirez's statement about the crime only places him at the crime scene with multiple other people, who were all wearing similar facial coverings and clothing.

---

[22] As discussed in this Petition, *supra/infra*, Ramirez contests the validity of his statements to police and maintains these statements were taken in violation of his constitutional rights and should have been suppressed.

However, Ramirez's statement provides no evidence that Ramirez actually shot Jerry Hildalgo or any of the other victims.

Based on these facts, no rational trier of fact could find Ramirez committed capital murder beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Nor, for purposes of imposing the death penalty, does proof exist that Ramirez had any culpable mental state. Even if Ramirez was present at the crime scene, Ramirez's punishment must be tailored to his personal responsibility and moral guilt. *Enmund*, 458 U.S. at 797.

## CLAIM FOURTEEN

**Ramirez was denied the effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (Initial Writ Appl. at 130, 149, 152, July 2, 2009.)

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); *see id.* at 395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist

223

the defendant to obtain a fair decision on the merits."). As such, "nominal representation" during an appeal "does not suffice to render the proceedings constitutionally adequate[.]" *Id*. at 396. In addition, the ABA Guidelines are instructive as to what is required by appellate counsel. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). Regarding appellate counsel's performance, the ABA Guidelines indicate that "counsel should seek to litigate all issues . . . that are arguably meritorious[.]" 2003 ABA Guideline § 10.15.1(C). In addition, appellate counsel should "make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review." 2003 ABA Guideline 10.15.1(C).

Ramirez's appellate counsel, Larry Warner, failed to do the bare minimum required by effective appellate counsel. Preliminarily, he failed to submit an intelligible brief to the appellate court. The brief is best described, almost apologetically, in a letter from the Office of the Criminal District Attorney of Hidalgo County to Ramirez's state post-conviction counsel, enclosing a copy of the second appellate brief filed:

> You will notice that Larry Warner calls this brief, like the one he submitted earlier, a "preliminary brief."
> You will also notice that this brief is very hard to follow, with the most difficult part to read being the "Summary of the Evidence" on pages 7–28, which merely contains

> record references followed by shorthand phrases
> describing parts of the record.
> I am also not sure why pages 32–34 consist of only a few
> phrases surrounded by blank space.

(DA Opening Br. at 1, Aug. 8, 2006.)

Both briefs filed on direct appeal failed to include a facts section and failed to follow the Texas Rules of Appellate Procedure. The second brief also raised issues contradicted by fact and law (*see, e.g.*, *Ramirez v. State*, No. AP-75,167, 2007 WL 4375936, at *7, n.12 (Tex. Crim. App. Dec. 12, 2007)), and raised the same issues, copied and pasted, multiple times within the same document (*see, e.g.*, DA Opening Br. at 12, 23, 43, 59, 112, Aug. 8, 2006) (repeating the exact same claim on "future dangerousness" on each page; the only thing that changes is font and spacing).

The Court of Criminal Appeals of Texas did not find the briefing easier to follow; its opinion includes the phrase, "To the extent that appellant may be claiming," calls a claim "merely speculative," and devotes an entire section to "Inadequately Briefed Points of Error." *Ramirez*, 2007 WL 4375936, at *9, *12, *19–20. These include important constitutional issues and violations, including the unconstitutionality of the death penalty as applied to Ramirez (see claim [Roper extension claim] *supra/infra*), and trial court errors in the exclusion of expert testimony as mitigation evidence, overruling Ramirez's motion for a mistrial, and admitting Ramirez's statements without an official translation of the non-English

225

portion of the statement. *Ramirez*, 2007 WL 4375936, at *19. (see trial court error claim *supra*).

Ramirez's appellate counsel not only failed to adequately brief many of the issues he raised, he also failed to brief meritorious claims. Warner failed to raise the issue of the jury instructions on mitigation special issue, or any other jury instruction errors (*see* jury instruction claim, *supra*). He did not challenge the state appellate court's selection of the "most serious penalty" when that court set aside one of the convictions on double jeopardy grounds. *Ramirez,* 2007 WL 4375936, at *5 ("The State suggests that we vacate the trial court's judgment and sentence of death for Count Two, and appellant has not expressed a preference in his brief. Thus, we reverse appellant's capital murder conviction and vacate the judgment in Count Two"). And crucially, Warner did not request a new penalty trial after the second conviction was set aside.

Warner failed to flag other due process violations in the trial below. The Equal Protection Clause of the Fourteenth Amendment prohibits litigants from peremptorily striking potential jurors on the basis of race. *See Batson v. Kentucky*, 476 U.S. 79, 96 (1986); s*ee also Powers v. Ohio*, 499 U.S. 400, 413–16 (1991) (holding that the State violated equal protection when it excluded black venire members from jury service even though the defendant was white). The Supreme

Court subsequently extended the *Batson* rationale to gender discrimination; thus, litigants cannot remove potential jurors based solely on their gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994). Yet Warner did not raise any *Batson* issues when the state impermissibly used 11 of its 15 peremptory strikes (this amounted to 73% of its peremptory strikes) to remove women from the jury, amounting to a prima facie case of purposeful discrimination. *See, e.g.*, *Miller-El v. State*, 748 S.W.2d 459, 459 (Tex. Crim. App. 1988) (holding that use of 10 of 14 strikes to exclude all but one African American made out a prima facie case).

Warner failed to raise claims regarding prosecutorial misconduct that rose to the level of violating Ramirez's due process rights (see prosecutorial misconduct claim, supra). *See, e.g.*, *Berger v. United States*, 295 U.S. 78, 88 (1935); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). He failed to raise grave ineffective assistance of counsel claims, including trial counsel's representation of Ramirez while laboring under a conflict of interest (see IAC claim on this, supra). *See, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980). And crucially Ramirez was denied effective assistance of appellate counsel when Warner failed to raise issues relating to Ramirez's innocence.

As Ramirez did not even receive "nominal representation" on appeal, his due process rights have been violated and his sentence must be vacated. *Evitts*, 469 U.S. at 396.

## CLAIM FIFTEEN

**The Court of Criminal Appeals of Texas prohibited Ramirez from raising sufficiency of the evidence claims on direct appeal regarding the mitigation special issue in violation of Ramirez's Eighth and Fourteenth Amendment rights.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (DA Opening Br. at 22, Aug. 8, 2006.)

The Court of Criminal Appeals of Texas (hereinafter "CCA") has prohibited defendants from raising sufficiency of the evidence claims on direct appeal regarding the mitigation special issue. This allows juries to have unfettered discretion over which offenders to sentence to death and violates the Eighth Amendment's prohibition on imposing cruel and unusual punishment and the Fourteenth Amendment's due process protections.

The third special issue submitted to the jury during the punishment phase of Ramirez's trial required the jurors to determine:

228

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(2 CR at 563.) Mitigating evidence was defined as "evidence that a juror might regard as reducing the Defendant's moral blameworthiness." (2 CR at 563.) The mitigation special issue did not assign a burden of proof, and Ramirez's jury answered this question "No." (2 CR at 563.)

A capital sentencing scheme cannot give the jury unfettered discretion in determining which offenders to sentence to death. *See Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam). However, the CCA has rejected claims raising sufficiency of the evidence regarding the mitigation special issue on direct appeal. *See Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999). Even though Texas is not a state that weighs aggravating and mitigating circumstances, similar concerns that led the Supreme Court to declare that automatic affirmance of death sentences in a weighing state afflict the Texas system; namely, the defendant is not given the individualized treatment on appeal that he deserves. *See Clemons v. Mississippi*, 494 U.S. 738, 752 (1990) (internal citations omitted) ("An automatic rule of affirmance

229

in a weighing State would be invalid [because] . . . it would not give defendants the individualized treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances."). This failure violates Ramirez's due process rights under the Fourteenth Amendment and his protection against cruel and unusual punishment guaranteed by the Eighth Amendment. As such, Ramirez's sentence is constitutionally infirm and he is entitled to relief.

## CLAIM SIXTEEN

**Ramirez's post-conviction counsel were ineffective and deprived Ramirez of his constitutional rights to due process and effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez was represented by three different attorneys throughout his state habeas proceedings. None of them provided Ramirez with effective assistance, and as a result, Ramirez was denied the opportunity to raise valid legal challenges to his conviction and sentence.

In Texas, "the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal[.]" *Martinez v. Ryan*, 566 U.S. 1, 11 (2012). And the direct appeal is a critical

component of a constitutional sentencing scheme. *Parker v. Dugger*, 498 U.S. 308, 321 (1991) ("[The United States Supreme Court] [has] emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally.").

"Without the help of an adequate attorney, a prisoner will have . . . difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim." *Martinez*, 566 U.S. at 11. Ineffective-assistance claims "often require investigative work and an understanding of trial strategy. When the issue cannot be raised on direct review, moreover, a prisoner asserting an ineffective-assistance-of-trial-counsel claim" during post-conviction proceedings cannot "rely on a court opinion or the prior work of an attorney addressing that claim." *Id.* at 11–12. Thus, "[t]o present a claim of ineffective assistance at trial in accordance with the State's procedures . . . a prisoner likely needs an effective attorney." *Id.*; *see also Trevino v. Thaler*, 569 U.S. 413 (2013).

For the reasons articulated throughout this Petition, Ramirez's state post-conviction counsel's performance fell below the standard of minimally competent assistance. Three non-exhaustive examples underscore post-conviction counsel's deficiencies. Because Ramirez did not receive effective assistance during his state post-conviction proceedings, he failed to have effective post-conviction review of a

number of meritorious claims, including ineffective assistance of trial and appellate counsel, before the state courts.

### A. Post-conviction counsel failed to adequately raise claims.

State post-conviction counsel failed to raise several meritorious claims, which could only be appropriately raised in a state post-conviction proceeding. For example, post-conviction counsel failed to raise significant errors committed by Ramirez's trial counsel in the penalty phase. As discussed above in this Petition, trial counsel did nothing to investigate and present mitigation evidence, challenge the State's presentation about future dangerousness, or effectively advocate in argument or about the jury instructions given. Ramirez's post-conviction counsel failed to sufficiently investigate or, in some instances, failed to raise at all errors committed by Ramirez's trial counsel. Similarly, post-conviction counsel failed to raise errors pertaining to jury selection, prosecutorial misconduct, and due process, among a significant list of others.

Ramirez's state post-conviction counsel therefore failed to bring meritorious claims for state post-conviction review, and fell below the standards expected of post-conviction counsel. *See* 2003 ABA Guidelines 10.15.1(C).

### B. Post-conviction counsel failed to adequately develop mitigation evidence with both lay and expert witnesses.

Despite Ramirez having had three post-conviction teams, post-conviction counsel either unreasonably failed to investigate and present significant mitigation or presented flawed mitigation. Their performance was deficient as to both lay witnesses and experts.

As described in this Petition, Ramirez's federal habeas counsel has readily uncovered a wealth of mitigating evidence that neither post-conviction nor trial counsel investigated, despite obvious red flags that they should do so. *See supra* Claim One. For example, post-conviction counsel failed to investigate Ramirez's family's psychiatric history, which is very significant and linked to the cycle of childhood abuse and mental illness shared by Ramirez's siblings. Post-conviction counsel also failed to investigate Ramirez's history of maltreatment in relation to his placement in TYC, his lifelong learning and emotional disability, as well as obvious signs that he was neurologically impaired. Not only that, post-conviction counsel obtained and presented incorrect information which they failed to corroborate.

Individually and cumulatively, these mistakes prevented Ramirez from having an effective post-conviction review of his prior state proceedings. *See Martinez*, 566 U.S. at 9.

**C.     Post-conviction counsel elicited false testimony from trial counsel.**

Post-conviction counsel was also ineffective for failing to impeach Ramirez's trial counsel, Alma Garza, at the evidentiary hearing. While Ramirez's post-conviction counsel failed to raise significant IAC claims, they ineffectively raised some allegations against Alma Garza and Rolando Garza, Ramirez's trial counsel. After Ramirez's initial post-conviction application, both attorneys filed affidavits with the court to address the allegations raised. (Aff. of Alma Garza, CR-0551-04-G(1), filed Oct. 26, 2012; Aff. of Rolando Garza, CR-0551-04-G(1), filed Oct. 23, 2012.) Then, at the evidentiary hearing, they also both testified. (Evid. Hr'g Tr. at 18, 77, Nov. 3, 2014.)

Post-conviction counsel should have investigated and obtained information to impeach Alma Garza's testimony, that she was unable to locate and present mitigation testimony from family-witnesses. For example, multiple records existed that demonstrated Juana Ramirez, Ramirez's mother was available and wanted to attend Ramirez's sentencing, but she was told to stay away from the courtoom sentencing proceedings by Alma Garza. (*E.g.*, Ex. 58 at 2.) Post-conviction counsel did nothing to impeach Garza nor point out this discrepancy. This is just one of post-conviction counsel's many failings.

Because Texas entitles a defendant to the appointment of state post-conviction counsel and provides standards in an attempt to ensure counsel's competence, due

process requires that counsel be effective. *See* Tex. Code Crim. Proc. art. 11.071(2)(b). Implementation of this statutorily provided right must comport with due process: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts v. Lucey*, 469 U.S. 387, 401 (1985). Due process demands that when a statutory right to counsel is established, the concomitant right to effective assistance of counsel must also be recognized; otherwise, the statutory right would be meaningless. *See id*. at 396 ("[A] party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all.").

Other state courts have recognized that, because their state statutes provide for counsel in post-conviction proceedings, due process demands that counsel perform effectively: "[W]e will not presume that our legislature has mandated some 'useless formality' requiring the mere physical presence of counsel as opposed to effective and competent counsel." *Jackson v. Weber*, 637 N.W.2d 19, 23 (S.D. 2001). Their reasoning has been based on the well-established principle that the right to counsel means the right to the effective assistance of counsel. The Due Process Clause of the Constitution ensures fundamental fairness. If Texas ignores the dictates of its own statute and appoints incompetent counsel, the petitioner is entitled to

relief. *Cf. Lozada v. Warden*, 613 A.2d 818, 822 (Conn. 1992) ("[F]undamental fairness opens the door for relief by habeas corpus when the state, in discharging its statutory duty, appoints incompetent counsel.").

In sum, Ramirez's post-conviction counsel were ineffective. This deprived him of his constitutional rights to due process and the effective assistance of counsel, and he is entitled to relief.

## CLAIM SEVENTEEN

**The state court erred in denying Ramirez's motion to test DNA evidence, violating Ramirez's rights under the Fourteenth Amendment's Due Process clause.**

At Ramirez's trial, the State presented evidence of four hats found at the crime scene. (28 RR at 32; 32 RR at 116, 118; 33 RR at 16.) Two hats were linked through DNA testing to co-defendants of Ramirez—State's Exhibit 302 was consistent with DNA of Humberto Garza and State's Exhibit 303 was consistent with the DNA of Robert "Bones" Garza. (33 RR at 89–91.) According to witnesses for the State, only these two hats were tested for DNA, and State's Exhibits 211 and 215 were not. (33 RR at 78, 94.)

Prior to trial, Marcial Bocanegra gave a statement to police that was a key break in the case (Evid. Hr'g Ex. 13, ¶ 6), eventually leading to eleven arrest warrants for persons suspected to be involved, including Ramirez. (28 RR at 50–58.)

236

Bocanegra implicated a person known as "Lenny" and told police that Lenny had dropped his "bennie cap" at the crime scene. (Second Writ Ex. 40 at 3.) Leading up to trial, the State suggested that it could connect Ramirez to the actions of "Lenny" (3 RR at 23–27), and at trial, the State associated Ramirez with the actions prescribed to "Lenny." (27 RR at 43.) However, the State never presented eyewitness evidence that placed Ramirez at the scene nor did it present any DNA or fingerprint evidence linking Ramirez to the offense. Moreover, as explained below, Ramirez is not Lenny.

In state post-conviction proceedings, Ramirez moved the Texas state court to order post-conviction DNA testing on the two additional hats collected at the scene of the crime. (Mot. for Post-Conviction DNA Testing at 1, No. CR-0551-04-G, Oct. 23, 2015.) Ramirez argued that the hats had a reasonable likelihood of containing biological materials, were in the State's possession, and were never tested for DNA. (Mot. for Post-Conviction DNA Testing at 6–7, No. CR-0551-04-G(1), Oct. 23, 2015.)

There is a high probability that one of the hats that Ramirez requested DNA testing on was the hat that Bocanegra described as being dropped by "Lenny," and the requested DNA testing would have established that person's identity. In a post-conviction affidavit, Bocanegra unequivocally stated that Ramirez is not "Lenny."

(Evid. Hr'g Ex. 14, ¶¶ 3–4.) Exculpatory results from the DNA testing would show that Ramirez would not have been convicted.

The state court violated Ramirez's federal constitutional rights in not permitting this evidence be submitted for DNA testing. "[I]f a State establishes postconviction proceedings, [then] these proceedings must comport with due process." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 293 (1998) (Stevens, J., concurring); *see also Yates v. Aiken*, 484 U.S. 211, 217–18 (1988) (unanimous court making clear that state post-conviction proceedings are subject to due process protections).

Due Process requires, at *minimum*, that before the State can deprive a defendant of his life, a defendant must receive notice of the State's grounds for denying review of his federal constitutional claim, and an opportunity to be heard where those grounds turn out to be factually and materially incorrect. *See Woodard*, 523 U.S. at 290 (O'Connor, J., concurring) (recognizing that Due Process protections would be transgressed where capital petitioner failed to receive notice of a clemency hearing and an opportunity to participate in clemency interview prior to his execution, but finding no such transgression to have occurred); *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (due process requires "notice and an opportunity to be heard" before one is deprived of a constitutionally protected

interest); *Woodard*, 523 U.S. at 291 (Stevens, J., concurring) ("There is, however, no room for legitimate debate about whether a living person has a constitutionally protected interest in life. He obviously does.").

Because the right of access to DNA evidence for testing is an essential component to satisfy numerous federal constitutional claims, the state court's denial impeded Ramirez's ability to adequately raise constitutional violations. *See generally Herrera v. Collins*, 506 U.S. 390, 404 (1993) ("actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (requiring defendant to show that counsel's performance was deficient); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment . . . ."). In light of these principles, the State's refusal to grant Ramirez access to the DNA evidence violates Ramirez's Fourteenth Amendment rights and Ramirez is entitled to relief.

## CLAIM EIGHTEEN

### Ramirez's death sentence is unconstitutional.

**A.   Ramirez's execution as someone with a serious mental illness would be unconstitutional.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Eighth Amendment to the U.S. Constitution prohibits the infliction of cruel and unusual punishments. U.S. Const. amend. VIII. The words of the amendment are not "static"; instead, a court must look to the "evolving standards of decency that mark the progress of a maturing society" in defining the contours of that which is "cruel and unusual" under the Eighth Amendment. *Trop v. Dulles*, 356 U.S. 86, 101 (1958). In determining whether contemporary standards of decency militate a finding that a particular punishment is unconstitutional, a court should look to "objective factors to the maximum possible extent." *Harmelin v. Michigan*, 501 U.S. 957, 1000 (1991) (Kennedy, O'Conner, and Souter J.J., concurring) (internal quotation marks omitted).[23] In addition to looking to objective indicia of consensus,

---

[23] These factors include whether state legislative enactments indicate that a national consensus has emerged against the imposition of a particular punishment (*see, e.g.*, *Roper v. Simmons*, 543 U.S. 551 (2005)); whether prosecution and sentencing trends in locations where such punishments are permissible indicate the practice is nevertheless uncommon (*see, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 316 (2002)); whether there is a consensus among relevant professional and social organizations (*see, e.g.*, *Atkins*, 536 U.S. at 316 n.21; *Thompson v. Oklahoma*, 487 U.S. 815, 830

240

a court must also exercise its own independent judgment in determining whether a punishment is a disproportionate response, given either the severity of the crime or the moral culpability of the defendant. *See Coker v. Georgia*, 433 U.S. 584 (1977).

As such the Supreme Court, citing both objective indicia of consensus and its own reasoned judgment, has identified several classes of defendants for whom the death penalty is constitutionally impermissible. For example, in *Roper v. Simmons*, 543 U.S. 551 (2005), the Court held that the Eighth Amendment prohibits the execution of individuals who were juveniles at the time of the offense, because they lacked the culpability of adult offenders. Similarly, in *Enmund v. Florida*, 458 U.S. 782 (1982), the Court found that sentencing to death those who did not kill, intend to kill, or anticipate that death would occur was an unconstitutionally excessive punishment. And finally, in *Atkins v. Virginia*, 536 U.S. 304, 306 (2002), the Court held that the Eighth Amendment prohibits the imposition of the death penalty upon the intellectually disabled because "their disabilities in areas of reasoning, judgment, and control of their impulses" mean they do not act with the requisite level of culpability.

---

(1988)); and how the international community views the practice (*see, e.g.*, *Atkins*, 536 U.S. at 316 n.21)).

The same considerations cited by the *Atkins* Court in finding the intellectually disabled ineligible for execution and cited by the *Simmons* Court with respect to juvenile offenders apply with equal force to individuals with severe mental illness. National consensus supports this conclusion. Of the 30 jurisdictions with death penalty statutes, 25 specifically address mental illness as a mitigating factor.[24] Representative language is found is the North Carolina statute, which directs the jury to consider whether "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance" and "[t]he capacity of the

---

[24] Ala. Code § 13A-5-51 (mental or emotional disturbance and capacity); Ariz. Rev. Stat. Ann. § 13-751(G)(1) (capacity); Ark. Code Ann. § 5-4-605(1) (mental or emotional disturbance and capacity); Cal. Penal Code § 190.3 (mental or emotional disturbance and capacity); Colo. Rev. Stat. Ann. § 18-1.3-1201(4) (capacity and "emotional state"); Fla. Stat. Ann. § 921.141(7) (mental or emotional disturbance and capacity); Ind. Code § 35-50-2-9(c) (mental or emotional disturbance and capacity); Ky. Rev. Stat. Ann. § 532.025(2)(b) (mental or emotional disturbance and capacity); La. Code Crim. Proc. Ann. art. 905.5 (mental or emotional disturbance and capacity); Miss. Code Ann. § 99-19-101(6) (mental or emotional disturbance and capacity); Mo. Rev. Stat. § 565.032(3) (mental or emotional disturbance and capacity); Mont. Code Ann. § 46-18-304(1) (mental or emotional disturbance and capacity); Nev. Rev. Stat. § 200.035 (mental or emotional disturbance); N.H. Rev. Stat. Ann. § 630:5(VI) (mental or emotional disturbance and capacity); N.C. Gen. Stat. Ann. § 15A-2000(f) (mental or emotional disturbance and capacity); Ohio Rev. Code Ann. § 2929.04(B) (capacity); Or. Rev. Stat. Ann. § 163.150(1) ("mental and emotional pressure"); 42 Pa. Cons. Stat. Ann. § 9711(e) (capacity); S.C. Code Ann. § 16-3-20(C)(b) (mental or emotional disturbance and capacity); Tenn. Code Ann. § 39-13-204(j) (mental or emotional disturbance and capacity); Utah Code Ann. § 76-3-207(4) (mental or emotional disturbance and capacity); Va. Code Ann. § 19.2-264.4(B) (mental or emotional disturbance and capacity); Wyo. Stat. Ann. § 6-2-102(j) (mental or emotional disturbance and capacity); 18 U.S.C. § 3592(a) (mental or emotional disturbance and capacity).

defendant to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of law was impaired." N.C. Gen. Stat. Ann. § 15A-2000(f)(2), (6). Other statutes make relevant whether the impaired capacity was due to "mental disease or defect,"[25] "mental condition,"[26] or "mental illness."[27]

In addition, nearly every major mental health association in the United States has issued policy statements recommending the banning of the death penalty for severely mentally ill offenders.[28] The American Bar Association also publicly

---

[25] Ark. Code § 5-4-605(3); Cal. Penal Code § 190.3; Ind. Code § 35-50-2-9(c)(6); La. Code Crim. Proc. art. 905.5(e); Ohio Rev. Code § 2929.04(B)(3); Tenn. Code § 39-13-204(j)(8).

[26] Utah Code § 76-3-207(4)(d).

[27] Ky. Rev. Stat. § 532.025(2)(b)(7).

[28] *See* Am. Psychiatric Ass'n, *Position Statement on Diminished Responsibility in Capital Sentencing* (approved Nov. 2004 and reaffirmed Nov. 2014), http://www.psychiatry.org/psychiatrists/search-directories-databases/policy-finder (last visited Nov. 27, 2018) (stating position that "[d]efendants shall not be sentenced to death or executed if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences, or wrongfulness of their conduct, (b) to exercise rational judgment in relation to their conduct, or (c) to conform their conduct to the requirements of the law"); Am. Psychological Ass'n, *Report of the Task Force on Mental Disability and the Death Penalty* (2005), https://www.apa.org/pubs/info/reports/mental-disability-and-death-penalty.pdf (outlining its recommendation to "prohibit execution of persons with severe mental disabilities whose demonstrated impairments of mental and emotional functioning at the time of the offense would render a death sentence disproportionate to their culpability"); Mental Health Am., *Position Statement 54: Death Penalty and People with Mental Illnesses* (approved Mar. 5, 2011), http://www.mentalhealthamerica.net/positions/death-penalty (declaring position that "defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired

opposes executing or sentencing to death the severely mentally ill. *See* Am. Bar Ass'n, ABA Recommendation 122A (adopted Aug. 7-8, 2006), http://www.americanbar.org/content/dam/aba/migrated/2011_build/death_penalty_ moratorium/mental_illness_policies.authcheckdam.pdf (last visited Nov. 30, 2018).

Finally, it is a violation of a customary international law norm to execute a person with serious mental illness. The Supreme Court has often cited international laws and norms in its Eighth Amendment jurisprudence. *See Atkins*, 536 U.S. at 316 n.21; *Thompson*, 487 U.S. at 830–31; *Enmund*, 458 U.S. at 796 n.22. The United Nations Commission on Human Rights has called for capital punishment countries to "[n]ot to impose the death penalty on a person suffering from any form of mental disorder or to execute such person[.]" *See* U.N. Comm'n on Human Rights Res. 2004/67, U.N. Doc. E/CN.4/RES/2004/67 (Apr. 21, 2004); U.N. Comm'n on Human Rights Res. 1996/91, U.N. Doc. E/CN.4/RES/1996/91 (Apr. 28, 1999). In a recent report by the U.N. Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions emphasized concern with "the number of death sentences imposed and executions carried out" in the United States "in particular, in matters involving

---

their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law."); Nat'l Alliance on Mental Illness, *Death Penalty*, https://www.nami.org /Learn-More/Mental-Health-Public-Policy/Death-Penalty (declaring opposition to "the execution of persons with serious mental illness").

individuals who are alleged to suffer from mental illness." Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, U.N. Doc. A/HRC/26/36/ADD.2 (June 2, 2014). The European Union has likewise declared that the execution of persons "suffering from any form of mental disorder . . . [is] contrary to internationally recognized human rights norms and neglect[s] the dignity and worth of the human person." European Union, Delegation of the European Commission to the USA, EU Memorandum on the Death Penalty, presented to United States Assistant Secretary of State for Human Rights. Feb. 25, 2000.

Ramirez has suffered from emotional disturbance and mental illness since childhood. He has been diagnosed as suffering from major depressive disorder with multiple suicide attempts since age 10, post-traumatic stress disorder, and as a child was found to have impulsive hostility and self-destructive tendencies, among other severe mental disturbances. (Ex. 83 at 23.) As such, his death sentence is unconstitutional.

Because the severely mentally ill lack personal culpability in the same manner as those who are intellectually disabled, this Court should recognize that the Eighth Amendment's prohibition of cruel and unusual punishment, defined by the "evolving standards of decency that mark the progress of a maturing society,"

likewise exempts those suffering of severe mental illnesses from receiving the penalty of death.

### B   Ramirez's death sentence is inconsistent with the evolving standards of decency that mark the progress of a maturing society.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Ramirez's death sentence is unconstitutional under the Eighth Amendment to the U.S. Constitution—applied to the States by the Fourteenth Amendment—because the death penalty is inconsistent with evolving standards of decency, is arbitrary, serves no valid penological purpose, and is torturous.

Ramirez's death sentence was obtained pursuant to an arbitrary process that failed to limit the death penalty to the worst offenders and instead operated by means of and promoted discrimination on the basis of race. *Furman v. Georgia*, 408 U.S. 238 (1972). As a result, Ramirez's death sentence and continued confinement deprive him of his rights to due process, equal protection, and freedom from the infliction of torture and cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution; decisional law, and other mandatory rules; and international law as set forth in treaties, customary law, and international human rights law.

Ramirez's sentence of death is further unconstitutional because Ramirez has been and will continue to be confined for a time that is unnecessarily lengthy, and under conditions that are torturous and inhumane.

Justices of the Supreme Court have increasingly opined that the delay that will transpire between a capital prisoner's conviction and his execution violates the Eighth Amendment in light of the current standards of decency because it subjects the prisoner, in addition to and in anticipation of the forfeiture of his life, to the endurance of many years living under sentence of death under extraordinary psychological duress, as well as extreme physical and social conditions and restrictions. *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of the petition for writ of certiorari); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (Stevens, J., same); *Glossip v. Gross*, 135 S. Ct. 2726 (2015) (Breyer, J., dissenting); *Davis v. Ayala*, 135 S. Ct. 2187, 2208–10 (2015) (Kennedy, J., concurring).

The conditions of confinement on Texas's Death Row are draconian, especially so for an inmate like Ramirez who suffers from serious mental illness. These conditions of confinement dangerously deteriorate inmates' mental health— there have been several suicides in recent years on Texas's Death Row, in addition to many failed attempts. *See* Eric Dexheimer, *Texas Prison Suicide Rate High Among Inmates in Isolation*, Austin American-Statesman, May 29, 2013, available

247

at https://www.statesman.com/NEWS/20130529/Texas-prison-suicide-rate-high-among-inmates-in-isolation (last visited Nov. 29, 2018).

It is well established that what is constitutionally tolerable under the Eighth Amendment is not static. "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100–01 (1958). Moreover, "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Gregg v. Georgia*, 428 U.S. 153, 171 (1976) (quoting *Weems v. United States*, 217 U.S. 349, 378 (1910)).

### 1. There is a national trend towards abolition.

Jurisdictions throughout the country have increasingly repealed or abolished the death penalty, with greater frequency within the past few years, and thus the use of the penalty has become unusual within the meaning of the Eighth Amendment. New York's death penalty was declared unconstitutional in 2004, *People v. LaValle*, 3 N.Y. 3d 88 (N.Y. 2004), and no legislative or other attempt was made to reinstate it. New Jersey repealed the death penalty in 2007,[29] and New Mexico repealed

---

[29] Jeremy W. Peters, *Death Penalty Repealed in New Jersey*, N.Y. Times, Dec. 17, 2007, *available at* http://www.nytimes.com/2007/12/17/nyregion/17cnd-jersey.html?_r=0 (last visited Nov. 29, 2018).

capital punishment in 2009.[30] Following the commutation of all death sentences by the Illinois governor in 2003, the state abolished capital punishment in 2011.[31] Connecticut repealed the death penalty in 2012,[32] Maryland did so in 2013,[33] Nebraska did so in 2015,[34] and Washington did so in 2018.[35]

Numerous other U.S. jurisdictions, while retaining the death penalty on the books, either have not carried out any executions in recent years or have carried out only a handful. The federal government has not carried out any executions since 2003. The military capital punishment system has not executed anyone since 1961.

---

[30] *Death Penalty Is Repealed in New Mexico*, N.Y. Times, Mar. 18, 2009, *available at* http://www.nytimes.com/2009/03/19/us/19execute.html (last visited Nov. 29, 2018).

[31] John Schwartz & Emma G. Fitzsimmons, *Illinois Governor Signs Capital Punishment Ban*, N.Y. Times , Mar. 9, 2011,  *available at* http://www.nytimes.com/2011/03/10/us/10illinois.html (last visited Nov. 29, 2018).

[32] Laura Bassett, *Connecticut Repeals Death Penalty*, Huffington Post, Apr. 25, 2012,  *available at* http://www.huffingtonpost.com/2012/04/25/connecticut-repeals-deathpenalty_n_1453331.html (last visited Nov. 29, 2018); *State v. Santiago*, 318 Conn. 1, 33 (Conn. 2015).

[33] *Maryland: Governor Signs Repeal of the Death Penalty*, N.Y. Times, May 2, 2013, *available at* http://www.nytimes.com/2013/05/03/us/maryland-governor-signs-repeal-of-the-death-penalty.html (last visited Nov. 29, 2018).

[34] Julie Bosman, *Nebraska Bans Death Penalty, Defying a Veto*, N.Y Times, May 27, 2015,  *available at* http://www.nytimes.com/2015/05/28/us/nebraska-abolishes-death-penalty.html (last visited Nov. 29, 2018).

[35] Kirk Johnson, *Washington State Supreme Court Deems Death Penalty Unconstitutional*, N.Y. Times, Oct. 11, 2018, *available at* https://www.nytimes.com/2018/10/11/us/death-penalty-ruling-washington-state.html (last visited Nov. 29, 2018).

Seven states that legally authorize the death penalty have not carried out an execution in the past twelve years: California, Colorado, Kansas, New Hampshire, Oregon, Pennsylvania, and Wyoming.

Only ten states have accounted for over 90% of all executions over the last decade, with a single state, Texas, responsible for over 39% (151/387). Death Penalty Information Center, *Searchable Execution Database*, available *at* http://www.deathpenaltyinfo.org/views-executions.

Even those states which still routinely employ the death penalty have seen a marked drop in executions, as reflected in a steady decline nationally. Executions reached their apex in 1999, when 98 offenders were executed. The ensuing years have shown decreases in executions.[36]

The decline in new death sentences handed down in court is just as stark. In 1995, 310 people were sentenced to death nationwide.[37] In 2004, the number was less than half that, at 138. In 2015, the number was more than halved again, with a total of 49 people sentenced to death, the lowest total since the death penalty was reintroduced in 1976.

---

[36] *See, e.g.*, Death Penalty Information Center, "Facts about the Death Penalty," updated Nov. 15, 2018, *available at* https://deathpenaltyinfo.org/documents/FactSheet.pdf (last visited Nov. 27, 2018).
[37] Tracy L. Snell, U.S. DOJ, Bureau of Just. Stat. Bull. *Capital Punishment 1995* (Dec. 1995), *available at* http://www.bjs.gov/index.cfm?ty=pbdetail&iid=468.

The executive branches of multiple states have demonstrated concerns about the fairness and appropriateness of the death penalty. Governors of Colorado, Oregon, and Pennsylvania have declared official moratoria on executions.[38] The result is that the death penalty is now actively practiced in just a handful of states.

The United States Supreme Court has examined actual practices rather than simply whether the death penalty was legislatively authorized when assessing the constitutionality of the death penalty for categories of offenders, as well as the constitutionality of other punishments. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) ("[E]ven among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since we decided *Penry* [*v. Lynaugh*, 492 U.S. 302 (1989)]."); *Roper v. Simmons*, 543 U.S. 551, 564–65 (2005) (noting that although twenty states authorized capital punishment for juveniles, the practice

---

[38] Exec. Order No. D 2013-006, at 2 (Colo. May 22, 2013),  *available at* https://www.colorado.gov/governor/sites/default/files/d_2013-006_death_sentence_reprieve.pdf (last visited Nov. 29, 2018); William Yardley, *Oregon Governor Says He Will Block Executions*, N.Y. Times, Nov. 22, 2011, *available at* http://www.nytimes.com/2011/11/23/us/oregon-executions-to-be-blocked-by-gov-kitzhaber.html (last visited Nov. 29, 2018); Gov. Tom Wolf, Death Penalty Moratorium Declaration (Feb. 13, 2015),  *available at* https://www.scribd.com/doc/255668788/Death-Penalty-Moratorium-Declaration (last visited Nov. 29, 2018).

was infrequent, with only three states, Oklahoma, Texas, and Virginia, actually executing juveniles in the prior ten years); *see also Graham v. Florida*, 560 U.S. 48, 62 (2010) ("Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use. Although these statutory schemes contain no explicit prohibition on sentences of life without parole for juvenile nonhomicide offenders, those sentences are most infrequent."); *Miller v. Alabama*, 567 U.S. 460, 485 (2012) (simply counting legislative enactments can present a distorted view).

Capital punishment is infrequently practiced, other than in a very few states, and new death sentences are rapidly and consistently declining. The infrequency of the use of the death penalty, relative to the number of death eligible offenders, renders it "truly unusual" and it can now be concluded that a "national consensus has developed against it." *Atkins*, 536 U.S. at 316 (footnote omitted).

### 2.   The death penalty is excessive.

The Eighth Amendment proscribes "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins*, 536 U.S. at 311, n.7.

The traditional goals of punishment—deterrence, retribution, incapacitation, and rehabilitation—form the baseline for analyzing excessiveness. *Graham*, 560

U.S. at 71 (discussing "penological justifications" relevant to the Eighth Amendment analysis). The death penalty fails to significantly further these goals in any measurable degree over life imprisonment. *See, e.g.*, Justin F. Marceau & Hollis A. Whitson, *The Cost of Colorado's Death Penalty*, 3 U. Denv. Crim. L. Rev. 145, 145 (2013) ("[S]ocial scientists increasingly agree that the deterrence benefits of the death penalty are entirely speculative"); Michael L. Radelet & Traci L. Lacock, *Do Executions Lower Homicide Rates?: The Views Of Leading Criminologists*, 99 J. Crim. Law & Criminology 489, 489–90 (2009); *Ring v. Arizona*, 536 U.S. 584, 615 (2002) (Breyer, J., concurring) (concluding that "[s]tudies of deterrence are, at most, inconclusive") (citation omitted); *Glossip*, 135 S. Ct. at 2767 (Breyer, J., dissenting) ("Capital punishment by definition does not rehabilitate. It does, of course, incapacitate the offender. But the major alternative to capital punishment—namely, life in prison without possibility of parole—also incapacitates."); *id.* at 2769 ("[W]hatever interest in retribution might be served by the death penalty as currently administered, that interest can be served almost as well by a sentence of life in prison without parole. . . .").

Because the death penalty fails to measurably promote any of the principal penological goals over life imprisonment, it is excessive. *Furman*, 408 U.S. at 279 (Brennan, J, concurring) ("If there is a significantly less severe punishment adequate

to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive." (internal citation omitted)).

### 3. The United States is out of step with the international community's consensus against the death penalty.

Since the 1970s, eighty-two countries have abolished the death penalty for all crimes, bringing the total number of abolitionist countries to ninety-eight. And thirty-five countries can be considered abolitionist in practice as they have not executed anyone during the last ten years and are understood to have an established policy or practice of not carrying out executions.[39] The General Assembly of the United Nations, comprising all 193 members of the UN, has repeatedly adopted resolutions calling for countries that still maintain the death penalty "to establish a moratorium on executions with a view to abolishing it."[40]

Ramirez's prolonged confinement under sentence of death violates international human rights law.[41] The European Court of Human Rights has held that the protracted post-conviction, pre-execution confinement is a human rights violation of sufficient magnitude to prohibit the United Kingdom from sending an

---

[39] DPIC, Abolitionist and Retentionist Countries, https://www.deathpenaltyinfo.org/abolitionist-and-retentionist-countries (last visited Nov. 27, 2018).

[40] G.A. Res. 69/186 ¶ 4, U.N. Doc. A/RES/69/186 (Dec. 18, 2014), *available at* http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/69/186 (last visited Nov. 29, 2018).

[41] As of this writing, Ramirez has spent over 14 years on Texas's death row.

accused to face such a fate. *Soering v. United Kingdom*, App. No. 14038/88, 11 Eur. H. R. Rep. 439 (1989) (six to eight year delay before execution in Virginia prohibited United Kingdom from extraditing potential capital defendant to that state). The Canadian Supreme Court cited such delays as a relevant consideration in deciding that extradition of a murder suspect to the United States without first obtaining assurances that the death penalty would not be imposed violated principles of fundamental justice. *United States v. Burns*, 1 S.C.R. 283, 353 (2001).

The Supreme Court has routinely taken into account the climate of international opinion in its Eighth Amendment jurisprudence. *See, e.g.*, *Graham*, 560 U.S. at 80 (the Court may look "beyond our Nation's borders for support for its independent conclusion that a particular punishment is cruel and unusual"); *Roper*, 543 U.S. at 575 ("[F]rom the time of the Court's decision in *Trop*, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'" (citation omitted)).

### 4. Capital punishment has failed to ensure reliability, consistency, and equal protection of the law.

The risk of wrongful execution, that is, the execution of an innocent person, attends all death penalty schemes in the United States. There is evidence of at least 156 exonerations in capital cases throughout the nation. Researchers have estimated

that nearly one in twenty (4.1%) of those sentenced to death are actually innocent, an unacceptably high error rate given the consequences. Because due process of law protects the innocent, as long as there remains the possibility of exoneration, this right should not be foreclosed.

The Eighth Amendment's requirement to eliminate arbitrariness in capital sentencing is undermined by the conflicting demands of consistency in application, and a capital defendant's right to individualized sentencing. These requirements may ultimately be irreconcilable.

The Eighth Amendment prohibits the imposition of a death sentence unless the governing statute reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. Thus, to pass constitutional muster, a death penalty statute must genuinely narrow the subclass of offenders upon whom a sentence of death may be imposed and provide a meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which it is not, and suitably guide the sentencer's discretion. *See, e.g.*, *Furman v. Georgia*, 408 U.S. 238 (1972); *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

In conflict with these clearly established U.S. Supreme Court mandates, many death penalty statutes, were designed to, and do, operate in the precise manner the Supreme Court found violated the Eighth Amendment in *Furman*. Death penalty

statutes fail to justify the imposition of a more severe sentence on some defendants than other similarly-situated defendants; permit the imposition of a freakish, wanton, arbitrary, and capricious judgment of death; and allow prosecutors to arbitrarily select defendants for capital prosecution without providing consistent guidelines to ensure reliability. As a result of the extraordinary breadth of the future-dangerousness aggravating circumstance, individual prosecutors are afforded virtually unfettered discretion to determine whether to seek death, thereby creating a substantial risk of arbitrariness.

One of the fundamental goals of our criminal justice system is to ensure that justice is meted out fairly, in accordance with the law, and not on the basis of improper concerns such as race. Applying the death penalty in a discriminatory manner constitutes functional and structural error. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). The denial of equal protection is established where a defendant demonstrates that the prosecutorial authorities' selective enforcement decision is deliberately based upon an arbitrary classification, such as race, ethnicity, national origin, or gender.

Statistical evidence shows disproportionate prosecution of people of color under the federal death penalty statute. The prosecution of and imposition of the death sentence against Ramirez contributed to "the inevitable loss of confidence in

257

our judicial system that state-sanctioned discrimination in the courtroom engenders." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).

Many studies have demonstrated the significant role that race plays in the criminal justice system generally, and on the administration of the death penalty in particular. These studies consistently reveal, even after accounting for legitimate non-racial case characteristics, that offenders who kill white people have a significantly higher chance of receiving a death sentence than offenders who kill people of other races. *See, e.g.*, U.S. General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (GAO/GGD-90-57, Feb. 1990).

Some states have invoked the persistence of discrimination as a basis for eliminating or restricting the use of the death penalty. Governor Martin O'Malley of Maryland, a state that repealed the death penalty, flatly declared that the death penalty "cannot be administered without racial bias."[42] Connecticut Governor Dannel P. Malloy, signing repeal legislation, observed that he saw discrimination in the administration of the death penalty.[43] Illinois Governor Pat Quinn, signing repeal

---

[42] Ian Simpson, *Maryland Becomes Latest U.S. State to Abolish Death Penalty*, Reuters, May 2, 2013,  *available at* http://mobile.reuters.com/article/idUSBRE9410TQ20130502 (last visited Nov. 27, 2018).

[43] Press Release, Gov. Mallow on Signing Bill to Repeal Capital Punishment (Apr. 25, 2012), *available at* https://portal.ct.gov/Office-of-the-Governor/Press-

legislation, similarly commented that it is impossible to design a death penalty system that is consistent and free from discrimination on the basis of race.[44] And New Mexico Governor Bill Richardson, on approving the abolition of capital punishment, stated, "It bothers me greatly that minorities are overrepresented in the prison population and on death row."[45]

The governors of Colorado, Oregon, and Pennsylvania have declared moratoria on execution in their states, and each has cited concerns about racial discrimination and equal justice in support of the moratoria.[46]

---

Room/Press-Releases/2012/04-2012/Gov-Malloy-on-Signing-Bill-to-Repeal-Capital-Punishment (last visited Nov. 29, 2018).

[44] Press Release, Statement from Governor Pat Quinn on Senate Bill 3539 (Mar. 9, 2011), *available at* http://www3.illinois.gov/PressReleases/ShowPressRelease.cfm?SubjectID=2&REcNum=9265 (last visited Nov. 27, 2018).

[45] Press Release, Governor Bill Richardson Signs Repeal of the Death Penalty (Mar. 18 2009), *available at* http://www.deathpenaltyinfo.org/documents/richardsonstatement.pdf (last visited Nov. 27, 2018).

[46] Exec. Order No. D 2013-006, at 2 (Colo. May 22, 2013), *available at* https://www.colorado.gov/governor/sites/default/files/d_2013-006_death_sentence_reprieve.pdf (last visited Nov. 29, 2018)[this is the same cite as above so I am making the citations the same]; William Yardley, *Oregon Governor Says He Will Block Executions*, N.Y. Times, Nov. 22, 2011, *available at* http://www.nytimes.com/2011/11/23/us/oregon-executions-to-be-blocked-by-gov-kitzhaber.html (last visited Nov. 27, 2018); Government that Works Statement, *Governor Tom Wolf Announces a Moratorium on the Death Penalty in Pennsylvania*, Feb. 13, 2015, *available at* https://www.governor.pa.gov/moratorium-on-the-death-penalty-in-pennsylvania/

And there are significant, as yet unaddressed, concerns. For example, *Roper* and *Atkins* recognized that certain classes of offenders are on average sufficiently lacking in culpability so as to render their execution unconstitutional. Yet, the severely mentally ill, like Ramirez, whose illness may defy ready categorization but who nevertheless occupy the less-culpable end of the spectrum, remain subject to the death penalty.[47] Indeed, there is growing evidence that the categorical approach to death penalty exclusions exemplified in *Roper* and *Atkins* may have missed the larger picture, and even introduced unintended arbitrariness.[48] It is estimated that as many as 25% of the approximately 3,000 inmates on death row have a serious mental

_____

(last visited Nov. 29, 2018).

[47] *See, e.g.*, *Corcoran v. State*, 774 N.E. 2d 495, 502 (Ind. 2002) (Rucker, J., dissenting) ("[T]he underlying rationale for prohibiting executions of the mentally retarded is just as compelling for prohibiting executions of the seriously mentally ill . . . ."); American Bar Association, Recommendation 122A (recommending "prohibit[ing] execution of persons with severe mental disabilities whose demonstrated impairments of mental and emotional functioning at the time of the offense would render a death sentence disproportionate to their culpability"), *available at* http://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/2006_am_122a.authcheckdam.pdf (last visited Nov. 29, 2018).

[48] *Graham*, 560 U.S. at 75 (acknowledging that "[c]ategorical rules tend to be imperfect . . . ."); Stephen B. Bright, *The Role of Race, Poverty, Intellectual Disability, and Mental Illness in the Decline of the Death Penalty*, 49 U. Rich. L. Rev. 671, 687-88 (2015) ("Another reason for arbitrariness is the impossibility of measuring the mental state or level of intellectual functioning of a person accused of a capital crime.").

illness, and even this number may significantly underestimate its prevalence.[49] There is a troubling randomness in excluding some groups of less-culpable defendants from execution while allowing the execution of others whose culpability is equally reduced.

There are also wide disparities in the quality of capital counsel and the resources states are willing to provide, also introducing arbitrariness. This is far from rare. *See* Cory Isaacson, *How Resource Disparity Makes the Death Penalty Unconstitutional: An Eighth Amendment Argument Against Structurally Imbalanced Capital Trials*, 17 Berkeley J. Crim. L. 297, 300 (2012) ("An inadequately resourced defense, when pitted against a much better resourced prosecution, yields distorted

---

[49] Rebecca Covarrubias, *Lives in Defense Counsel's Hands: The Problems and Responsibilities of Defense Counsel Representing Mentally Ill or Mentally Retarded Capital Defendants*, 11 The Scholar: St. Mary's Law Rev. On Minority Issues 413, 416, 440 (2009), *available at* http://lawspace.stmarytx.edu/item/STMU_TheScholarStMarysLRev_v11i3p0413_ Covarrubias (last visited Nov. 29, 2018) (noting that mentally ill defendants often mask their symptoms because of the enduring stigma associated with mental illness; counsel often fail to recognize their clients' mental health problems; and lack of funding, before and after conviction, often precludes thorough mental health examinations). *See also* Robert J. Smith, *Forgetting Furman*, 100 Iowa L. Rev.. 1149, 1153 (2015) ("Juvenile offenders and the intellectually disabled are categorically exempt from capital punishment due to their insufficient culpability; yet, most of the last hundred people executed in America possessed functional impairments that rivaled or outpaced those endured by the typical adolescent or intellectually disabled person.").

capital trials and a consequential risk of arbitrary sentencing outcomes."). Lack of resources and lack of quality counsel are still endemic in capital proceedings.

Notwithstanding the Supreme Court's efforts, the fact remains we have achieved nothing close to the consistency the Constitution requires. *Glossip v. Gross*, 135 S. Ct. at 2760 (Breyer, J., dissenting) ("Despite the *Gregg* Court's hope for fair administration of the death penalty, 40 years of further experience make it increasingly clear that the death penalty is imposed arbitrarily, *i.e.*, without the 'reasonable consistency' legally necessary to reconcile its use with the Constitution's commands."). Unacceptable levels of arbitrariness persist, and the problem appears to be growing, not abating.

For that reason, among others, the people closest to Texas's death penalty mechanism have called for its abolition. In *Ex parte Panetti*, 450 S.W.3d 144 (Tex. Crim. App. 2014), Judge Tom Price of the Texas Court of Criminal Appeals published a thoughtful dissent from the denial of a stay of execution and declared that, having spent forty years as a trial and appellate judge in Texas, the death penalty should be abolished. He cited in support of his position that "[e]volving societal values" militate in favor of abolition, that the life-without-parole option assures "that the public at large is forever protected from a capital murder defendant, who will never re-enter our society," and perhaps most importantly that "society is now less

convinced of the absolute accuracy of the criminal justice system." *Id.* at 145–46. In light of the many exonerations in Texas and elsewhere, Judge Price noted that "it is wishful thinking to believe that this State will never execute an innocent person for capital murder." *Id.* at 146. He also decried the ineffectiveness of post-conviction counsel whose poor representation of defendants at the initial stage resulted in procedural bars to subsequent, well-drafted petitions. *Id.*

Judge Price is not alone in his opinions. Indeed, Judge Alcala of the same court has recently published multiple lengthy opinions highlighting the myriad of problems with Texas's capital sentencing scheme. *See, e.g.*, *Ex Parte Murphy*, 495 S.W.3d 282 (Tex. Crim. App. 2016) (Alcala, J., concurring and dissenting); *Ex parte Moore*, 470 S.W.3d 481, 529 (Tex. Crim. App. 2015) (Alcala, J., dissenting).

The death penalty is inhumane, arbitrary, inaccurate, and obsolete. Society has recognized as much and it is now time for the courts to come into line with our evolved standard of decency. Ramirez respectfully asks that the Court grant relief on this claim.

### C. The Texas death penalty scheme violates Ramirez's due process rights as it is unconstitutionally arbitrary.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (Second Writ Appl. at 139, Nov. 6, 2013.)

Because of the prosecutorial discretion established under Texas's system of administering criminal justice, a minority of Texas counties are responsible for a sizable majority of death sentences assessed over the last 36 years. Both geographic and racial disparities have created a system of capital punishment in Texas that punishes not based on the heinousness of a defendant's crime, but on the irrelevant factors of where he committed that crime and what races were involved in the crime. Ramirez's capital sentence was handed down in the midst of this arbitrary system and as such, he has been denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

The Supreme Court has long held that proceedings surrounding the imposition of a death sentence must meet a "heightened standard of reliability" because of the severe and irreversible nature of the death penalty. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."). The Court briefly suspended the nation's death penalty in *Furman v. Georgia* during the 1970s based on this heightened standard. 408 U.S. 238 (1972) (per curiam). The Court rested its decision on the basis that the lack of guidance and narrowing considerations in a jury's decision of who was to receive the death penalty created an arbitrariness too cruel and unusual to withstand constitutional scrutiny.

*Id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.").

Following *Furman*, the Court has been careful to weigh a death penalty sentencing scheme to determine whether there are suitable safeguards to prevent the arbitrary assignment of death. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (noting "the need for reliability in the determination that death is the appropriate punishment in a specific case"). The Court held that procedural reforms—such as bifurcated trials, narrowing of death-eligible crimes, and proportional appellate review—"focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant," thus preventing it from "wantonly and freakishly impos[ing] the death sentence." *Gregg v. Georgia*, 428 U.S. 153, 206–07 (1976).

Even those procedures, however, must be reviewed for their effectiveness in preventing the arbitrary assessment of death. *See, e.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 432–33 (1980) (reviewing the application of Georgia's aggravating factor that a crime be "outrageously or wantonly vile, horrible or inhuman"). When "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," a state's death penalty scheme can no

longer be said to be imposing a death sentence "based on reason rather than caprice or emotion." *Id.* at 433.

The Texas death penalty scheme fails this review, however as capital punishment is arbitrarily and wantonly applied. While the numbers show that even in Texas a death sentence is becoming increasingly rare as a utilized punishment, there are arbitrary factors at work in the imposition of a death sentence. Therefore Texas's system does not function as an "evenhanded, rational, and consistent imposition of death." *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

The factors that create the arbitrary assignment of death have nothing to do with any individual crime, trial, or defendant, but are based on such determinations as geography[50] or race. Studies show that race continues to be a motivating factor

---

[50] Of the total offenders who either have been executed or are currently housed on death row in Texas since 1976, only 119 out of the 254 counties in Texas have contributed an offender to that list. Tex. Dep't Crim. Just., *Death Row Information*, http://www.tdcj.state.tx.us/death_row/index.html (last visited Nov. 28, 2018); Tex. Dep't Crim. Just., *Number of Offenders Sentenced to Death From Each County*, http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited Nov. 28, 2018). Seven counties (Bexar, Dallas, Harris, Jefferson, Nueces, Smith, and Tarrant) account for nearly eighty percent of these offenders. *Id.* Five additional counties (Cameron, El Paso, Lubbock, Montgomery, and Travis) account for another ten percent. *Id.* Texas is not alone in this phenomenon. A recent report conducted by the Death Penalty Information Center found that geography is a major factor in whether or not a person is sentenced to death. Since 1976, 2 percent of the counties in the United States are responsible for 52 percent of all executions and 56 percent of the death row population. Death Penalty Information Center, *The 2% Death Penalty: How a Minority of Counties*

behind the imposition of the death penalty—even if that factor is unconsciously applied.[51] Ramirez, as a Hispanic man, was undoubtedly prejudiced by jurors' unconscious biases. When a law is utilized in such a way that it becomes more directed at a "particular class of persons," especially in the context of racial discrimination, the implementation of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

For the foregoing reasons, Texas's death penalty scheme is unconstitutional. Therefore, Ramirez's sentence of death should be vacated.

### D. Ramirez's execution after fourteen years on death row violates his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

---

*Produce Most Death Cases at Enormous Cost to All* (2013), http://www.deathpenaltyinfo.org/twopercent#pressrelease (last visited Nov. 28, 2018).

[51] *See, e.g.*, David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 Colum. Hum. Rts. L. Rev. 143 (2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 Mich. J. Race & L. 135 (2009-2010) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims); Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 Hous. L. Rev. 807 (2008) (same); Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 Hous. L. Rev. 131 (2012) (same).

267

The Eighth and Fourteenth Amendments require that state-imposed punishment remain within civilized standards. *See Robinson v. California*, 370 U.S. 660, 675 (1962) (Douglas, J., concurring). Ramirez has spent over 14 years on death row, starting when he was only 18 years old. For the reasons below, continuing to detain Ramirez on death row or executing him after so long a confinement, starting at such a young age, does not fall within those civilized bounds.

First, executing Ramirez after so long spent on death row is inconsistent with the history of the Eighth Amendment and foundational British and American jurisprudence. At the time the Bill of Rights was adopted, the Anglo-American legal tradition—which had a direct influence on the framers of the U.S. Constitution— had uniformly denounced undue delays between death sentences and executions as cruel and unusual. *See, e.g.*, 2 William Blackstone, Commentaries on the Laws of England 2650 (William C. Jones, ed., 1916) ("It has been well observed that it is of great importance, that [capital] punishment should follow the crime as early as possible[.]"); Cesare Beccaria, *An Essay on Crimes and Punishments* 73 (5th ed. 1804) (immediate punishment will be more just "because it spares the criminal the cruel and superfluous torment of uncertainty . . .; and because the privation of liberty, being [in and of itself] a punishment, ought to be inflicted before condemnation but for as short a time as possible."); *see also, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957,

966 (1991) (there is no doubt the English Declaration of Rights of 1689, which prohibited "cruel and unusual punishments," is the "antecedent of our constitutional text[s]"); *Ex parte Grossman*, 267 U.S. 87, 108–09 (1925) (Eighteenth-century English criminal jurisprudence directly relevant to determining what framers intended in drafting Bill of Rights).

The framers' writings confirm that they also viewed such inordinate delay as inherently "cruel and unusual." *See, e.g.*, 2 The Works of James Wilson 629–30 (Robert McCloskey ed., 1967); 2 The Papers of John Marshall 208 (Univ. of N.C. Press 1977) (clemency petition filed by Marshall and others sought commutation in part because prisoner's execution was delayed five months). Historically, then, executing Ramirez after nearly 14 years charged with a capital crime or on death row would have been considered cruel and unusual.

Second, such a punishment is no less cruel and unusual under modern jurisprudence. The current death-penalty scheme is purported to serve two purposes: retribution and deterrence. *Gregg v. Georgia*, 428 U.S. 153, 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). But, the "longer the delay, the weaker the justification for imposing the death penalty in terms of punishment's basic retributive or deterrent purposes." *Knight v. Florida*, 120 S. Ct. 459, 462 (1999) (mem.) (Breyer, J., dissenting from denial of certiorari); *see also Lackey v. Texas*,

269

514 U.S. 1045, 1045 (1995) (mem.) (Stevens, J., dissenting from denial of certiorari) ("It is arguable that neither [retribution nor deterrence] retains any force for prisoners who have spent some 17 years under a sentence of death."). The lengthy delay between the day of incarceration and the day of execution "can inflict 'horrible feelings' and 'in (sic) immense mental anxiety amounting to a great increase of the offender's punishment.'" *Foster v. Florida*, 537 U.S. 990, 992 (2002) (mem.) (Breyer, J., dissenting from denial of certiorari) (quoting *In re Medley*, 134 U.S. 160, 172 (1890). After inflicting such anxiety on the petitioner by making him wait long periods before carrying out his death sentence, the State hardly furthers the goal of retribution by finally executing him. *See, e.g.*, *Dist. Att'y for the Suffolk Dist. v. Watson*, 411 N.E.2d 1274, 1287 (Mass. 1980). Further, the added deterrent effect of executing someone who has spent a long time on death row awaiting his execution is slight indeed. *See Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (mem.) (Stevens, J., respecting denial of certiorari). When the death penalty ceases to realistically further the purposes of retribution and deterrence, its imposition is simply "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes." *Lackey*, 514 U.S. at 1046 (mem.) (Stevens J., dissenting from denial of certiorari) (quoting *Furman v. Georgia*, 408 U.S. 238, 312 (1972) (White, J., concurring)). "A penalty with such negligible

returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Id*.

Any penological goals served when Ramirez was first sentenced to death no longer apply. Executing Ramirez, almost three decades after the crime for which he was condemned, can have no deterrent or retributive purpose.

Third, the stress of living under threat of death for lengthy periods is so oppressive that it, on its own, can constitute cruel and inhuman treatment. Conditions of confinement on death row can be "so degrading and brutalizing to the human spirit as to constitute psychological torture." *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972), *superseded as stated in Strauss v. Horton*, 207 P.3d 48 (Cal. 2009); *see also Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("[T]he onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."); *In re Medley*, 134 U.S. at 172 ("[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it."). "Whatever one believes about the cruelty of the death penalty itself, this violence done to the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest." *Watson*,

411 N.E.2d at 1291 (Liacos, J., concurring). Certainly, then, such cruel treatment also renders any further punishment, namely execution, unconstitutional.

Finally, Ramirez has spent his 14 years on death row solitary confinement. The conditions of confinement on Texas's Death Row are draconian: at the Polunsky Unit, inmates under a sentence of death are automatically and permanently housed in solitary confinement. *See* Burke Butler, *Liman Report: Solitary Confinement on Texas's Death Row*, Yale Law Sch. Arthur Liman Pub. Interest Prog. (Oct. 24, 2014). For two days a week, inmates are confined to these steel-door-enclosed cells twenty-four hours each day, with only a few minutes outside of their cells to shower. The other five days per week, inmates are permitted a maximum of two hours per day in a recreation area—a cage slightly larger than their cells. Dave Mann, *Solitary Men*, Texas Observer (Nov. 10, 2010), https://www.texasobserver.org/solitary-men/ (last visited Nov. 29, 2018). All visits are conducted through glass with both the visitor and the prisoner communicating through a telephone bolted to the wall. Inmates receive no educational programming, and outside ministerial and spiritual advisors are permitted to visit only at the warden's discretion. These conditions of confinement dangerously deteriorate inmates' mental health. *See* Kathleen M. Flynn, Note, *The "Agony of Suspense": How Protracted Death Row Confinement Gives Rise to an Eighth Amendment Claim of Cruel and Unusual Punishment*, 54 Wash.

& Lee L. Rev. 291, 294–98 & nn.25–38 (1997). Certainly, then, such cruel treatment also renders any further punishment, namely execution, unconstitutional.

The "added punishment" on inmates in solitary confinement is not a revelation of modern psychology. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring). The Court in 1890 recognized time spent in solitary confinement awaiting execution as "an additional punishment of the most important and painful character," *In re Medley*, 134 U.S. at 171 (Brewer and Bradley, JJ., dissenting), and "research still confirms what [the] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Ayala*, 135 S. Ct. at 2210 (Kennedy, J., concurring). Accordingly, the American Bar Association and the United Nations Special Rapporteur on Torture have recommended limitations on the use of solitary confinement. *See Glossip v. Gross*, 135 S. Ct. 2726, 2765 (2015) (Breyer, J., dissenting). Indeed, foreign courts have found that extended delay in the imposition of a death sentence "renders ultimate execution inhuman, degrading, or unusually cruel." *Knight*, 528 U.S. at 990 (Breyer, J., dissenting from denial of certiorari). Execution after 14 years in solitary confinement is cruel and unusual.

Given the length of time Ramirez has spent on death row, the conditions of confinement, including the unique stress of living under threat of execution, historical understandings of "cruel and unusual" punishment, and the evolving

standards of decency, executing Ramirez at this time would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

### E. Ramirez's mental impairments render him insufficiently culpable, and thus ineligible, for the death penalty.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (Initial Writ Appl. at 112, July 2, 2009; Second Writ Appl. at 119, Nov. 6, 2013.)

The Supreme Court has held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with intellectual disabilities. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The Court determined that there was a national consensus prohibiting the execution of people with diminished capacity, given an inability to fully comprehend actions or their consequences. *Id.* at 320–21. Persons with intellectual impairments, by definition, have "diminished capacities to understand and process information, . . . to engage in logical reasoning, [and] to control [their] impulses." *Atkins*, 536 U.S. at 318.

Recognizing these cognitive deficits, the Court found that "the large number of States prohibiting the execution of mentally retarded persons . . . provides powerful evidence that . . . our society views mentally retarded offenders as categorically less culpable than the average criminal." *Id.* at 315–16. The Court

274

reaffirmed the importance of decision-making and impulse control on culpability when it extended immunity from execution to juveniles in *Roper v. Simmons*, 543 U.S. 551, 571 (2005).

The execution of a person with diminished capacity would also not serve any legitimate goal of criminal punishment. Unless the imposition of the death penalty "measurably contributes" to one or both of the penological goals of retribution or deterrence, "it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Enmund v. Florida*, 458 U.S. 782, 798 (1982) (internal quotation marks and citation omitted). When faced with a capital punishment, "the lesser culpability" of impaired offenders "surely does not merit that form of retribution." *Atkins*, 536 U.S. at 319. And the deterrent value of punishment is necessarily reduced when an individual's cognitive and behavioral impairments "make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Id.* at 320.

Finally, the reduced capacity of impaired offenders increases the risk that "the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . ." *Id.* at 320 (internal quotation marks and citation omitted). Intellectually disabled individuals are less able to "make a persuasive showing of mitigation . . .

275

are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse . . . ." *Id.* at 320–21. Intellectual disability is often inaccurately viewed by juries as an aggravating factor, rather than as mitigating. Such defendants are also less able to give meaningful assistance to their counsel. Each of these factors demonstrated that persons with intellectual disability "face a special risk of wrongful execution." *Id.* at 321.

While *Atkins* spoke of defendants with intellectual disability, Ramirez's diminished capacity and mental impairments similarly render him insufficiently culpable and ineligible for the death penalty. The same concerns that underlie execution of intellectually disabled offenders exist in Ramirez's case as well. Ramirez suffered from severe mental impairments from a very early age. For instance, there is clear evidence of learning disabilities and associated deficits in brain functioning since early primary school age and continuing thereafter. (Ex. 83 at 4.) Ramirez's school records repeatedly substantiate his ongoing struggles with low cognitive functioning and neurological impairments. (Ex. 83 at 13-21.) Ramirez's learning disability "is a neurological disorder that impairs the brain's ability to receive, process, store, and respond to information." (Ex. 83 at 10.) Thus Ramirez has cognitive, neurological, and intellectual disabilities that result in lack of impulse control, the inability to anticipate the future consequences of actions, poor

perceptions of social cues, and suggestibility. (Ex. 83 at 10.) Moreover, Ramirez has a developmental or acquired brain injury to the frontal lobes, impairing his executive functioning ability. (Ex. 84 at 4.) As a result, Ramirez suffers from cognitive defects. (Ex. 84 at 4.) These mental impairments mirror those highlighted by the Supreme Court to support the ban on the execution of the intellectually disabled. *Atkins*, 536 U.S. at 315–21.

The imposition of the death penalty would be grossly disproportionate to Ramirez's moral culpability, would not "measurably advance the deterrent or the retributive purpose of the death penalty," and carries an enhanced risk of error. *Id.* at 320–21. For these reasons, this Court should vacate Ramirez's death sentence.

## F. The reliability of testimony regarding Ramirez's future dangerousness is so low as to violate due process.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (DA Opening Br. at 13, Aug. 8, 2006.)

Highly unreliable evidence introduced at trial violates the Fifth Amendment's guarantee of due process. U.S. Const. amend. V; *United States v. George*, 160 F. App'x 450, 454 (6th Cir. 2005). The nation's largest professional psychiatric organization has made it clear that testimony regarding future dangerousness is highly unreliable and must not be used as a basis for punishment in criminal

277

proceedings. *See* Brief for American Psychiatric Association (APA) as Amici Curiae, *Barefoot v. Estelle*, 463 U.S. 880 (1983) (No. 82-6080). The APA stated:

> Although psychiatric assessments may permit short-term predictions of violent or assaultive behavior, medical knowledge has simply not advanced to the point where long-term predictions—the type of testimony at issue in this case—may be made with even reasonable accuracy. The large body of research in this area indicates that, even under the best of conditions, psychiatric predictions of long-term future dangerousness are wrong in at least two out of every three cases.
>
> [Moreover], the use of psychiatric testimony on this issue causes serious prejudice to the defendant. By dressing up the actuarial data with an "expert" opinion, the psychiatrist's testimony is likely to receive undue weight. In addition, it permits the jury to avoid the difficult actuarial questions by seeking refuge in a medical diagnosis that provides a false aura of certainty. For these reasons, psychiatric testimony on future dangerousness impermissibly distorts the fact-finding process in capital cases.

*Id.* at 3.

Given how unreliable and prejudicial the testimony regarding Ramirez's future dangerousness was, Ramirez's death sentence is in violation of his Fifth Amendment right to due process and should be overturned.

**G.   Ramirez's constitutional rights were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this claim below. (Second Writ Appl. at 149, Nov. 6, 2013.)

The "10–12" jury instruction in the Texas capital sentencing scheme violates Ramirez's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, as it unconstitutionally encourages arbitrary and capricious death sentences.

When the U.S. Supreme Court reinstated the death penalty in *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), it did so only after it was satisfied that Georgia's death penalty statute would "not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." Otherwise put, a death penalty statute would run afoul of the Constitution if it lacked a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* (quoting *Furman v. Georgia*, 408 U.S. 238, 313 (1972) (White, J., concurring) (per curiam)).

The *Gregg* Court noted that, for a death statute to be constitutional, the sentencing body's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189. To do so, the sentencing jury must be "apprised of the information relevant to the imposition

of sentence and provided with standards to guide its use of the information." *Id.* at 195.

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased; (3) and whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. art. 37.071 § 2(b)(1)-(2), (e)(1).

The court shall sentence a defendant to death if the jury answers "yes" to the first two special issues and "no" to the third special issue. If the jury returns a "no" answer to either of the first two special issues, a "yes" to the third special issue, or if the jury is unable to answer all of the questions submitted to under these guidelines, the court shall sentence the defendant to life without parole. Tex. Code Crim. Proc. art. 37.071 § 2(g).

However, the jury is statutorily misinformed about the full impact of the way it answers these special issues. The jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. Tex. Code Crim.

Proc. art. 37.071 § 2(d)(2). Similarly, the jury is to be instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. Tex. Code Crim. Proc. art. 37.071 § 2(f)(2). The jury is informed by the judge that if the jury unanimously finds a mitigating circumstance under the third special issue, the defendant will be sentenced to life without parole. Tex. Code Crim. Proc. art. 37.071 (e)(2).[52]

Critically, the statute expressly bars the jury from being instructed that if the jury is unable to reach a unanimous or at-least-ten verdict on either of the special issues, the trial court is required to sentence the defendant to life in prison. Tex. Code Crim. Proc. art. 37.071 § 2(a) (barring instruction on the effect of a failure to agree); *Id.* § 2(g) (life sentence required if jury is unable to agree).

The statute and the confusing instructions create a scenario in which the opposite of "unanimous" is "ten people agree." Clearly, deliberations in a jury room on a death sentence could reach multiple outcomes that fall into neither category: a vote of 9–3, 8–4, 7–5, and so on. However, juries are given no instruction on how to proceed if that likely scenario plays out. Instead, jurors are instructed that, in order

---

[52] Though the current statute has the language "life imprisonment *without parole*," the jury in Petitioner's case was instructed only on "life imprisonment" because his offense occurred on January 5, 2003, before Texas law and the jury instruction on this point was changed.

to make the predicate findings that would result in a sentence of life imprisonment, "10 or more jurors [must] agree."

The instruction thus violates *Mills v. Maryland*, 486 U.S. 367 (1988). As in *Mills*, a reasonable juror could understand the jury charge to mean that her single vote for life imprisonment would have no effect. *Mills*, 486 U.S. at 375–76; *Francis v. Franklin*, 471 U.S. 307, 315–16 (1985). Indeed, Ramirez's jury was instructed that it "may not answer" special issue number three "yes" (mitigation warrants a life sentence) "unless 10 or more jurors agree." (39 RR 114–15.) On its face, this is precisely the kind of ambiguity that the Constitution does not tolerate in a capital sentencing scheme. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."); *Andres v. United States*, 333 U.S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning . . . is probable. In death cases doubts such as those presented here should be resolved in favor of the accused.").

The statute and instructions also create an unconstitutional risk of jury coercion, wherein the jurors perceive that they must reach a certain result. *See Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam). The instruction is

also contrary to *Wiggins*, which held that a death sentence cannot stand if a single juror strikes a different balance in weighing the mitigating circumstances. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

This portion of the jury instruction, which suggests that it requires the agreement of ten out of twelve jurors to find "no" on the first special issue and to find "yes" on special issue two, unconstitutionally diminished each juror's individual sense of responsibility in the sentencing process in violation of the Eighth Amendment. The plain language of the statute creates the impression that one juror's dissent from the remaining members of the jury, without the agreement of at least one other juror, would be insufficient to make a difference in the determination of either of these special issues or the ultimate sentence the jury imposes. For this reason, this instruction is also a violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Moreover, by actively misleading potential holdout jurors to believe their individual votes will not change the outcome, the instruction injects arbitrariness and unfairness into the penalty phase, in violation of Ramirez's due process rights.

**H.    Texas's capital sentencing scheme violated Ramirez's rights by failing to require the jury find each element necessary to impose the death penalty beyond a reasonable doubt.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition. Ramirez raised this issue below. (Initial Writ Appl. at 124, July 2, 2009.)

Texas's capital sentencing scheme is facially unconstitutional because it violates the Sixth and Fourteenth Amendments' requirements that each fact necessary to impose death be found by a jury beyond a reasonable doubt. As discussed in Claim Eighteen (G) *supra*, special issues are found by the jury under Texas law. But, although special issue one must be found beyond a reasonable doubt, *see* Tex. Code Crim. Proc. art. 37.071 § 2(c), special issue three—whether mitigation evidence warrants a life sentence—need not be found beyond a reasonable doubt, *see id.* § 2(e)(1).

The jury's finding on special issue three is a finding of fact that exposes a defendant to a greater punishment—a sentence of death—and must therefore be found beyond a reasonable doubt. Indeed, without the jury's finding on special issue three, a sentence of death cannot be imposed under Texas law. *See* Tex. Code Crim. Proc. art. 37.071 § 2(g) ("If the jury. . . is unable to answer any issue submitted under Subsection (b) or (e), the court shall sentence the defendant to confinement in the Texas Department of Criminal Justice for life imprisonment without parole."). Texas's capital sentencing scheme therefore violates the Constitution.

284

The Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . " U.S. Const. amend. VI. This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99, 104 (2013). In *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000), the Supreme Court held that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be submitted to a jury.

Shortly after *Apprendi*, the Supreme Court invalidated Arizona's capital sentencing scheme in *Ring v. Arizona*, 536 U.S. 584 (2002). In Arizona, judges were charged with finding aggravating circumstances that would increase the maximum punishment for murder from life in prison to a sentence of death. *Ring*, 536 U.S. at 592. The Court held that, "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id.* at 602; *see also id.* at 610 (Scalia, J., concurring) ("I believe that the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by

the jury beyond a reasonable doubt."); *Blakely v. Washington*, 542 U.S. 296, 301–02 (2004) (quoting *Apprendi* for proposition that any fact that increases penalty "must be submitted to a jury, and proved beyond a reasonable doubt").

These principles have recently been powerfully applied to invalidate state capital sentencing schemes by the U.S. Supreme Court in *Hurst v. Florida*, 136 S. Ct. 616 (2016). The reasoning in *Ring*, *Apprendi*, and *Hurst* about the Sixth Amendment's jury trial right also renders the Texas capital sentencing scheme unconstitutional.

In *Hurst*, the U.S. Supreme Court invalidated Florida's death penalty scheme because it violated the Sixth Amendment by allowing for a non-unanimous, standardless jury verdict that served as a recommendation to the sentencing judge. The Court adopted the logic employed in *Apprendi* that, to comply with the Sixth Amendment, the focus should be on the finding of facts that expose a defendant to a greater punishment. *Id.* at 621 (citing *Apprendi*, 530 U.S. at 494). In summary, the Sixth Amendment requires that: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602; *see also Blakely*, 542 U.S. at 301–02; *Hurst*, 136 S. Ct. at 621; *Hurst v. State*, 202 So. 3d 40, 53 (Fla. 2016); *Rauf v. State*, 145 A.3d 430, 434 (Del. 2016)

("must the jury [find whether the aggravating circumstances outweigh the mitigating circumstances] unanimously and beyond a reasonable doubt to comport with federal constitutional standards? **Yes**.") (emphasis in the original).

Applying those principles to Texas's death penalty scheme, the finding in special issue three is a finding of fact that is necessary for the imposition of a sentence of death. Tex. Code Crim. Proc. art. 37.071. If a jury makes no finding on it, the sentence is life. *Id.* Thus, the special-issue-three finding is a finding of fact that increases a defendant's possible penalty from a penalty of life to a penalty of death. Accordingly, the Sixth Amendment mandates that it must be made unanimously and beyond a reasonable doubt. Texas's statute falls short of that standard and therefore violates the Sixth Amendment. Ramirez's death sentence must be vacated.

### I.     Texas's capital sentencing scheme unconstitutionally limits what constitutes mitigation in violation of Ramirez's Eighth and Fourteenth Amendment rights.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The "Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances

of the offense that the defendant proffers as a basis for a sentence less than death."
*Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978) (footnote and emphasis omitted) ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."). *Id.* at 605. Texas's statute governing capital trials expressly limits the evidence that a jury may consider mitigating, in violation of this constitutional mandate. Therefore, Ramirez's death sentence violates his constitutional rights and should be vacated.

Texas's statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's *moral blameworthiness*." Tex. Code Crim. Proc. art. 37.071 §2 (e)(4) (emphasis added). No further definition of "moral blameworthiness" is provided. Nor are there further instructions regarding the relationship between this instruction and the dictates of the special issue itself.

As directed by the statute, the trial court in Ramirez's case gave the statutorily required instructions during the punishment phase of trial before the jury retired to deliberate. (39 RR at 116.)

288

Texas's statute unconstitutionally limits the categories of evidence a capital jury may find mitigating. The Supreme Court has long required that a jury "must be permitted to 'consider fully' [] mitigating evidence" and that such consideration is meaningless "unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 321, 323 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)). Each juror must have broad discretion to give impact to the mitigation evidence put forward by the defense and cannot be limited to certain categories of evidence the state approves as mitigating. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) ("[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.") (internal quotations marks and citation omitted); *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.") (emphasis removed).

Furthermore, the avenues of mitigation open to a capital jury are not, and must not be, limited to evidence that relates solely to the defendant's culpability for the crime, the nature of the crime, or even what the crime says about that individual

defendant. *Abdul-Kabir*, 550 U.S. at 246 ("[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.").

Because of the statutorily-mandated instruction, the jury was precluded from giving effect to any category of mitigation evidence that did not specifically relate to Ramirez's "moral blameworthiness." "[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264. In this case, application of the Texas death penalty statute impaired Ramirez's right to have *all* mitigating evidence considered by the jurors assessing whether he deserved a life or death sentence. *Penry*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence [the defendant] introduced."). Therefore, Ramirez's death sentence should be reversed.

**J.   The capital-sentencing scheme under which Ramirez was sentenced fails to ensure a proportionality review in violation of the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

The Texas capital-sentencing scheme fails to ensure a comparative proportionality review of Ramirez's death sentence, rendering the sentence unconstitutional. When the U.S. Supreme Court sanctioned the modern death-penalty scheme, it did so based on the belief that state supreme courts would conduct careful and effective proportionality reviews in individual cases to guard against the arbitrary and capricious infliction of the death penalty. *See Gregg v. Georgia*, 428 U.S. 153, 203–06 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review on appeal as an important protection against caprice in sentencing); *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (same); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2763 (2015) (Breyer, J., dissenting) (recognizing the importance of comparative proportionality review to avoid arbitrary imposition of the death penalty). *But see Pulley v. Harris*, 465 U.S. 37, 50–51 (1984). The Texas appellate courts, however, do not ensure this procedural safeguard. *See id.* at 44. The denial of proportionality review allows for the death penalty to be applied arbitrarily in Texas and violates the Fifth, Eighth, and Fourteenth Amendments to the U.S.

Constitution. Ramirez's sentence, affirmed without such a review, is constitutionally unsound, and Ramirez is entitled to relief.

### K.     Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it does not sufficiently channel the sentencer's discretion or sufficiently narrow the class of death-eligible defendants.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

In *Furman v. Georgia*, the U.S. Supreme Court declared that a death-sentencing procedure is unconstitutional when it provides "no meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." 408 U.S. 238, 313 (1972) (White, J., concurring) (per curiam); *see also, e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988); *Godfrey v. Georgia*, 446 U.S. 420, 427–28 (1980) (plurality opinion). "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.).

The narrowing process must moreover be established by statute. *See id.* at 207 (stating that the selection of the persons eligible to be prosecuted and ultimately sentenced to death "[must] always [be] circumscribed by . . . legislative guidelines"). "Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey*, 446 U.S. at 428 (alteration in original) (quoting *Gregg*, 428 U.S. at 196). Ultimately, "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).

Texas's death penalty statute violates these mandates of the U.S. Supreme Court. Per Texas Penal Code § 19.02, the mens rea required for murder is either intentionally or knowingly causing the death of an individual. Capital murder is murder committed pursuant to one of the enumerated offenses under statute. *See* Tex. Penal Code § 19.03. Under the capital murder statute, a broad range of conduct constitutes first-degree murder, including intentional killings, premeditated killings, killings committed in the course of a myriad of other crimes, and the killings of law enforcement officers in the line of duty. *See id*. Thus the initial "pool" of individuals

293

eligible for the death penalty is so broadly defined that it encompasses the vast majority of murders actually committed. This is seen by a reading of the statute, which only distinguishes between murder and manslaughter; there is no statutory recognition of non-capital murder (e.g. second-degree murder). Tex. Penal Code § 19.01. Upon information and belief, a thorough review of the actual cases would demonstrate that almost all murders in Texas could in fact be categorized as first-degree murder. That there is no further statutory narrowing renders the Texas death-penalty scheme unconstitutional.

Given the failure of the Texas statute to narrow the class of death-eligible defendants, the function, then, is ostensibly performed by the jury. However, there is no statute to channel the sentencer's discretion in determining whether a crime deserves capital punishment. Once the State has proven capital murder, the jury may then only consider mitigation that has in fact been *limited* by statute to spare a defendant a capital sentence. Tex. Code Crim. Proc. art. 37.071 §2 (f)(4); *see* Claim Eighteen (I) *supra*.

Nothing in Texas's capital sentencing scheme "genuinely narrow[s] the class of persons eligible for the death penalty" or assists the jury in making a reasonable determination to "justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Stephens*, 462 U.S. at 877. Because

Ramirez was sentenced under Texas statutes which fail to meet constitutional requirements, Ramirez's sentence is constitutionally infirm and he is entitled to relief.

**L.  Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it affords the prosecutor unbridled discretion to seek the death penalty.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

In Texas, each prosecutor has the sole authority and complete discretion to determine whether to seek the death penalty as a sentencing option, following his or her unreviewable determination that a defendant has committed capital murder.[53] *See Jurek v. Texas*, 428 U.S. 262, 274 (1976). This discretion is limited only by the whims of each individual prosecutor as to which cases are appropriate for the death penalty. Texas's scheme thus allows arbitrary and capricious charging decisions and creates a substantial risk of variation between similar cases. Such "arbitrary and wanton" discretion in seeking a death sentence, *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), leads to the "wanton[] and freakish[]" imposition of the death sentence. *Furman v. Georgia*,

---

[53] Capital murder is murder committed pursuant to one of the enumerated offenses under statute. *See* Tex. Penal Code Ann. § 19.03 (West 2003).

408 U.S. 238, 310 (1972) (Stewart, J., concurring) (per curiam). *But see Jurek*, 428 U.S. at 274.

Indeed, unbridled prosecutorial discretion has led to the arbitrary imposition of death sentences across Texas—where a defendant is brought to trial, and thus which State office will handle a case, has greater bearing on whether a capital sentence is sought than any individualized determination about the case itself, the defendant, or the crime.[54]

The fact that Texas prosecutors have unbridled discretion to seek the death penalty violates the Eighth and Fourteenth Amendments. Ramirez's death sentence must therefore be vacated.

### M.    It is a violation of the Eighth Amendment to convict someone in Texas of capital murder under the State's law of parties.

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

---

[54] Of the total offenders who either have been executed or are currently housed on death row in Texas since 1976, only 119 out of the 254 counties in Texas have contributed an offender to that list. Tex. Dep't Crim. Just., *Death Row Information*, http://www.tdcj.state.tx.us/death_row/index.html (last visited Nov. 28, 2018); Tex. Dep't Crim. Just., *Number of Offenders Sentenced to Death From Each County*, http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited Nov. 28, 2018). Seven counties (Bexar, Dallas, Harris, Jefferson, Nueces, Smith, and Tarrant) account for nearly eighty percent of these offenders. *Id.*

Per U.S. Supreme Court precedent, capital punishment is only proportionate when used for "'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (quoting *Roper v. Simmons*, 543 U.S. 551, 568 (2005)); *see also Simmons*, 543 U.S. at 568 (recognizing that the death penalty should be reserved for "the worst of the worst"). Under the Eighth Amendment, a death sentence is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes. *Gregg v. Georgia*, 428 U.S. 153, 173, 183, 187 (1976).

Under Tex. Penal Code § 7.02(b), (often referred to as "the law of parties") a defendant can be convicted of capital murder under Tex. Penal Code § 19.03:

> [i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Tex. Penal Code § 7.02(b) is unconstitutional because it is grossly disproportionate—it qualifies for capital murder those who have neither committed murder nor intended to do so. It does not narrow capital punishment for only "the most serious of crimes" or "the most deserving of execution." Rather, it proscribes

297

execution for those who are in proximity to murder, a kind of capital guilt-by-association.

Additionally, given the lack of any definition or narrowing, the term "should have been anticipated," if a murder is committed, than a jury would naturally conclude, *ipso facto*, it should have been anticipated. And finally, using the law of the parties to convict a person of capital murder serves no retributive or deterrent purpose. A punishment can only deter an individual when it can influence that individual's own reasoned judgment and risk calculation. The law of parties condemns defendants for *another* individual's inability to make reasonable decisions. Nor can it serve a retributive purpose when the individual sentenced to death is significantly less culpable and blameworthy than the actual murderer.

Sentencing a person to death for capital murder based on the law of parties is wildly disproportionate to the crime, serves no penological purpose, and is therefore a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. As such, Ramirez's death sentence is unconstitutional and must be vacated.

## CLAIM NINETEEN

**Ramirez will be denied a fair, transparent clemency process in violation the Eighth and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Under Texas law, Ramirez has the right to seek executive clemency before execution. Clemency is part of the constitutional scheme that ensures the reliability of criminal convictions and the propriety of sentences. Clemency is not a mere formality on the way to an execution, but is "deeply rooted in our Anglo–American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." *Herrera v. Collins*, 506 U.S. 390, 411–12 (1993) (footnote omitted). As clemency isthe very last opportunity to be heard before a final punishment, the Supreme Court has stated that, "[f]ar from regarding clemency as a matter of mercy alone," it is the "'fail safe' in our criminal justice system." *Harbison v. Bell*, 556 U.S. 180, 192 (2009) (quoting *Herrera*, 506 U.S. at 415). Accordingly, Ramirez has a due-process liberty interest in the impartiality of the system by which clemency may be afforded to him. *See generally Mathews v. Eldridge*, 424 U.S. 319 (1976).

Upon information and belief, Texas's clemency procedures are not fair or transparent, and do not comport with the procedural due-process protections guaranteed to Ramirez by the Eighth and Fourteenth Amendments to the U.S. Constitution. As such, Ramirez is entitled to relief.

## CLAIM TWENTY

**Texas's lethal injection protocol is a violation of the Eighth Amendment's prohibition on cruel and unusual punishment.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Based on new reporting, lethal injection in Texas cannot be carried out in a manner consistent with principles of dignity, that does not impose a lingering death, and that avoids pain and suffering. *See* Chris McDaniel, *Inmates Said the Drug Burned as They Died. This is How Texas Gets Its Execution Drugs*, Buzzfeed News (Nov. 28, 2018 5:09 PM) https://www.buzzfeednews.com/article/chrismcdan iel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas (last visited Nov. 29, 2018). Texas currently receives its lethal-injection drugs from a compounding pharmacy called Greenpark. "In inspections by state regulators, Greenpark has been cited for 48 violations over the past eight years, according to documents obtained by BuzzFeed News. The violations included keeping out-of-date drugs in stock, using improper procedures to prepare IV solutions, and inadequate cleaning of hands and gloves." *Id.* Improper compounding of lethal injection drugs can cause the drugs to degrade, putting Ramirez at risk of a painful death that would amount to torture. Moreover, the improper procedures used by Greenpark make it more likely to leave particles in the drugs that would result in extraordinary pain if Ramirez is executed.

Because the Texas lethal injection protocol is cruel and unusual, Ramirez's sentence of death should be vacated.

## CLAIM TWENTY-ONE

**The cumulative prejudice of the constitutional errors in Ramirez's case demands his conviction and sentence be vacated under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition.

Ramirez submits that the errors set forth in this pleading each independently entitle him to relief. Should this Court disagree, however, it must proceed to analyze the cumulative prejudicial impact of the errors set forth herein. Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (prejudice assessed from effect of "counsel's unprofessional errors"); *Taylor v. Kentucky*, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial,

necessitating relief); *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc).

The combination of errors in this case, discussed in the preceding claims, deprived Ramirez of such rights as his right to a fair trial, trial by impartial jury, equal protection, due process, effective assistance of counsel, freedom from cruel and unusual punishment, presentation of a complete defense, a reliable determination at both the guilt and penalty phases, and fundamental fairness. Even if the errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Ramirez and undermined the fairness and reliability of his proceedings.

Even in cases where no single trial error examined on its own is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. *See, e.g.*, *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (affirming grant of habeas relief based on the cumulative prejudicial effect of multiple errors); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (same); *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) ("[T]he 'cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" (quoting *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc))). When evaluating cumulative error,

while only guilt-phase errors are relevant to Ramirez's convictions, "all errors are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003); *see also Satterwhite v. Texas*, 486 U.S. 249, 261 (1988) (Marshall, J., concurring).

In this case, as a result of the cumulative effect of the errors in the guilt and penalty phases, Ramirez's conviction and sentence were unlawfully and unconstitutionally imposed. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless, and they did in fact have a substantial and injurious effect on the guilt and penalty judgments. Considering all the errors above, this Court should conclude that Ramirez was denied fair and reliable proceedings and grant him habeas relief.

## CONCLUSION AND PRAYER FOR RELIEF

Based on the foregoing claims for relief, Ramirez prays that this Court:

1.    Grant him leave to amend this Petition;

2.    Grant him leave to file additional briefing, including a memorandum of law, if necessary;

3.    If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Ramirez may present evidence in support of his claims;

4.   Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional convictions and sentence of death;

5.   Grant such other relief as law and justice requires.

Respectfully submitted this 30 day of November, 2018.

Jon M. Sands
Federal Public Defender
Cary Sandman
Mridula S. Raman
Assistant Federal Public Defenders

By  s/Cary Sandman
Attorney-in-Charge
Arizona Bar No. 004779
*Pro Hac Vice*
Arizona Bar No. 004779
407 W. Congress, Suite 501
Tucson, Arizona 85701
Tel: 520.879.7622
Facsimile: 520.622.6844
cary_sandman@fd.org

## Certificate of Service

I hereby certify that on November 30, 2018, I electronically filed the foregoing with the Clerk's Office by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Jennifer Morris
Assistant Attorney General
Office of the Attorney General
Criminal Appeals Division
P.O. Box 12548
Austin, TX 78711-2548

s/Daniel Juarez
Assistant Paralegal
Capital Habeas Unit